# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PHILIP SANDERS, an Individual and Husband and Next of Kin of BRENDA JEAN SANDERS, Deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 17-CV-492-JHP-FHM |
| (1) CREEK COUNTY BOARD OF COUNTY COMMISSIONERS, (2) SHERIFF BRET BOWLING, in his official capacity as Creek County Sheriff, and (3) TURN KEY HEALTH CLINICS, a limited liability company, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the Court are (1) Defendants Creek County Board of County Commissioners and Sheriff Bowling's Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 25) and (2) Defendant Turn Key Health Clinic, LLC's Motion to Dismiss (Dkt. 26). After consideration of the briefs, and for the reasons stated below, Defendants Creek County Board of County Commissioners and Sheriff Bowling's Motion to Dismiss is **GRANTED** and Defendant Turn Key Health Clinic, LLC's Motion to Dismiss is **DENIED**.

# BACKGROUND

Plaintiff Philip Sanders ("Plaintiff"), as next of kin of Brenda Jean Sanders ("Sanders"), who is deceased, filed this action to recover against the defendants for alleged violations of the Eighth and/or Fourteenth Amendments to the United States Constitution. Plaintiff also brings state law tort claims for wrongful death, negligence, intentional infliction of emotional distress, and a claim for punitive damages against defendant Turn Key Health Clinics ("Turn Key"). The Second Amended Complaint names as defendants (1) the Creek County Board of County Commissioners ("Board"), (2) Creek County Sheriff Bret Bowling ("Sheriff Bowling"), in his official capacity, and (3) Turn Key. (Dkt. 23).

According to the Second Amended Complaint, on October 17, 2016, Sanders was booked into the Creek County Justice Center and placed in the custody of Sheriff Bowling for outstanding warrants. (Dkt. 23, ¶ 19). Plaintiff alleges Sanders' health dangerously deteriorated while under the care of Sheriff Bowling, his jail staff, and Turn Key medical personnel. (*Id.* ¶ 20). Specifically, Plaintiff alleges Turn Key medical personnel and jail staff noted Sanders had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks. (*Id.*). As Sanders' health "obviously and swiftly deteriorated," jail staff and Turn Key medical personnel never provided her with medical care or obtained her medical history. (*Id.*). On or about November 20, 2016, Sanders was

transported to Saint John Medical Center, "on the brink of death" and "fully incapacitated." (*Id.* ¶¶ 21-22). Sanders was then diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." (*Id.* ¶ 22). On November 21, 2016, Sanders died. (*Id.* ¶ 23). Plaintiff alleges the lack of medical care by Creek County Justice Center staff and medical personnel and their delay in transporting Sanders to a hospital caused and/or contributed to Sanders' death. (*Id.* ¶ 24).

Plaintiff asserts four causes of action against the defendants: (1) relief under 42 U.S.C. § 1983 for deliberate indifference to Sanders' serious medical needs, in violation of Plaintiff's rights under the Eighth and/or Fourteenth Amendments to the United States Constitution; (2) wrongful death pursuant to 12 Okl. St. § 1053 for the defendants' negligent and reckless failure to provide Sanders with medical treatment, resulting in her death; (3) negligence in failing to provide medical care and treatment to Sanders until she was dying; and (4) intentional infliction of emotional distress by taking outrageous, intentional, unreasonable, and malicious actions/omissions in denying medical care to Sanders despite her unrelenting physical illnesses and ailments. (*Id.* ¶¶ 25-52). Plaintiff seeks damages for Sanders' injuries and her family's suffering, as well as punitive damages against Turn Key. (See *id.* ¶¶ 25-55, *Prayer for Relief*).

The Board and Sheriff Bowling have now jointly filed a Motion to Dismiss Plaintiff's claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which any relief can be granted as a matter of law. (Dkt. 25). Plaintiff has filed a Response in opposition (Dkt. 29), and the Board and Sheriff Bowling have filed a Reply (Dkt. 30). Turn Key has also filed a Motion to Dismiss Plaintiff's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 26). Plaintiff has filed a Response in opposition (Dkt. 31), and Turn Key has filed a Reply (Dkt. 32). Both motions are fully briefed and ripe for review.

## DISCUSSION

In considering a Rule 12(b)(6) motion, the court must accept all well-pleaded allegations of the complaint as true, and must construe them in the light most favorable to the plaintiff. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008). To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Tenth Circuit has stated that "plausibility" in this context refers "to the scope of the allegations in the complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v.*

*Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 569).  The plaintiff bears the burden to frame "a complaint with enough factual matter (taken as true) to suggest" that he or she is entitled to relief.  *Twombly,* 550 U.S. at 556.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

> [T]he *Twombly/Iqbal* standard is a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do.  In other words, Rule 8(a)(2) still lives.  Under Rule 8, specific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests.

*Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235-36 (10th Cir. 2013) (quoting *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012)).

## I.    Motion of the Board and Sheriff Bowling

### A.    42 U.S.C. § 1983 Municipal Liability Claim

First, the Board and Sheriff Bowling contend Plaintiff fails to plead sufficient facts to show they may be held liable under § 1983 on a "municipal liability" theory.  In this regard, Plaintiff alleges the defendants were acting under

color of law when they acted with deliberate indifference to Sanders' pain, dire physical condition, and need for immediate medical treatment. (Dkt. 23, ¶¶ 25-33). The Board and Sheriff Bowling argue these allegations fail with respect to municipal liability, because Plaintiff fails to establish that either (1) a policy or custom existed at the Creek County jail that caused the alleged constitutional violation or (2) Sheriff Bowling personally participated in the alleged denial of medical care to Sanders.

Municipal liability may be established when the unconstitutional actions of a municipal employee were either (1) "representative of an official policy or custom of the municipal institution" or (2) "carried out by an official with final policy making authority with respect to the challenged action." *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480-83 (1986); *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1248-49 (10th Cir. 1999)). A municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see Bd. of Cnty. Comm'rs of Bryan Cnty., Okla., v. Brown*, 520 U.S. 397, 403 (1997).

A plaintiff must show "that there is a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Okla. City*, 627 F.3d 784, 788

(10th Cir. 2010) (quotation omitted). A policy must be a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by a municipality's officers." *Lankford v. City of Hobart,* 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Starrett v. Wadley,* 876 F.2d 808, 818 (10th Cir.1989)) (quotation and alteration marks omitted). A custom must be a practice that is "'persistent and widespread.'" *Id.* (quoting *Starrett*, 876 F.2d at 818). The plaintiff must demonstrate that the municipality was the "moving force" behind the alleged injury as a result of its deliberate conduct. *Brown*, 520 U.S. at 408. Accordingly, municipal liability under § 1983 requires Plaintiff to show the alleged violation of Sanders' constitutional rights was either caused by a policy, practice, or custom at the Creek County jail or that a final policymaker such as Sheriff Bowling carried out the alleged constitutional violation. *See Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Here, the Board and Sheriff Bowling contend the Second Amended Complaint fails to allege either that Sheriff Bowling personally participated in the alleged denial of medical care to Sanders or that the alleged denial of medical care was caused by a policy, practice, or custom of the Creek County jail. The Court agrees. Plaintiff's allegations with respect to municipal liability are purely conclusory and fail to establish that Sheriff Bowling was personally involved in Plaintiff's medical care or that the Creek County Jail had a policy, practice, or

custom of denying medical care to inmates. (*See* Dkt. 23, ¶¶ 27-33). As a result, Plaintiff has failed to state a § 1983 claim against the Board or Sheriff Bowling in his official capacity.

In his Response, Plaintiff contends the § 1983 claim is established, because the Second Amended Complaint alleges the components necessary to plead deliberate indifference on the parts of Sheriff Bowling and the Board. Plaintiff further points to his allegation that all defendants were aware of the deterioration of Sanders' health and mental condition (Dkt. 23, ¶¶ 19-24). However, Plaintiff completely ignores the Board and Sheriff Bowling's arguments regarding municipal liability and fails to point to any allegation regarding a municipal policy or personal involvement by Sheriff Bowling in the denial of medical care, as required under the prevailing law. Accordingly, the Court concludes Plaintiff's § 1983 municipal liability claim against the Board and Sheriff Bowling is subject to dismissal.

### B.    Negligence Claim Against the Board

Next, the Board asserts it is immune from suit for Plaintiff's state law claim for negligence pursuant to the Oklahoma Governmental Tort Claims Act ("OGTCA"), 51 Okl. St. §§ 151 *et seq.* The OGTCA is the exclusive remedy by which an injured plaintiff may recover against an Oklahoma governmental entity for its own torts and those of its employees. 51 Okl. St. § 153(B); *Fuller v. Odom*,

741 P.2d 449, 451-53 (Okla. 1987). The OGTCA generally immunizes "the state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts. 51 Okl. St. § 152.1(A). This immunity is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the OGTCA. 51 Okl. St. § 152.1(B). The Board is a political subdivision under the OGTCA. 51 Okl. St. § 152(11)(c); 19 Okl. St. § 4. Therefore, the Board may be subject to tort liability in situations where private persons or entities would also be liable under state law. *Salazar v. City of Oklahoma City*, 976 P.2d 1056, 1065-66 (Okla. 1999).

As the Board correctly points out, the OGTCA did not waive immunity for political subdivisions for losses resulting from the "provision, equipping, operation or maintenance of any prison, jail or correctional facility." 51 Okl. St. § 155(25). This exemption provided in § 155(25) "is all inclusive for tort claims." *Gibson v. Copeland*, 13 P.3d 989, 992 (Okla. Ct. App. 2000) (citing *Medina v. State*, 871 P.2d 1379 (Okla. 1993)). In *Medina*, the Oklahoma Supreme Court explained this exemption "withhold[s] the waiver of sovereign immunity for any loss or injury, whether to an inmate or other person, resulting from the operational level acts required to furnish the services of a penal institution," including the "medical and health services or any other service provided for inmates or other persons." *Medina*, 871 P.2d at 1384 n.13 (discussing the scope of § 155(23), the predecessor

statute to § 155(25)). *See Redding v. State*, 882 P.2d 61, 63 (Okla. 1994) (holding the "legislative intent of § 155(23) is to protect the state from liability for loss resulting from any and all actions of officers and employees of a penal institution.").

In this case, Plaintiff's negligence claim arises in the context of the alleged denial of medical care to Sanders while she was in the custody of the Creek County jail. (*See* Dkt. 23, ¶¶ 42-44). Therefore, § 155(25) clearly applies to this claim, and the Board is immune from suit with respect to Plaintiff's negligence claim. Moreover, as the Board points out, to the extent Plaintiff's state law tort claims against it are premised upon the alleged acts or omissions of Turn Key, the Board is immune from suit pursuant to 51 Okl. St. § 155(18), which provides complete tort immunity for losses resulting from "[a]n act or omission of an independent contractor or consultant or his or her employees, agents, subcontractors or suppliers or of a person other than an employee of the state or political subdivision at the time the act or omission occurred."

In his Response, Plaintiff contends the OGTCA does not provide blanket immunity to political subdivisions for the acts of its employees committed within the scope of employment, relying on *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013). However, Plaintiff's citation to *Bosh* is inapt. *Bosh* did not hold that § 155(25) does not provide blanket immunity for state law torts.

Rather, in *Bosh* the Oklahoma Supreme Court recognized a private right of action for excessive force against pre-trial detainees in violation of Article II § 30 of the Oklahoma Constitution, notwithstanding the tort immunity provided in the OGTCA. *Id.* at 1001. Therefore, *Bosh* provided an alternative constitutional remedy in a situation where OGTCA tort immunity applied pursuant to § 155(25). Here, Plaintiff does not raise a claim pursuant to the Oklahoma Constitution but rather a claim for ordinary state law negligence. The Board is immune from suit for such a claim, rendering this claim against the Board subject to dismissal.

### C.    Intentional Infliction of Emotional Distress Claim Against the Board

Next, the Board contends it is immune from suit for Plaintiff's claim of intentional infliction of emotional distress, because such a claim necessarily excludes good faith conduct on the part of Board employees. As the Board correctly points out, relief under the OGTCA against a political subdivision is not available "for any act or omission of an employee acting outside the scope of the employee's employment. 51 Okl. St. § 153(A). "Scope of employment" is defined in the OGTCA as "performance by an employee acting *in good faith* and within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority . . . ." 51 Okl. St. § 152(12) (emphasis added). Under Oklahoma law, when "the tort cause of action sued upon requires proof of an element that necessarily excludes good faith conduct on the part of governmental

11

employees, there can be no liability against the governmental entity in a[n] [O]GTCA-based suit." *Fehring v. State Ins. Fund*, 19 P.3d 276, 283 (Okla. 2001), *overruled in part by Gowens v. Barstow*, 364 P.3d 644, 652 (Okla. 2015).

The tort of intentional infliction of emotional distress is one which necessarily excludes good faith conduct on the part of the political subdivision's employees:

> One commits the tort of outrage, or intentional infliction of emotional distress, by extreme and outrageous conduct which, through the actor's intent or recklessness, causes severe emotional distress to another. *Breeden v. League Services Corp.,* 575 P.2d 1374, 1376-77 (Okla. 1978); *see Munley v. ISC Financial House, Inc.,* 584 P.2d 1336, 1338 (Okla. 1978). Extreme and outrageous conduct is conduct which is "so outrageous in character, and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as utterly atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, Comment *d* (1965), quoted in *Breeden,* 575 P.2d at 1376.

*McMullen v. City of Del City*, 1996 OK CIV APP 46, 920 P.2d 528, 531 (Okla. Civ. App. 1996). The *McMullen* court noted there is no way to prove such a claim for intentional infliction of emotional distress if the defendant has acted in good faith. *Id. See Shaw v. City of Oklahoma City*, 380 P.3d 894, 897 (Okla. Civ. App. 2016) (concluding tort of intentional infliction of emotional distress required proof of bad faith and therefore could not be committed by city officers within scope of employment). As a result, the Board is immune from this claim.

In his Response, Plaintiff relies on the exception to the general rule regarding intentional torts—that intentional torts such as assault may be committed within the scope of employment, if the employee is "engaging in work assigned, or if doing what was proper, necessary and usual to accomplish the work assigned, or doing that which was customary within the particular trade or business." *Bosh*, 305 P.3d at 1000 (citations omitted). However, Plaintiff fails to address *McMullen* or any other prevailing authority addressing the specific tort he alleges— intentional infliction of emotional distress—which necessarily requires a finding of bad faith. The Court finds the Board's argument persuasive and concludes Plaintiff's claim for intentional infliction of emotional distress is subject to dismissal.

### D.     State Law Claims Against Sheriff Bowling

Next, the Board and Sheriff Bowling argue that Sheriff Bowling in his official capacity is not a suable entity under the OGTCA. *See* 51 Okl. St. § 152(11) (definition of "political subdivision" does not include a sheriff in his official capacity). The Court agrees with the defendants that OGTCA claims may be brought only against the state or a political subdivision, which does not include a sheriff in his official capacity. *See* 51 Okl. St. § 153. Accordingly, Plaintiff's OGTCA claims may be properly presented only against the county, which is a political subdivision. 51 Okl. St. § 152(11). State law requires OGTCA claims

such as this to name the county's Board of County Commissioners as the defendant. 19 Okl. St. § 4. *See Speight v. Presley*, 203 P.3d 173, 179 (Okla. 2008) ("Suit against a government officer in his or her official capacity is actually a suit against the entity that the officer represents," which "is improper under the [O]GTCA." (citing *Pellegrino v. State ex rel. Cameron University*, 63 P.3d 535, 537 (Okla. 2003)). Plaintiff appears to agree with this analysis but nonetheless asks for Sheriff Bowling to remain in the suit, because there are "viable claims" against him. (Dkt. 29, at 5-6). Plaintiff does not expand on this argument, and the Court does not find it persuasive. Therefore, dismissal of the OGTCA claims against Sheriff Bowling in his official capacity is appropriate.

### E. Wrongful Death

Finally, the Board and Sheriff Bowling contend that Plaintiff's claim for wrongful death against them must be dismissed. Oklahoma's wrongful death statute, 12 Okl. St. § 1053, entitles the personal representative of the deceased to maintain an action when the death is caused by the wrongful act or omission of another. "Before there is liability under the wrongful death statute, the deceased must have had a right of recovery for the injury at the time of his death." *White v. Equity Fire & Cas. Co.*, 823 P.2d 953, 954 (Okla. Civ. App. 1991) (citing *Haws v. Luethje*, 503 P.2d 871, 874-75 (Okla. 1972)). As a result, Plaintiff's claim for wrongful death depends entirely upon whether Plaintiff has a viable underlying

claim against the defendants pursuant to state law. As explained above in Parts I.A., I.B., I.C., and I.D., Sheriff Bowling and the Board are not subject to suit under Plaintiff's other claims. Accordingly, Plaintiff may not maintain a wrongful death claim against those defendants.

Plaintiff argues in his Response that the wrongful death claim is independent of the decedent's own claim, and that a decedent's heirs may recover under this statute for claims such as loss of companionship and grief. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1506 (10th Cir. 1990). However, "Oklahoma views wrongful death actions as derivative claims that depend upon the existence of a right of action in the decedent before death." *Id.* at 1505 n.22 (citing *Rios v. Nicor Drilling Co.*, 665 P.2d 1183, 1186 (Okla. 1983); *Haws v. Luethje*, 503 P.2d 871, 874 (Okla. 1972)). The wrongful death statute "does not expand the scope of claims or the number of persons entitled to bring an action, but merely entitles someone to bring what the decedent could have brought himself." *Economy Fire & Cas. Co. v. Faulkner*, 790 F. Supp. 1082, 1085 (W.D. Okla. 1991), *aff'd*, 951 F.2d 1258 (Table), 1991 WL 283912 (10th Cir. Dec. 30, 1991). Because all claims which Sanders may have had against the Board or Sheriff Bowling are precluded, Plaintiff's right of action for grief or loss of companionship is likewise barred.

## II.    Motion of Turn Key

The Court next addresses the arguments raised by defendant Turn Key in favor of dismissal of all claims against it.

### A.    42 U.S.C. § 1983 Claim

#### 1.    Constitutional Violation – Deliberate Indifference

First, Turn Key contends Plaintiff fails to plead sufficient facts to show that Turn Key was deliberately indifferent to Sanders' serious medical needs in denying her adequate medical care while she was incarcerated.  Section 1983 provides a claim for relief against state actors for violation of a plaintiff's federal rights. *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007).  Under the Eighth and Fourteenth Amendments, prisoners have a constitutional right to medical care, which is violated when doctors or prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).[1]

The Tenth Circuit recognizes two types of conduct amounting to deliberate indifference in the context of prisoner medical care.  "First, a medical professional may fail to treat a serious medical condition properly."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  When this type of conduct is alleged, "the

---

[1] It is unclear from the Second Amended Complaint whether Sanders was a pre-trial detainee at the time she was incarcerated at the Creek County jail, which would mean that the § 1983 claim arises under the Fourteenth Amendment's Due Process Clause.  However, it is unnecessary to determine Sanders' status at this stage, as the Court applies the same analysis for both an Eighth Amendment and a Fourteenth Amendment claim for denial of medical care. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

medical professional has available the defense that he was merely negligent in diagnosing or treating the medical condition, rather than deliberately indifferent." *Id.* (citing *Estelle*, 429 U.S. at 105-06). Second, prison officials may "prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Id.* (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). A prison medical professional who serves solely "as a gatekeeper for other medical personnel capable of treating the condition" may be liable under this standard if he or she "delays or refuses to fulfill that gatekeeper role due to deliberate indifference." *Id.*

Deliberate indifference "involves both an objective and a subjective component." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (citing *Sealock*, 218 F.3d at 1209). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir.1999)). The question raised by the objective prong "is whether the alleged harm . . . is sufficiently

serious . . . , rather than whether the symptoms displayed to the prison employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005).

To satisfy the subjective component, there must be evidence that "the official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Mata*, 427 F.3d at 751 (quoting *Farmer,* 511 U.S. at 837). The subjective component may be satisfied if the jury can "infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008) (citing *Farmer*, 511 U.S. at 842).

Moreover, the subjective component may be satisfied if the defendant's "delay in providing medical treatment caused either unnecessary pain or a worsening of her condition. Even a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. However, the "'negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.'" *Self*, 439 F.3d at 1233 (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

Here, the Court concludes that Plaintiff has plausibly alleged a claim under § 1983 based on deliberate indifference to Sanders' serious medical needs. Plaintiff

alleges Sanders was incarcerated at the Creek County jail for 35 days, during which her health "dangerously deteriorated." (Dkt. 23, ¶¶ 20-21). Specifically, Plaintiff alleges Turn Key medical personnel noted Sanders "had been suffering from diarrhea and her mental health had been rapidly declining for at least two to three weeks." (*Id.* ¶ 20). Despite these conditions and her "obviously and swiftly" deteriorating health, Plaintiff alleges Turn Key medical personnel never provided Sanders with medical care, nor did they obtain her medical history. (*Id.*). Plaintiff alleges Turn Key medical personnel finally had Sanders transported to the hospital "after she had become fully incapacitated and on the brink of death," and Sanders died the following days from a combinations of her illnesses—severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia. (*Id.* ¶¶ 21-23).

These allegations, taken as true for purposes of this motion, state a claim for a constitutional violation. Plaintiff has plausibly alleged Sanders suffered a serious medical need in the form of a rapidly declining mental state and diarrhea, which Turn Key medical personnel noted but failed to address. Plaintiff alleges Turn Key personnel did not even obtain Sanders' medical history and waited 35 days, until Sanders was on the brink of death, to have her transported to the hospital. Only one day after her admittance to the hospital and diagnosis with multiple serious medical conditions, Sanders died. Based on these allegations, a reasonable

inference can be made that Turn Key medical personnel had actual knowledge of Plaintiff's serious medical conditions. Turn Key's alleged delay or failure in alleviating Sanders' known deteriorating health conditions states a claim for deliberate indifference.

Turn Key attempts to liken Plaintiff's allegations to those alleged in *Woodside-Fisher v. Pulley*, 2015 WL 631106 (W.D. Okla. Feb. 12, 2015). In *Pulley*, the plaintiff alleged he asked a prison official if his meal had included pork, because he felt abdominal pain, numbness, and nausea after eating. The official advised him his tray included no pork and denied the request for medical treatment. For three days, the plaintiff repeatedly requested medical attention for his abdominal pain, swelling, and nausea but was denied. The plaintiff in *Pulley* also alleged the jail medical professional denied his request for medicine for his post-traumatic stress disorder for several months. The court ruled the plaintiff failed to allege conduct that stated a plausible claim for unconstitutional denial of medical care. *Id.* at *3. The *Pulley* court noted that the plaintiff had not identified any jail official to whom he had made his requests for medical attention, that the plaintiff failed to allege any particular officer had ignored his symptoms, and that the plaintiff did not allege facts demonstrating his symptoms caused outward signs that would objectively indicate to the officer the presence of a substantial risk of serious harm. *Id.*

The Court finds the analogy to *Pulley* to be inapt. In *Pulley*, the plaintiff believed he was suffering from pain because he had eaten pork, and the jail officer confirmed he had not eaten pork. Moreover, Plaintiff's symptoms resolved within a matter of days. *Id.* Here, by contrast, Plaintiff alleges Turn Key noted Sanders' declining mental state and diarrhea, yet Turn Key medical personnel failed to provide Sanders with medical care or even take her medical history for over a month. (Dkt. 23, ¶¶ 20). A full 35 days after her arrival at the Creek County jail, Sanders was transported to the hospital, where she was diagnosed with numerous serious conditions, including sepsis with shock, respiratory failure, and kidney injury. (*Id.* ¶¶ 21-22). Sanders died the following day from a combination of her illnesses, and Plaintiff alleges the lack of medical care by Turn Key personnel and their delay in transporting Sanders to the hospital caused or contributed to her death. (*Id.* ¶¶ 23-24).

Although Plaintiff does not name any individual jail or medical personnel who refused Sanders treatment, Plaintiff identifies Turn Key as the medical provider at the Creek County jail during the time of Sanders' incarceration. (*Id.* ¶ 6). Plaintiff indicates Turn Key medical personnel noted Sanders' declining mental state and diarrhea, and Plaintiff alleges Turn Key failed to provide any medical care to Sanders, take her medical history, or transport her to the hospital until she was incapacitated and near death. (*Id.* ¶¶ 20-21). It may be impossible

without discovery to know which of Turn Key's employees was charged with taking an inmate's medical history or responding to notations of inmate health conditions.

In addition, Turn Key's reliance on *Soboroff v. Federal Transfer Center*, 2013 WL 4788614, at *3-4 (W.D. Okla. Sept. 9, 2013), is also misplaced. In *Soboroff*, the Court concluded the plaintiff's Eighth Amendment claim for denial of medical care was too vague and conclusory to state a plausible claim for relief, where the plaintiff did not provide dates or other specific facts concerning the nature of his claim against an unnamed prison physician's assistant. The plaintiff in *Soboroff* failed to allege the physician's assistant was aware of a substantial risk of serious harm to the plaintiff when he refused to administer prescribed pain relief, lumbar support, and muscle relaxants to the plaintiff, despite plaintiff's periodontal condition, past head injury, and spinal disability. *Id.* at *4.

By contrast, Plaintiff here alleges that between October 17 and November 20, 2016, Turn Key medical personnel and jail staff were aware of Sanders' diarrhea and deteriorating mental state yet failed to provide any medical care or even take her medical history. (Dkt. 23, ¶¶ 19-20). Thirty-five days after her arrival at the Creek County jail, Sanders was allegedly hospitalized with multiple serious medical conditions. (*Id.* ¶¶ 21- 22). Plaintiff alleges Sanders died as a result of Turn Key's lack of medical care and delay in transporting her to the

hospital. Plaintiff's allegations here are more specific and detailed than those in *Soboroff*, and Plaintiff specifically alleges the defendants' knowledge of Sanders' serious health conditions and ongoing failure to provide any medical care for thirty-five days, which allegedly caused or contributed to her death.

Plaintiff has described the alleged conduct of Turn Key with sufficient specificity to give Turn Key notice of the claims against it. Plaintiff's allegations of misconduct rise above the level of medical malpractice or mere negligence. Therefore, Plaintiff's allegations meet the standard for raising an Eighth or Fourteenth Amendment claim.

### 2.    Acting Under Color of State Law

To state a claim under § 1983, a plaintiff must allege she was deprived of her federal rights "by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). When a corporate defendant acts "for the government in carrying out a government program in accordance with government regulations," it is "a person 'acting under color of state law.'" *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 n.13 (10th Cir. 2003). In the prison context, a private physician treating prisoners under contract with state prison authorities acts under color of state law for Eighth Amendment purposes. *West*, 487 U.S. at 57.

Turn Key asserts Plaintiff provides only conclusory allegations that Turn Key was acting under color of state law, which is fatal to his § 1983 claim. The

Court disagrees. Here, Plaintiff has plausibly averred conduct by Turn Key that is fairly attributable to the State for purposes of § 1983. *See Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1338 (N.D. Okla. 2014) (finding plaintiff plausibly alleged that private healthcare provider under contract with Tulsa County Jail to provide medical care to prisoners was acting under color of state law) (citing *West*, 487 U.S. at 54). Plaintiff alleges that Turn Key had a legal duty to provide medical care when required, and that Turn Key breached this duty to provide Sanders with reasonably adequate medical care, which resulted in a violation of her constitutional rights. (Dkt. 23, ¶¶ 27-28). Plaintiff further alleges Turn Key employees "were contracted by Creek County as agents working in the Creek County Jail to provide medical care to inmates," and that those agents were "acting under the color of state law when [Sanders'] constitutional rights were violated." (*Id.* ¶¶ 6, 33). These allegations suffice to plausibly allege that Turn Key was acting under color of state law in providing medical care to Creek County jail inmates, including Sanders. *See Revilla*, 8 F. Supp. 3d at 1338-39; *Freeman v. Glanz*, 2017 WL 2569602, at *5 (June 13, 2017).

### 3. Punitive Damages Under § 1983

Next, Turn Key contends it cannot be held liable for punitive damages under a § 1983 claim, because punitive damages are not available against a municipality

on a claim brought under § 1983. Plaintiff argues Turn Key may nonetheless be subject to punitive damages because it is a private, non-governmental entity.

In *City of Newport v. Fact Concerts, Inc.*, 433 U.S. 247, 271 (1981), the Supreme Court found the unique qualities of a municipality meant municipalities are immune from punitive damages under § 1983. *See Butcher v. City of McAlester*, 956 F.2d 973, 976 n.1 (10th Cir. 1992). However, Plaintiff alleges, and Turn Key does not contest, that Turn Key is a limited liability company, not a municipality. (Dkt. 23, ¶ 6). Turn Key cites no authority in support of its argument that as a private entity, it should not be subject to punitive damages. Indeed, courts have found private corporations could be subject to punitive damages under § 1983. *Revilla*, 8 F. Supp. 3d at 1343 (concluding it was "unable to apply the punitive damages immunity afforded municipalities under the *City of Newport* case to CHC, which is a private corporation.") (collecting cases). This Court recently rejected an identical argument involving a private corporation contracted to provide medical services at the Tulsa County Jail. *Freeman*, 2017 WL 2569602, at *7. Therefore, at this stage of the case, no basis exists to dismiss Plaintiff's claim for punitive damages pursuant to § 1983.

### B.    OGTCA Claims

#### 1.    Immunity Under the OGTCA

Next, Turn Key asserts Plaintiff's tort claims against it pursuant to the OGTCA must be dismissed as a matter of law.[2]  Turn Key contends that, under the OGTCA, it is considered an "employee" of the state and therefore immune from liability for tort claims.

As explained above in Part I.B, the OGTCA generally immunizes "the state, its political subdivisions, and all of their employees acting within the scope of their employment" from liability for torts.  51 Okl. St. § 152.1(A).  This immunity is subject to a limited waiver for the state and its political subdivisions, but "only to the extent and in the manner provided" in the OGTCA.  51 Okl. St. § 152.1(B).  As Turn Key correctly points out, the OGTCA did not waive immunity of state employees.  In fact, the OGTCA precludes tort actions against "an employee of the state or political subdivision acting within the scope of his employment."  51 Okl. St. § 163(C).  For purposes of the OGTCA, "employees" of the state include "licensed medical professionals under contract with city, county, or state entities

---

[2] Turn Key additionally asks the Court to review its grounds for dismissal of Plaintiff's Oklahoma-based claims as stated in Turn Key's original Motion to Dismiss (Dkt. 8), which this Court previously found moot in light of the filing of Plaintiff's Second Amended Complaint. (*See* Dkt. 28).  Setting aside the fact that combining Turn Key's briefing in both motions would far exceed the Court's page limit for briefs, *see* L.Cv.R. 7.2(c), the Court finds it would be inappropriate to consider arguments that pertain to a complaint that has since been amended and is no longer active.  Therefore, the Court declines Turn Key's request to review and consider arguments contained in its original Motion to Dismiss.

who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." 51 Okl. St. § 152(7)(b)(7). Turn Key asserts it falls within this category of "licensed medical professionals" and is therefore immune from tort liability.

Consistent with its previous decisions, the Court declines to find Turn Key immune on this basis, particularly at this early stage of the case. *See Freeman*, 2017 WL 2569602, at *6-7. Here, Plaintiff alleges Turn Key "is a limited liability company doing business in Creek County." (*Id.* ¶ 6). The phrase "licensed medical professionals" is not defined in the OGTCA, and it is not clear whether the phrase would cover a correctional medical provider such as Turn Key. It would be premature at this stage of litigation to decide this issue, because the Court lacks evidence to determine the specific contractual relationships among Turn Key, its employees, and the Creek County jail. Moreover, Turn Key submits no authority to indicate that the "employee" immunity applies to a correctional medical provider.

In its Reply, Turn Key argues OGTCA immunity should apply to it, because Sanders must have been treated at the jail by individual licensed medical providers who provided care pursuant to contract with the county. Turn Key fails, however, to address its own immunity as a corporate entity under the OGTCA or offer any support for its assertion that the OGTCA "is clearly meant to include a correctional

healthcare provider such as Turn Key . . . within its ambit of immunity." (Dkt. 32, at 5). In the absence of any legal authority to the contrary, the Court will not read the phrase "licensed medical professionals" to cover companies such as Turn Key at this early stage of the case. *See Revilla*, 8 F. Supp. 3d at 1344-45 (declining to apply § 152(7)(b)(7) immunity to corporation providing healthcare services to county jail inmates at motion to dismiss phase); *Freeman*, 2017 WL 2569602, at *7 (same). At minimum, there is an insufficient factual record at this stage to dismiss Turn Key as an "employee" as a matter of law under the OGTCA.

### 2. Negligence

Next, Turn Key argues Plaintiff's negligence claim against it fails as insufficiently pled. Under Oklahoma law, the elements of medical negligence are (1) the defendant owed a duty to protect the plaintiff from injury; (2) the defendant failed to properly exercise or perform that duty; and (3) the defendant's breach of that duty proximately caused the plaintiff's injuries. *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982) (citations omitted).

Turn Key contends Plaintiff fails to plead that any alleged breach in the standard of care by a Turn Key provider proximately caused Sanders' injuries. The Court disagrees. Plaintiff pleads that Turn Key medical personnel noted Sanders' rapidly declining mental state and diarrhea yet failed to provide her with any medical care or obtain her medical history. (Dkt. 23, ¶ 20). Only when

Sanders had become fully incapacitated and on the brink of death did Turn Key medical personnel allegedly send her to the hospital. (*Id.* ¶ 21). Sanders was diagnosed with multiple serious conditions in the hospital and died the next day. (*Id.* ¶¶ 22-23). Plaintiff alleges the lack of medical care by Turn Key medical personnel and their delay in transporting Sanders to the hospital "caused and/or contributed to her death." (*Id.* ¶ 24). Taken as true, these allegations suffice to allege a negligence claim, including the element of proximate cause.

### 3. Intentional Infliction of Emotional Distress

Finally, Turn Key argues Plaintiff's claim for intentional infliction of emotional distress against it fails due to insufficient pleading. Under Oklahoma law, this claim requires proof that: "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Computer Publ'ns Inc. v. Welton,* 49 P.3d 732, 735 (Okla. 2002).

Turn Key contends this claim fails, because Plaintiff, Sanders' husband, makes no claim he was physically present, directly involved, or personally witnessed any of the events that are subject to this lawsuit. Turn Key points to the requirement under Oklahoma law that a family member asserting an intentional infliction of emotional distress claim must be a "direct victim," meaning that the

plaintiff "must be a victim, not a bystander, directly involved in the incident, damaged from directly viewing the incident, and a close family relationship must exist between the plaintiff and the party whose injury gave rise to plaintiff's mental anguish." *Shull v. Reid*, 258 P.3d 521, 525 n.5 (Okla. 2011) (citing *Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc.*, 916 P.2d 241, 250 (Okla. 1996)). Plaintiff does not respond directly to this argument but argues generally in his Response that he has pled a plausible claim for intentional infliction of emotional distress.

The Court fails to appreciate the relevance of Turn Key's argument, as Plaintiff here alleges Sanders, not Plaintiff, suffered emotional distress. (*See* Dkt. 23, ¶¶ 47-52). In the Second Amended Complaint, Plaintiff's only reference to his own personal harm under this cause of action is a general allegation that "[a]s a direct and proximate result of the Defendants' conduct, Decedent and the Plaintiff suffered serious personal harm." (*Id.* ¶ 52). Because this cause of action is based upon Sanders' alleged suffering of severe emotional distress, the Court rejects Turn Key's request to dismiss this claim.

## CONCLUSION

For the reasons detailed above, Defendants Creek County Board of County Commissioners and Sheriff Bowling's Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 25) is **GRANTED**. Defendant Turn Key Health Clinic, LLC's Motion to Dismiss (Dkt. 26) is **DENIED**.

James H. Payne
United States District Judge
Northern District of Oklahoma