# *Kimberly M. Pearson, MHA, MBA, RN, CCHP*

1615 Ashland Bluff Way, Reno, NV 89523

---

## I.   INTRODUCTION

My name is Kimberly M. Pearson.  My business address is 1615 Ashland Bluff Way, Reno, NV 89523. I was retained by defense counsel, Paulina Thompson, on behalf of Turn Key Health Clinics to consult in the case of <u>Philp Sanders, an individual and husband and next of kin of Brenda Jean Sanders, deceased v. Turn Key Health Clinics, et. al.;</u> Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM.

I have been asked to review and analyze records and documents in this matter and provide my opinion regarding whether there is any deviation from the standard of care or evidence of deliberate indifference on the part of the defendant, Turn Key Health Clinics, as it relates to Ms. Brenda Jean Sanders during her incarceration at the Creek County Justice Center.

This report is submitted in compliance with FRCP 26(a)(2)(B).

My rate for consulting is $300 per hour for review; $350 per hour for deposition testimony plus actual expenses (with a minimum of 2 hours), and $3000 per day for trial testimony plus actual expenses.

## II.   BACKGROUND AND EDUCATION

I was born in Decatur, Illinois.  I have been a Registered Nurse since 1984 with a current active license in the state of California.   I have an inactive "in good standing" license in the state of Illinois, and I have also previously held a license in the state of New Mexico - in good standing, but not retained due to geographical relocation. I have been working in the healthcare industry as both a Registered Nurse and Manager/Administrator for over 36 years in various settings holding progressive management and nursing leadership roles and specifically correctional health roles for the past ten years.

EXHIBIT
**2**

I have a Diploma in Nursing from St. Francis School of Nursing in Peoria, Illinois (1984) and a Bachelor of Science in Health Arts from the University of St. Francis in Joliet, Illinois (1990). Additionally, I hold two Masters' degrees both from the University of St. Francis in Joliet, Illinois:  Master's in Healthcare Administration (2004) and Master's in Business Administration (2009).

a. Professional Experience

I have been most recently employed by the County of Orange (California) Health Care Agency as the Deputy Agency Director for Correctional Health Services.   This position was responsible for all healthcare delivery – both medical and mental health – to the incarcerated population in Orange County.  I have also previously held the positions of Chief of Operations and Director of Nursing for this correctional program. The jail system is one of the largest in the United States with an average daily census of 6,500 inmates and approximately 60,000 incarcerated annually. Every inmate is managed by the healthcare staff (medical and mental health) upon admission/booking and throughout the incarceration as needed and required.  I was employed with Orange County from January 2010 until my retirement in February 2018.  The County then asked me to return on a consultative basis to assist with various corrections-related administrative and clinical operational needs.  I provided this service to the County of Orange until May 2019 at which time I made a geographic move out of California.

Additionally, I am the President/CEO of KP Consulting LLC, a company that provides consultation, reviews, and inspections and monitoring for detention facilities (jails and prisons), as well as private correctional healthcare companies across the country.  In my role, I serve as both a program consultant regarding administrative and clinical operations and as an expert witness for correctional healthcare cases.

A complete listing of my credentials and experience are outlined on the attached Curriculum Vitae.

b. <u>Professional Memberships</u>

I am currently a member of and/or serve the following organizations:
- Academy of Correctional Health Professionals – Board of Directors 2018-2021
- National Commission on Correctional Healthcare (NCCHC) – Previous Jail Accreditation Surveyor and current Certified Correctional Health Professional
- Western American Correctional Health Services Association – CA/NV Chapter – member and past Board member (2013-2015)
- American Correctional Association (ACA)
- American Jail Association (AJA)

c. <u>Professional Certifications and Awards</u>

I have obtained and received the following certifications and awards:
- Certified Correctional Health Professional – current certification / since 2011
- National Award Recipient:  Excellence in Executive Leadership – 2016 Nurse.com; Nursing Excellence GEM Awards (Giving Excellence Meaning)
- Six Sigma Green Belt certification
- California State Association of Counties – Senior Executive Credential
- California State Association of Counties – Fellow Credential

## III.   PRESENTATIONS

I have made the following presentations in the last several years:

- *"The Art of Managing Regulatory Inspections,"* National Commission on Correctional Health Care, Fort Lauderdale, FL, October 2019
- *"EHR: More Than Just a Medical Record,"* National Commission on Correctional Health Care, Fort Lauderdale, FL, October 2019
- *"How Decentralized Health Care Data Expands Efficiencies Outward and Upward: Offender Management Systems and Electronic Health Records Systems,"* Corrections Technology Association Summit, Daytona Beach, FL, June 2018

- *"The Art of Managing Regulatory Inspections,"* National Commission on Correctional Healthcare, Annual Conference, Chicago, IL, November 2017
- *"Clinical Management for High-Risk Patients in this Litigious Environment,"* American Correctional Health Services Association, California-Nevada Chapter Conference, San Jose, CA, September 2017
- *"Sticking Together: A Cohesive Correctional Healthcare Delivery System,"* National Commission on Correctional Healthcare, Leadership Institute, Las Vegas, NV, July 2017
- *"Responding to Inmate Advocacy Groups and Preventing Jail Lawsuits,"* California State Association of Counties – Annual Conference, Administration of Justice Policy Committee, Palm Springs, CA, December 2016
- *"September 2016 News Round Up,"* Correctional Nursing Today, Correctional Nurse.net, September 2016
- *"August 2016 News Round Up,"* Correctional Nursing Today, Correctional Nurse.net, August 2016
- *"December 2015 News Round Up,"* (Podcast Episode 111), Correctional Nursing Today, Correctional Nurse.net, December 2015
- *"Harnessing Political Will in the Criminal Justice System as it relates to Mental Health,"* Words to Deeds conference, Sacramento, CA, November 2015
- *"Medical and Mental Health Care Challenges in County Jail Settings,"* National Association of Counties – Annual National conference, Charlotte, NC, July 2015
- *"Federal Healthcare Reform and California Counties,"* CSAC (California State Association of Counties) Institute of Excellence, San Diego, CA, Nov. 2014
- *"Healthcare in the Orange County Jails,"* Advocates for Cost Effective Justice in Orange County, Laguna Beach, CA, June 2014
- Advance for Nurses:  Key interviewee for "The Culmination of Nursing at Orange County Health Care Agency Correctional Health Services," April 2011
- *"Access to Care,"* American Cancer Society/Cancer Action Network, National Bus Tour, Gallup, NM, September 15, 2008
- *"Corporate Compliance,"* Gallup Med Flight, Gallup, NM, April 2007
- *"Legal Aspects of Documentation – What You Need to Know,"* Gallup Med Flight, Gallup, NM, November 2006
- Earlier presentations outlined on Curriculum Vitae

## IV.   PUBLICATIONS

RN Magazine (Freelance writer for *Consult Stat* column) regarding the following topics:
- "Old Veins Need a Gentle Touch," March 2007
- "Got a Tough Stick?" January 2007
- "DKA versus HHNS," September 2006

I have provided editorial review for national nursing journal articles, such as Nursing Management, RN Magazine, Nursing, and RN Journal. All editorial reviews are outlined on my curriculum vitae.

Additionally, I have provided editorial critique and comment prior to publication in the following corrections-related textbooks and journals:

- Manuscript review – Journal of Correctional Healthcare, "A Qualitative Study of Success in Post-Release Federal Offenders with Mental Health Issues," April 2019
- Manuscript Review — *Nursing 2016*: "Evidence-Based Practice – Medication Assisted Treatment (MAT) for Opioid Addiction in Corrections" — August 2016
- Enchanted Mountain Press Publications – *"Environment of Care."* Textbook chapter review: *"Correctional Healthcare Patient Safety Handbook: Reduce Clinical Error, Manage Risk, and Improve Quality."* December 2013
- Manuscript Review – *Nursing 2013*: "When Your Patients are also Inmates:  Providing Nursing in a Correctional Facility," April 2013

## V.   CASE TESTIMONY

I have testified as an expert at trial over the last four years for the following cases:

- *Estate of Mark Vasquez Pajas, SR. v. California Forensic Medical Group, et al;*
  US District Court, Northern District of California; Case No. 16-cv-00945-LHK;
  February 2019 (Defense)

I have testified in deposition over the last four years for the following cases:

- *Samuel Karim v. Wexford Health Sources, et al.*
    US District Court, Northern District of Illinois / Eastern Division; Case No. 14-C-01318; October 2016 (Defense)
- *Yolanda Frausto and Norman Cornejo v. Alameda County Sheriff's Office, et al.*
    US District Court, Northern District of California; Case No. 3:16-CV-00311-RS, 3:16-CV-00974-RS, 16-CV-03633-SBA; February 2017 (Defense)
- *James Merchant v. Woodbury County, et al.*
    US District Court, Northern District of Iowa, Western Division; Case No. C15-CV-4111; November 2017 (Plaintiff)
- *James Neuroth v. California Forensic Medical Group, et al.*
    US District Court, Northern District of California, Case No. 3:15-CV-03226-RS (NJV); February 2018 (Defense)
- *Estate of Mark Vasquez Pajas, SR. v. California Forensic Medical Group, et al;*
    US District Court, Northern District of California; Case No. 16-cv-00945-LHK; February 2018 (Defense)
- *Terry Eugene Parks v. Sebastian County, et al.;*
    US District court, Western District of Arkansas; Fort Smith Division; Case No. 17-2047; March 2018 (Plaintiff)
- *Brandon Villarreal, a minor, as the Successor in Interest of the Estate of Larra Ann Gillis v. County of Monterey, CFMG, et al.;*
    US District Court, Northern District of California; Case No. 16-CV-06672-LHK; June 2018 (Defense)
- *Dennis P. Murphy, Personal Representative of the Estate of Steven Sanchez, deceased v. Sandoval County, Southwest Correctional Medical Group, et al;*
    United States District Court for the District of New Mexico; Case No. 17-CV-1159-JHR/KBM; November 2018 (Defense)
- *Jonathan Scott v. Southern Health Partners, et al;*
    Court of the Common Pleas, Twelfth Judicial Circuit, Civil Action No. 2017-CP-33-907, Case No. 1:18-CV-00047-RMG-SVH; April 2019 (Plaintiff)

- *Estate of Michael Carter, Sr. v. Macon County Sheriff's Department, Decatur Memorial Hospital, et al;*
    United States District Court for the Central District of Illinois; Case No. 2:16-cv-02221, September 2019 (Plaintiff)
- *Marilyn Johnson, individually and as Administrator of the Estate of Norman Johnson, deceased, v. Cook County Kim Blackstone, RN, Markitha Bolden, LPN, et al.;*
    United States District Court, Northern District of Illinois, Eastern Division; Case No. 16 C 144; December 2019 (Defense)
- *Estate of Ruth Freiwald by Personal Representative Charles Freiwald v. Correct Care Solutions, LLC, Jessica Jones, RN, Emily Blozinski, LPN, et al;*
    United States District Court, Eastern District of Wisconsin; Case No: 18-cv-896; January 2020 (Defense)

## VI.    MATERIALS REVIEWED

In preparation for forming the opinions expressed below, and in addition to my education and experience in healthcare and the correctional healthcare field, I have reviewed the following records/materials/references relative to this case:

1. <u>Court Documents</u>
    a.  Second Amended Complaint
    b.  Stipulated Protective Order
    c.  Joint Status Report
    d.  Amended Scheduling Order
    e.  Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production
    f.  Plaintiff's Preliminary Witness and Exhibit List
    g.  Defendant Turn Key's Preliminary Witness and Exhibit List
    h.  Plaintiff's Expert Report – Susan Lawrence, MD

2. <u>Jail Records</u>
   a. Creek County Jail Inmate File Redacted
   b. Creek County "Production" documents
   c. Death Certificate – Brenda Sanders
   d. Creek County Contract for Medical Staffing and Administration for Creek County Criminal Justice Center
   e. Creek County Contract for Medical Staffing – First Amendment

3. <u>Medical Records</u>
   a. Turn Key Records for Brenda Sanders
   b. St. John's Medical Center Records
   c. Okemah Indian Health Center Records

4. <u>Policies and Turn Key Company Documents</u>
   a. Turn Key Policies (19 policy documents)
   b. Turn Key Nursing Assessment Protocol for Diarrhea
   c. Oklahoma Board of Nursing File – Lela Goatley
   d. Oklahoma Board of Nursing File – Cheryl Green
   e. Oklahoma Board of Nursing File – Kerri Ferris
   f. Oklahoma Board of Nursing File – Tamara Jackson

5. <u>Deposition Transcripts and Associated Exhibits as applicable</u>
   a. Philip Sanders taken on 10/23/19
   b. Alice Bruner taken on 10/25/19
   c. Heather Sanders taken on 10/25/19
   d. Philip Sanders, Jr. taken on 1/3/20
   e. Classica Goodwin taken on 6/17/20
   f. Bailey Smalley taken on 6/2/20
   g. Lindsey Foster taken on 6/16/20
   h. Lela Goatley taken on 5/13/20
   i. Cheryl Green taken on 3/11/20
   j. Nicholas Groom taken on 5/6/20
   k. Cody Smith taken on 6/19/20

6. <u>References</u>
    a. National Commission on Correctional Health Care Jail Health Standards – 2014
    b. American Correctional Association Performance-Based Standards for Adult Local Detention Facilities – Fourth Edition – 2004

## VII.  SUMMARY OF DOCUMENT REVIEW / TIMELINE OF PERTINENT EVENTS

Brenda Jean Sanders  (DOB  7/10/60) was 56 years old at the time she was arrested and booked into the Creek County Justice Center on **10/17/16** for obstructing and resisting and officer; driving while her license was cancelled/suspended/revoked; failure to wear a seat belt; and back child support.

Medical records from Okemah Indian Health Center provided for review date back to 2012. Ms. Sanders had multiple medical encounters over the years which included the following conditions/diagnoses:

- Stomach/abdominal pain
- Alcoholic cirrhosis (alcohol abuse)
- Hepatitis C
- Cholelithiasis (gallstones)
- Abdominal ascites (accumulation of fluid in the abdominal cavity)
- Acute pancreatitis

Upon her arrival to the Creek County Justice Center on **10/17/16**, an Intake Medical Form was completed by Creek County Sheriff's staff – albeit unsigned by any specific member of the Creek County Sheriff's Department.  Signature lines were left blank for both staff and Ms. Sanders. (Creek County SO 000015-000016) Ms. Sanders answered "no" to medical questions and/or denied all medical and mental health conditions with the exception of high blood pressure and taking "several" medications.

On **10/18/16**, a Medical Intake Form was completed by Licensed Practical Nurse (LPN) Nicholas Groom.  (Turn Key records, pages 10-11) Ms. Sanders indicated she had a history

of high blood pressure since 2011, as well as had undergone gallbladder surgery in 2012. She reported receiving care from the Okemah Indian Clinic and taking medications for her blood pressure, Ibuprofen, and a "stomach pill." Nurse Groom testified during his deposition that because he wrote "Okemah Indian Clinic" on the Intake Form, he would have placed a call to that facility at that time to request Ms. Sanders' medical records. He stated that this was his usual practice when doing an Intake Medical Form. (Groom deposition, page 33-34)

Nurse Groom also documented that Ms. Sanders was alert and nothing remarkable noted in her appearance, breathing, or behavior with the exception of a lice infestation in her hair. She did admit to last using alcohol on 10/11/16 but denied experiencing any withdrawal symptoms. Nurse Groom recommended medical housing to the jail staff due to her need for isolation because of the lice infestation and associated necessary treatment. Lice treatment was initiated.

At **2:00pm** that day, Advanced Practice Registered Nurse (APRN) Lela Goatley was contacted regarding Ms. Sanders booking and need for medication continuation since she reported taking medications prior to incarceration. APRN Goatley ordered Ibuprofen, Prilosec and Norvasc to be administered to Ms. Sanders. The medications were initiated that evening according to the Medication Administration Record (MAR) (Creek County SO 000012)

Ms. Sanders received medications from a licensed nurse twice daily throughout her incarceration. (Turn Key records, pages 12-13)

On **10/25/16**, LPN Kerri Ferris conducted a recheck of Ms. Sanders' hair and additional re-application of the topical medication to eradicate lice per medication instructions. With the lice infestation resolved, Ms. Sanders was released to General Population housing. Housing moves are conducted and coordinated solely by jail staff. (Groom deposition, page 53)

On **10/27/16**, LPN Cheryl Green responded to a Sick Call Request Form completed by Ms. Sanders indicating that she had gotten soap in her eye and could barely see. She also stated she had glaucoma (which she had not admitted to during her Intake Assessment). When

Ms. Sanders was brought to the medical area for Sick Call (Green deposition, page 127), Nurse Green evaluated Ms. Sanders and then flushed and washed her eyes. Ms. Sanders stated that she was then able to see better.   Ms. Sanders did not request any other medical interventions or relay any medical concerns to Nurse Green. (Creek County SO 000011) Nurse Green testified in her deposition that if Ms. Sanders had any issues other than her eye complaints, she (Nurse Green) would have documented it.  (Green deposition, page 157)

**Between 10/27/16 until 11/17/16,** nursing staff continued medication administration to Ms. Sanders 1-2 times daily.  (Turn Key records, pages 12-13)

On **11/17/16 at 9:50pm,** Nurse Ferris contacted APRN Goatley by phone due to Ms. Sanders having redness noted in her right eye.   APRN Goatley ordered artificial tears for Ms. Sanders to be instilled into her right eye twice daily for three days.  (Creek County SO 000012)

On **11/18/16 at 6:50am,** Nurse Ferris arrived at the jail, and one of the officers told her that Ms. Sanders "didn't seem right" during the overnight shift.  (Creek County SO 000010) Nurse Ferris instructed the officer to immediately bring Ms. Sanders to the nursing office.

Her vital signs revealed no fever with a temperature of 97.7 degrees.  Her heart rate was within normal range at 65 beats per minute.  Her respiratory rate was normal at 14 breaths per minutes.   Her blood pressure was 114/93 and oxygen saturation 95%. With stable vital signs, Ms. Sanders verbalized that she was "fine", but her vision was slightly blurry.   Nurse Ferris noted that her right eye was slightly reddened but also reiterated contacting the APRN the previous night and receiving an order for artificial tears to be instilled.  Nurse Ferris administered the eye drops and then escorted Ms. Sanders (who was walking independently) back to her cell. Nurse Ferris noted that Ms. Sanders had no other complaints or concerns during the remainder of her shift.

**Between 11/18/16 and 11/20/16,** nursing staff continued to administer medications to Ms. Sanders 1-2 times daily.  (Turn Key records, pages 12-13)

On **11/20/16 at 11:00am**, LPN Tamara Jackson documented that she was called to Ms. Sanders' cell by jail staff because she (Ms. Sanders) was "not responding verbally and disoriented." (Creek County SO 000008)  Nurse Jackson documented that Ms. Sanders was able to verbalize her first name.  However, vital signs revealed a blood pressure of 75/35; heart rate of 66; respiratory rate of 28; temperature of 97.3 degrees (normal); oxygen saturation of 89%; and blood sugar of 93.  Due to her condition and abnormal vital signs, Nurse Jackson informed jail staff that an ambulance needed to be called for transport to the hospital.   Nurse Jackson's additional documentation indicated that Ms. Sanders was being sent to the hospital due to disorientation, pallor (pale), low blood pressure, incontinence, and low oxygen saturation of 89%.   Nurse Jackson also contacted APRN Goatley to notify her of the decision to transport Ms. Sanders to the hospital. (Creek County SO 000006)

Jail Incident reports regarding this incident indicate that at **11:06am**, Officer Bailey Smalley was handing out lunch trays in the booking area (where Ms. Sanders was housed). The report says she was slow to get up from her bed; she picked up her tray and then spilled it on the floor.   She reportedly tried to bend over and almost fell over instead.  The officer advised her to sit on her bed.   Ms. Sanders laid down and was breathing very loudly and sounded like she was having trouble breathing.  It was noted that her speech was also slurred.  Officer Smalley documented that she then advised the nurse (Nurse Jackson) that Ms. Sanders needed medical attention.

The report goes on to indicate that at **11:17am**, Officer Smalley was advised by the nurse to call an ambulance for the inmate.  At **11:22am**, the ambulance arrived, and at **11:41am** EMS (Emergency Medical Services) exited the jail and took Ms. Sanders to St. John's Hospital in Tulsa.

The EMS report contains documentation that indicates they (EMS personnel) spoke with an "RN" at the jail who did not know the inmate.  "An employee stated" (Jail supervisor Lindsey Foster—based on testimony from Officer Foster during her deposition, page 29) that Ms. Sanders had been deteriorating for the past few weeks and was becoming more altered.  Officer Foster also told them that as of "today" (11/20/16), Ms. Sanders was unable to walk and had poor food and fluid intake as well.  The report also indicates that the "RN"

reported the patient's oxygen saturation and blood pressure were low and there were wheezing and rales noted when listening to her lungs. The "RN" could not provide any additional medical history about the patient. The report also indicated that Ms. Sanders had been having diarrhea for the past two weeks. (There were no RN's working at the jail on 11/20/16. This was apparently an assumption on the part of the EMS providers.)

Upon arrival to St. John's Medical Center Emergency Department, Dr. Charles Farmer reiterated what EMS providers had stated in that Ms. Sanders had reportedly had diarrhea for two weeks, as well as a declining mental status. Dr. Farmer, however, documented that when he questioned Ms. Sanders, she denied having diarrhea or pain upon his examination. (Sanders 000043)

Dr. Bobby Muthalaly consulted on her case and documented that he felt Ms. Sanders had an acute kidney injury accompanied by shock and multi-organ failure. He documented she likely was in septic shock and also had long-standing, chronic liver disease with **acute decompensation** with markedly elevated bilirubin levels and abnormal coagulation findings. He also documented that Ms. Sanders had a history of heavy alcohol intake on a daily basis prior to incarceration. (Sanders 000060-62)

Ms. Sanders was diagnosed as having severe sepsis with shock – "UTI (urinary tract infection) ? Pneumonia." (Sanders 000062) As documented, it was unclear to hospital physicians at that point where the infection leading to sepsis had begun. Documentation indicated it possibly began as a urinary tract infection or pneumonia.

Ms. Sanders' continued to deteriorate at the hospital in spite of critical care interventions and her poor prognosis was explained to her son, who agreed with the hospital physician that cardiopulmonary resuscitation (CPR) and other resuscitative efforts would likely not prevent her imminent death. On **11/21/16 at 12:10pm**, Ms. Sanders was pronounced dead. (Sanders 000020)

## VIII. OPINION

Based on my review of the documents provided, my education, and over 36 years of

experience in the healthcare industry, as well as my role and responsibilities in the Orange County jail system and various other correctional healthcare roles, it is my opinion that the Turn Key Health staff were in no way indifferent nor exhibited any disregard for Ms. Sanders's healthcare needs. They acted reasonably *based upon the information available* to them during Ms. Sanders incarceration. She did not submit any Health Care Requests nor did she verbalize having any issues or concerns about diarrhea -- uncontrollable or otherwise. Conversely, her requests to healthcare staff were related to issues with her eyes and past history of glaucoma. A healthcare provider (Advanced Practice Registered Nurse with the licensure to diagnose and prescribe medications) was contacted to obtain medical orders for Ms. Sanders based upon the data that had been gathered during the Receiving Screening process.

Ms. Sanders submitted Sick Call Request forms which were promptly addressed and included phone calls to the 24/7 on call provider, APRN Goatley. Ms. Sanders was also seen by licensed nursing staff 1-2 times per day throughout her incarceration for medication administration during which time she did not verbalize any complaints or concerns nor did the nursing staff observe any signs indicating she was in distress until the morning of 11/20/16 when she was expediently sent to the hospital by nursing staff – without even contacting a provider. Nursing staff had the ability to have a patient sent to the hospital when necessary without provider pre-approval, which clearly is the opposite of indifference or disregard for her medical condition.

My detailed opinions are outlined below and include supportive citations from the National Commission on Correctional Healthcare (NCCHC), the American Correctional Association (ACA), and other pertinent references.

The NCCHC is an organization "dedicated to improving the quality of correctional healthcare services and helping correctional facilities provide effective and efficient care." (NCCHC Standards for Health Services in Jail – 2014, page vii.) NCCHC has published standards addressing required policies, practices, clinical and administrative operations via 67 specific "essential" and "important" standards. These standards are considered "best practices" in the correctional healthcare field. There are NCCHC standards outlined below due to their relevance to facts in this matter.

The American Correctional Association (ACA) also provides written standards for facilities addressing services, programs, and operations essential to good correctional management, including administrative, staffing, fiscal, staff training, medical services, and a variety of other subjects comprising good correctional practices.  The standards are under continuous revision to reflect changing practices, current case law, new knowledge and agency experiences. There are also ACA standards outlined below due to their relevance to facts in this matter.

**Opinion 1:  Turn Key Health staff acted reasonably and within the standard of care in providing access to healthcare, as well as conducting the Receiving Screening for Ms. Sanders upon her arrival at Creek County Justice Center.**

1.1   The Receiving Screening process is a structured inquiry (subjective information) which also includes observation (objective information) of a patient at the time of arrival into a jail facility.   The purpose is to determine whether an individual has an urgent or emergent healthcare need, as well as determine ongoing healthcare needs that will need to be managed and treated during the incarceration (medications, treatments, chronic clinical conditions/needs, etc.).   Nurse Groom obtained this information from Ms. Sanders through both questioning and observation.   As is common, Ms. Sanders did not provide a comprehensive history and could not even provide the specific names of her medications.   Healthcare staff in jails across the country are faced with this same dilemma.  Many arrestees are either not well-versed regarding their medical conditions or are unable to relay the information due to intoxication, mental illness, etc.

This is similar to Emergency Departments across the country as well.   Typically Emergency Department staff do not have any prior knowledge of patients arriving to the hospital and must rely upon subjective questioning and objective evaluation and findings to treat and manage patients "real-time" during Emergency Department encounters.

1.2     Nurse Groom contacted the on-call provider (Advanced Practice Registered Nurse Lela Goatley) to obtain orders, including which medications should be initiated.

1.3     Ms. Sanders did not exhibit nor state any urgent or emergent healthcare needs that could not be accommodated by the healthcare staff at the Creek County Justice Center.

1.4     Nurse Groom testified that he contacted the Okemah Indian Clinic via phone to request Ms. Sanders medical records. He stated this is his usual and customary practice with new arrestees. As is typical in jails across the country, the acquisition of outside records takes time. It can take a couple of weeks for an outside provider to gather records, photocopy, and prepare for mailing to a jail. It is not uncommon for a jail to be waiting on the delivery of outside records. In the meantime, patients are managed (just like in the Emergency Department) based upon what is known and/or observed and evaluated.

1.5     Ms. Sanders had access to healthcare during her incarceration, which began with the Receiving Screening at Intake, as well as the ability to request healthcare services in writing, which she did utilize via the Sick Call Request form.

Additionally, jail officers had the ability to make requests, on Ms. Sanders behalf, for a healthcare evaluation, as did occur specifically on 11/18/16 to which Nurse Ferris expediently responded, as well as Nurse Jackson's expedient response on 11/20/16.

Finally, Ms. Sanders was receiving medication from nursing staff 1-2 times daily. During these interactions with nursing, she had the opportunity to request and/or verbalize any concerns or needs she had. Nurse Green corroborated this in her deposition testimony in that if a medical problem is identified during medication pass, nurses would ask the officers to bring the patient to the clinic for further examination. (Green deposition, page 155)

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-A-01 (Access to Care)** *states that inmates must have access to care to meet their serious medical, dental, and mental health needs. Patients can be seen by a clinician, be given a professional clinical judgment, and receive*

*care that is ordered.   This standard was developed by the National Commission's desire to uphold the basic principle established by the U.S. Supreme Court in the 1976 landmark case of Estelle v. Gamble.  Inmates must have access to care to meet their serious health needs.*

**The National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails, Section J-E-02 (Receiving Screening)** *states that a receiving screening is performed on all inmates to ensure that emergent and urgent health needs are met.*

**The American Correctional Association (ACA), Performance-Based Standards for Adult Local Detention Facilities, Section 4-ALDF-4C-22 (Health Screens)** *states that health screening is a system of structured inquiry and observation to identify inmates who require immediate medical attention. Intake medical screenings are conducted on inmates upon arrival to the facility.  Inmates who are unconscious, semi-conscious, bleeding, or otherwise obviously in need of immediate medical attention are referred to an emergency department.*

Ms. Sanders had access to healthcare services provided by licensed practitioners including nursing as well as medical orders from a licensed APRN.  Her medical and mental health history was obtained via the Receiving Screening process at the time of her arrival to the jail facility and was reported by a nurse to the facility provider (APRN).   There was no disregard for any of her stated and/or observed healthcare needs.   There was no standard of care violation.   The Turn Key staff acted reasonably and within the standard of care expected within an adult jail facility in providing access to care.

**Opinion 2:   Turn Key staff cannot act upon information that has not been provided to them by either the patient and/or jail staff.   There is no "indifference" or "disregard" when information is not known or communicated. Additionally, jail documentation and sworn testimony does not corroborate the alleged overwhelming and constant diarrhea, and it further confirms Turn Key staff were not notified about Ms. Sanders alleged  lack of food and fluid intake.**

2.1  On 10/18/16, during the Receiving Screening process, there was no stated or obvious issue related to diarrhea and/or any infectious process occurring concerning Ms. Sanders.

2.2  On 10/25/16, Nurse Ferris completed the additional lice treatment, and there is no documentation of any concerns or observation of diarrhea.

2.3  On 10/27/16, Ms. Sanders specifically requested (in writing via the Sick Call Request Form) to be seen due to issues with her eyes.   Nurse Green evaluated and treated Ms. Sanders.   There was no indication – either stated or observed – of diarrhea.

2.4  On 11/17/16 and 11/18/16, Nurse Ferris evaluated Ms. Sanders, as well as called the APRN for orders regarding an issue with her (Ms. Sanders) eyes.  Nurse Ferris was face-to-face with Ms. Sanders, as she obtained a full set of vital signs, administered eye drops, and walked Ms. Sanders back to her cell.  Nurse Ferris wrote a detailed note about this encounter, and there was no mention of stated or observed diarrhea.

2.5  When Ms. Sanders arrived at the hospital on 11/20/16, the Emergency Department physician documented that EMS stated Ms. Sanders had been having diarrhea for two weeks.   However, he also documented that Ms. Sanders denied having diarrhea.

2.6  Deposition testimony from Officer Bailey Smalley testified that she did not receive any reports from Ms. Sanders' cellmates regarding diarrhea (Smalley deposition, page 43) nor did she ever see any fecal material on Ms. Sanders or the floor. (Smalley deposition, page 42).  She only testified that she could smell diarrhea.  Likewise, Inmate Classica Goodwin repeatedly testified that she never saw any diarrhea on Ms. Sanders' clothing; however, there was a smell of diarrhea. (Goodwin deposition, pages 11, 22, 32, and 42)

2.7  Supervising Officer Lindsey Foster testified that she saw fecal stains on her clothing, and she directed the jail staff to take Ms. Sanders to the shower on **one** occasion. (Foster deposition, pages 60-61)  She also testified that she couldn't recall if she notified medical staff regarding Ms. Sanders diarrhea (Foster deposition, pages 67); however, later in her testimony, she stated that she did notify Nurse Groom and he did not "look into it."   Her

rationale for this statement was that Nurse Groom would have to be accompanied by an officer into the cell, and she did not accompany him. (Foster deposition, page 69)

First, Officer Foster contradicted herself during her deposition as to whether or not she reported her observations or concerns to healthcare staff.  It is unclear whether or not communication occurred between Officer Foster and Nurse Groom, who testified that he had never been told by anyone that Ms. Sanders was having diarrhea.  (Groom deposition, page 135)  Furthermore, he testified that if had been told that she had diarrhea, he would  have initiated the Diarrhea Nursing Protocol, which would have led to a call to the APRN and likely anti-diarrheal medications.  (Groom deposition, page 133)

Secondly, Jail Administrator Cody Smith testified during his deposition that whenever an inmate is taken to the shower and given a change of clothes for an issue such as diarrhea, the activity would be logged on the Medical Observation Sheet utilized by jail staff to track inmate activity.  (Smith deposition, page 62)

The Medical Observation Sheets for Ms. Sanders show **no showers from 10/30/16 through 11/19/16.**  (Smith deposition exhibits, pages 10-11)

Plaintiff's expert, Dr. Susan Lawrence, states that the detention staff had to assist Ms. Sanders with changes of clothes and showers; (Lawrence report, page 13) however, there is no documentation or testimony to corroborate this statement, other than one shower incident directed by Officer Foster.

2.8 Officer Cody Smith personally completed some of the observation checks for Ms. Sanders. He  testified that he was completely unaware of any occurrences of diarrhea, and he would have reported it to healthcare had it been occurring on his watch. (Smith deposition, pages 41, 52)   He also stated that he did not receive any complaints from any of the jail officers regarding Ms. Sanders' having diarrhea.  (Smith deposition, page 57)

2.9 Both Officer Smalley and Officer Foster provided statements during their depositions that have no validity and are outside the scope of their education, training, and knowledge.

Officer Smalley acknowledged that she never reviewed Ms. Sanders medical records; however, she claimed "I know she didn't get treated or she probably wouldn't be dead." (Smalley deposition, page 50) She additionally admitted that she was concerned about Ms. Sanders for two weeks, but she never followed up with anyone to make sure she was seen by nursing.  (Smalley deposition, page 82)

Officer Foster stated that day Ms. Sanders was sent to the hospital was the first time someone had checked her vital signs.  (Foster deposition, page 24)  This is simply untrue. Officer Foster was not at the jail facility 24/7 and observing Ms. Sanders around the clock to be able to make such a statement.   Statements like these – that are blatantly untrue and made under oath -- cast doubt on the integrity of the remainder of the testimony of these two officers.

2.10  Both Officer Smalley and Officer Foster cannot recall if they ever reported food and fluid intake issues to Turn Key staff.   Officer Smith clearly stated that jail staff is the responsible party to track and log meal activity. (Smith deposition, page 27) This is usual and customary in jails across the country, as officers are located in the housing units 24/7. The number of healthcare staff is typically much smaller than jail staff, and therefore, nurses are typically not stationed within a housing unit and rely upon jail staff to communicate any observed or known patient issues.   Healthcare   staff   rely   upon communication from jail staff when/if an inmate is routinely not eating or drinking fluids.

Officer Smalley acknowledged that Ms. Sanders had poor food and fluid intake. (Smalley deposition, page 31)  Officer Foster stated Ms. Sanders had poor food and fluid intake as well, but that she couldn't recall if she ever reported Ms. Sanders lack of eating to Turn Key staff.  (Foster deposition, pages 26 and 29)

**Opinion 3:  While medical staff often have input regarding an inmate who requires "medical housing," jail staff make the ultimate decisions about inmate housing in a jail setting .**

3.1 Ms. Sanders was initially placed in medical housing upon her arrival at the jail due to the fact that she had lice and required isolation for seven (7) days.  After the eradication of the lice, she was then moved to General Population.

3.2 According to Nurse Groom, Ms. Sanders was never moved to medical housing due to a request from healthcare staff (other than the initial lice infestation/isolation.)  He testified that  jail staff moves people every day for reasons such as fighting or the presence of a problematic inmate (from a jail perspective) or someone being taken advantage of by other inmates.  (Groom deposition, pages 87 and 90)

Nurse Green testified similarly that the detox and medical observation cells were used for other reasons besides medical.  Jail staff utilized those cells for suicidal inmates, protective custody inmates, and/or combative inmates.  She stated that nursing/healthcare was not in charge of cell assignments nor are they given information by jail staff about rationale for movement in these situations.  (Green deposition, pages 162-163)  This is typical, usual and customary in jails across the country.

Officer Bailey Smalley testified that Ms. Sanders was moved to a detox cell in order to "make room for more males on suicide watch."  (Smalley deposition, page 13) This was a jail-driven decision with no input from Turn Key staff.  Officer Smalley also testified that when Ms. Sanders was moved from Holding Cell 1 to Holding Cell 5, it was done in order to  make room for new bookings.  (Smalley deposition, page 14) She also indicated that when Ms. Sanders was moved from the detox cell to Holding Cell 1, it was because of uncontrollable diarrhea; however, there is no indication Turn Key staff were notified or involved in this move.

Officer Foster testified that she had been told Ms. Sanders was moved to the detox/holding cell area because she (Ms. Sanders) was being "difficult" – not for any medical reason.  (Foster deposition, pages 27 and 59)  Officer Foster also testified that she personally made the decision to keep Ms. Sanders housed in booking.  (Foster deposition, page 94)  This was a jail staff decision without notification or input from Turn Key staff.

Dr. Lawrence criticizes Turn Key staff for not having medical records documenting Ms. Sanders housing transfer to the "front of the jail" (booking/medical observation cells). (Lawrence report, page 16).  As testified by jail staff themselves, their practice is to move inmates as they see fit for operational reasons, which is outside the purview of medical staff; and therefore, there would be no medical documentation about an issue for which there is no communication, awareness, or responsibility.  This housing move would and should be documented solely in jail records -- not the medical record.

Outside of the initial isolation due to lice infestation, Turn Key staff were not involved in determining housing for Ms. Sanders.  There is no evidence showing they were informed or notified about "constant diarrhea."   Ms. Sanders was housed in a medical area based upon space/capacity needs on the part of jail staff and a decision by the supervising officer (Foster) to keep her in the booking / medical area.   Plaintiff's Expert, Dr. Susan Lawrence, criticizes and alleges that Turn Key staff "must have been aware" that Ms. Sanders was in Medical Observation. (Lawrence report, page 12)  That is untrue.  Ms. Sanders may have been held in a cell that is frequently utilized for medical conditions; however, it is clear in testimony from both jail and healthcare staff that the jail staff moves inmates and utilizes any and all cells as they see fit for operational purposes.  Turn Key staff did not place Ms. Sanders in medical observation, as there was no known reason to do so.

## Opinion 4: The presence of a "late entry" in a medical chart is an acceptable practice.

<u>4.1</u> Nurse Groom was not on duty when Ms. Sanders had a dramatic change in her condition and exhibited a change in behavior with abnormal vital signs on 11/20/16.  In fact, Nurse Groom had four (4) days off during that time period.  (Groom deposition, page 96) Upon his return to work on 11/22/16, Nurse Groom added a "late entry" into Ms. Sanders medical chart to record his last encounter with her before his four-day vacation.   He testified that he was surprised about her deterioration because she had seemed okay during his last encounter with her.  (Groom deposition, page 97) He was not instructed by any supervisor to add this chart note, but rather, he felt it was appropriate (legally and clinically) to add his insight into her condition last he saw her.   He also acknowledged that he was taught in nursing school that late entries are acceptable.

Late entries are acceptable in medical records.  It is impossible to document every encounter, action, statement, and activity that occurs "real-time."  It is not unusual, nor is it a violation of the standard of care, to add a late entry into a patient chart when a nurse has forgotten to document pertinent information and remembers at a later time.  It is responsible and ethical to make a late entry regarding a patient encounter when it is deemed appropriate to provide pertinent information about a patient's condition.

Particularly in the event of a patient death, a retrospective review of the case will be most accurate  when reviewers are able to have any and all pertinent information in order to piece together the timeline and outcome.  It would be more appropriate and responsible nursing practice to include a "late entry" with pertinent information versus not adding the information for fear of criticism of a "late entry." These entries occur routinely in healthcare settings.   The volume of activity that occurs between nurses and patients over the course of a work shift can be voluminous. In this particular jail, nurses are managing between 350-400 inmates every shift.   It is not feasible or possible to make a chart entry for every encounter – especially when there are no medical concerns noted.  Nurse Groom simply recorded his last encounter with Ms. Sanders to make the record complete.

It is unclear how Plaintiff's Expert, Dr. Lawrence, can accuse Nurse Groom of "covering up his knowledge of Ms. Sanders' dire situation and the fact that he knew what was going on and chose to do nothing." Dr. Lawrence also states that the late entry is "false." (Lawrence report, page 14-15)

Nurse Groom testified he had no knowledge regarding Ms. Sanders having diarrhea (Groom deposition, page 135), and Officer Foster contradicted herself in her deposition stating she told Nurse Groom but also that she  couldn't  recall  if  she  told anyone from Turn Key about the diarrhea (Foster deposition, page 67-68) Furthermore, no other officer (Smalley or Smith) visualized diarrhea according to testimony,  and Ms. Sanders had no showers from 10/30- 11/19/16, which seems illogical if she was experiencing constant and overwhelming diarrhea.

**Opinion 5: Based upon my actual nursing experience in Critical Care and Critical Care Flight Nursing, patients can and do deteriorate rapidly with sepsis.**

5.1 Plaintiff's Expert, Dr. Lawrence, states that Ms. Sanders was allowed to deteriorate to the point at which she died in the ICU 24 hours after being rushed to the hospital in critical condition and that her symptoms were exceptionally obvious, even to a lay person. (Lawrence report, page 15)

Officer Foster testified that "just by looking at her laying in the bed, no...you wouldn't have known" that something was seriously wrong.  (Foster deposition, page 90)

Two days prior to Ms. Sanders rapid deterioration on 11/20/16, Ms. Sanders **walked** to and from her cell for a Sick Call appointment with Nurse Ferris on 11/18/20.  Ms. Sanders made no mention of diarrhea or feeling ill other than the issue with her eyes.  Nurse Ferris obtained vital signs which were all essentially normal.  She did not have a fever.  She did not complain of any urinary tract or respiratory symptoms.  (The coroner identified her "sepsis" as stemming from a urinary tract infection.)  There is no reasonable way that any nurse could identify a urinary tract infection in an afebrile patient who does not have any urinary complaints (frequency, burning, etc.)  Nurse Ferris went on to document that Ms. Sanders had no other complaints for the remainder of her entire shift.

Dr. Lawrence, as a physician, should be able to more adequately explain the pathophysiology of sepsis moving to severe sepsis which then advances to septic shock. While I am not a physician, I have certainly cared for these critically ill individuals in clinical settings, and I can attest to the fact that patients can and frequently do deteriorate rapidly.

When Nurse Jackson evaluated Ms. Sanders at the request of jail staff, her serious abnormal vital signs and condition led Nurse Jackson to summon an ambulance immediately -- without even contacting the APRN or MD.  Ms. Sanders poor condition at that time was addressed reasonably and well within the standard of care by expediently getting her to an acute care hospital for treatment.

**<u>Opinion 6: The National Commission on Correctional Health Care (NCCHC) Standards are considered "best practices" in the industry; however, there is no requirement to adhere to these standards verbatim unless a facility has sought and achieved "accreditation" from the National Commission.</u>**

<u>6.1</u> Plaintiff's Expert, Dr. Lawrence, seemingly alleges that the NCCHC standards equate to "standard of care."   This is not accurate.   The NCCHC standards are rigorous and mandatory only when a facility chooses to pursue "accreditation." Otherwise, the NCCHC standards are considered "best practices" that facilities can use to model  their policies and practices after.

<u>6.2</u> Dr. Lawrence states that the Turn Key policies and the contract between Turn Key and Creek County are "out of compliance with NCCHC Standards."  (Lawrence report, page 17) Neither set of documents are required to be in compliance with NCCHC Standards as they are not required to meet accreditation standards.

<u>6.3</u> Dr. Lawrence states that the Turn Key / Creek County contract requires that Ms. Sanders should have received an initial assessment which should have included a physical examination within fourteen (14) days of her arrival at the jail – no later than 10/31/16. (Lawrence report, page 17) However, the contract *actually* states that "inmates identified with health concerns will have a secondary **clinical health review** no later than fourteen (14) days after the inmate's arrival at the facility." (Turn Key / Creek County Contract, page 5)   There is no further description assigned to "clinical health review." There is no identification as to which health care staff would conduct a review, and there is certainly no written requirement that it include a physical examination.

While Ms. Sanders did not have a specific chart entry entitled "clinical health review," Turn Key nursing staff contacted the APRN regarding Ms. Sanders when her clinical presentation required a higher level of care, evaluation, and orders (i.e., needing medication which must be ordered by the ARNP and/or MD).

## IX.   **CONCLUSION**

My opinions in this case are based upon my years of education, skills, and experience in the nursing profession, healthcare industry and the correctional health field, as well as the documentation provided to me for review and outlined in Section VI of this report.

The actions taken by Turn Key Health staff on behalf of Ms. Sanders were objectively reasonable and met the standard of care expected within an adult correctional setting.

Turn Key Health staff did not exhibit any indifference or disregard toward Ms. Sanders, but rather acted within the standard of care based upon the *information available to them and their observations and evaluations of Ms. Sanders's clinical presentation- both during Sick Call encounters and medication administration.* Nursing staff contacted the on-call APRN on more than one occasion to report Ms. Sanders's medical history, medication regime, and other concerns regarding her eyes/glaucoma, which were the appropriate interventions expected of nurses in a correctional setting. Based upon existing documented episodes of contacting the APRN for patient orders and to communicate concerns, there is no reason to believe that the nurses would not have contacted the APRN if they were notified and/or aware of chronic diarrhea, poor food and fluid intake, or obvious deterioration. They clearly demonstrated contacting the APRN (or sending a patient to the hospital) were interventions which they routinely implemented in their daily practice. In fact, Nurse Groom testified that he spoke with APRN Goatley every day to provide her with a report regarding new inmates, the outcome of Nursing Sick Calls, and any other patient issues that had occurred. (Groom deposition, page 27)

Frequent housing relocations are common within a county jail setting, as was reported to be the case at Creek County Justice Center, as well. Jail staff controls housing movement. Beyond the initial lice infestation, the Turn Key staff did not have any role in placing Ms. Sanders in "medical housing." These moves were done by jail staff as testified by Officer Smalley for either operational / capacity needs and /or because Ms. Sanders was deemed by jail staff as being "difficult." Turn Key staff did not ignore nor exhibit any disregard towards Ms. Sanders and her care, and they did not place her in medical observation, as

they had no known reason to do so.

My opinions in this matter are based upon a reasonable degree of nursing certainty.  I reserve the right to supplement this opinion in light of additional information.

Executed on August 10, 2020, in Reno, Nevada.

Kimberly Pearson, MHA, MBA, RN, CCHP