**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **PHILIP SANDERS, an Individual and Husband and Next of Kin of BRENDA JEAN SANDERS, Deceased,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 17-cv-492-JED-CDL** |
| **v.** | ) ) | |
| **TURN KEY HEALTH CLINICS, a limited liability company,** | ) ) ) | **Attorney Lien Claimed Jury Trial Demanded** |
| **Defendant.** | ) ) ) | |

**DEFENDANT TURN KEY HEALTH CLINICS, LLC'S MOTION FOR SUMMARY
<u>JUDGMENT AND BRIEF IN SUPPORT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................ *i*

TABLE OF AUTHORITIES ................................................................................ *ii*

STATEMENT OF THE CASE ............................................................................... 1

STATEMENT OF UNDISPUTED FACTS ........................................................... 2

ARGUMENT AND AUTHORITIES ................................................................... 10

PROPOSITION I: PLAINTIFF IS UNFABLE TO SET FORTH AN ACTIONABLE § 1983 CLAIM AGAINST TURN KEY ........................................................................ 11

    A.  Phillip Sanders lacks the requisite standing to pursue a civil rights claim on behalf of Brenda Sanders .................................................................................... 11

    B.  There is no *Respondeat Superior* Liability under § 1983 ................................. 14

    C.  Plaintiff cannot establish a claim under the municipal theory of liability ........................ 15

    D.  Plaintiff cannot provide an underlying constitutional deprivation by any specific Turn Key medical provider ........................................................................... 20

PROPOSITION II: PLAINTIFF IS UNABLE TO STATE AN ACTIONABLE CLAIM UNDER OKLAHOMA LAW ...................................................................................... 26

    A.  Turn Key is statutorily immune from liability in tort ........................................ 26

CONCLUSION .................................................................................................. 30

CERTIFICATE OF SERVICE ........................................................................... 31

## **TABLE OF AUTHORITIES**

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 272, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)........................................................10, 11

*Archuleta v. McShan*
897 F.2d 495 (10th Cir. 1990) ................................................................................................12

*Barrios v. Haskell Cty. Pub. Facilities Auth.*
2018 OK 90, 432 P.3d 233........................................................................................28, 29, 30

*Berry v. City of Muskogee*
900 F.2d 1489 (10th Cir. 1990)................................................................................................13

*Birdwell v. Glanz*
Case No. 15-CV-304-TCK-FHM (N.D. Okla. Mar. 12, 2019) ....................................................29

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*
520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)......................................................16, 21

*Bridges v. Wilson*
No. 15-CV-00126-GKF-JFJ, 2019 WL 11589719 (N.D. Okla. July 2, 2019) ............................13

*Bradshaw v. Armor Corr. Health Serv's., Inc.*
No. 17-CV-615-TCK-FHM, 2019 WL 1675148 (N.D. Okla. April 17, 2019) ............................30

*Broadrick v. Oklahoma*
413 U.S. 601, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)................................................................12

*Burke v. Regalado*
2019 WL 1371144 (N.D. Okla. Mar. 26, 2019) ........................................................................30

*Celotex Corp. v. Catrett*
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)......................................................10, 11

*City of Canton, Ohio v. Harris*
489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)............................................................15

*Clark v. Colbert*
895 F.3d 1258 (10th Cir. 2018) ................................................................................................21

*Connick v. Thompson*
563 U.S. 51, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)....................................................11, 15, 21

*Crocker v. Armor Corr. Health Serv's, Inc.*
No. 17- CV-149-TCK-FHM, 2019 WL 2146595 (N.D. Okla. May 16, 2019) ...........................30

*Dohaish v. Tooley*
670 F.2d 934 (10th Cir. 1982) ..................................................................................................14

*Duffield v. Jackson*
545 F.3d 1234 (10th Cir. 2008) ................................................................................................22

*Espinosa Hernandez v. Bd. of Cty. Commissioners of Oklahoma Cty.*
No. CIV-18-606-R, 2019 WL 3069430 (W.D. Okla. July 12, 2019) .................................................
..............................................................................................................................................29

*Estelle v. Gamble*
429 U.S. 97, S. Ct. 285, 50 L. Ed. 2d 251 (1976)..........................................................10, 20, 22

*Farmer v. Brennan*
511 U.S. 825, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)..........................................................21

*Gaston v. Ploeger*
229 F. App'x 702 (10th Cir. 2007)............................................................................................21

*Gray v. Weber*
244 F. App'x 753 (8th Cir. 2007)..............................................................................................20

*Green v. Branson*
108 F.3d 1296 (10th Cir. 1997) ................................................................................................26

*Heidtke v. Corr. Corp. of Am.*
489 F. App'x 275 (10th Cir. 2012)..............................................................................10, 21, 22

*Hinton v. City of Elwood, Kan.*
997 F.2d 774 (10th Cir. 1993) ..................................................................................................15

*Holland v. Glanz*
No. 16-CV-349-JED-JFJ, 2019 WL 4781869 (N.D. Okla. Sept. 30, 2019) .................................29

*Kermicle v. Day*
428 F. Supp. 16 (W.D. Okla. 1976) ..........................................................................................21

*Monell v. Dept. of Soc. Serv. Of New York*
436 U.S. 658, 98 S.Ct. 2018 (1978)................................................................................ 11, 15, 16

*Nayebyazdi v. Turn Key*
District Court of Oklahoma County Case No: CJ-2020-4425 ......................................................30

*Olsen v. Layton Hills Mall*
312 F.3d 1304 (10th Cir. 2002) ................................................................20

*Olson v. Stotts*
9 F.3d 1475 (10th Cir. 1993) ..................................................................22

*O'Connor v. Washburn Univ.*
416 F.3d 1216 (10th Cir. 2005) ..............................................................12

*Pelt v. Utah*
539 F.3d 1271 (10th Cir. 2008) ..............................................................11

*Pembaur v. City of Cincinnati*
475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).......................15, 16

*Prince v. Turn Key Health Clinics, LLC*
No. 18-CV-282-CVE-JFJ, 2019 WL 238153 (N.D. Okla. Jan 16, 2019).....................30

*Raines v. Byrd*
521 U.S. 811, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997)...........................12

*Redding v. Marsh*
750 F. Supp. 473 (E.D. Okla. 1990) .......................................................20, 22

*Robbins v. Oklahoma*
519 F.3d 1242 (10th Cir. 2008) ..............................................................20

*Self v. Crum*
439 F.3d 1227 (10th Cir. 2006) ....................................................10, 21, 22

*Smart v. Villar*
547 F.2d 112 (10th Cir. 1976) ............................................................22, 27

*Snow v. Bd. of Cty. Comm'rs of the Cty. of McClain*
No. CIV-14-911-HE, 2014 WL 7335319 (W.D. Okla. Dec. 19, 2014).................13, 14

*Stone v. Albert*
338 F. App'x 757 (10th Cir. 2009)...........................................................20

*Strain v. Regalado*
977 F.3d 984 (10th Cir. 2020), <u>cert. denied,</u> 142 S. Ct. 312, 211 L. Ed. 2d 147 (2021) ...20, 26, 29

*Thompson v. Norman Reg'l Hosp.*
No. CIV-19-113-SLP (W.D. Okla. Mar. 11, 2020*)* ........................................29

*Willis v. Midland Risk Ins. Co.*
42 F.3d 607 (10th Cir. 1994) ......................................................................................11

*Winton v. Bd. of Comm'rs of Tulsa Cty., Okl.*
88 F. Supp. 2d 1247 (N.D. Okla. 2000) .....................................................................13

*Wright v. Glanz*
13-CV-315-JED-JFJ, 2020 WL 1663356 (N.D. Okla. Apr. 3, 2020)...........................30

<u>RULES</u>

Fed. R. Civ. P. 56(C)...................................................................................................10

Fed. R. Civ. P. 56(e) ...................................................................................................11

<u>STATUTES</u>

Okla. Stat. Ann. tit. 51, et seq. .............................................................................27, 29

COMES NOW Defendant, Turn Key Health Clinics, LLC's, (hereinafter referred to as the "Defendant" or "Turn Key") and pursuant to Rule 56 of the Federal Rules of Civil Procedure, moves for summary judgment on all claims asserted by the Plaintiff Philip Sanders, an Individual and Husband and Next of Kin of Brenda Jean Sanders. In support of this Motion, Defendant offers the following brief.

## STATEMENT OF THE CASE

This lawsuit arises from the health care provided to Brenda Sanders ("Ms. Sanders" or "Decedent"), while she was incarcerated at the Creek County Detention Center between October 17, 2016 and November 20, 2016. See Doc. 23, ¶¶ 19, 21. Plaintiff, Philip Sanders, as an individual and husband and next of in of Brenda Sanders, deceased, brought the instant action against Turn Key, including claims of deliberate indifference to the serious medical needs of Ms. Sanders pursuant to 42 U.S.C. § 1983 ("§ 1983") and Oklahoma state claims of negligence, wrongful death and intentional infliction of emotional distress. See Doc. No. 23. While Plaintiff does not specify whether his claims are founded upon the Eighth and/or Fourteenth Amendment to the U.S. Constitution, this ambiguity is largely immaterial to the analysis at hand because the Tenth Circuit applies the same standard.

Ms. Sanders presented to the Creek County Jail on October 17, 2016. Doc. No. 23, ¶ 19. Upon arriving at the jail, jailers went through a Creek County Sheriff's Office Medical Intake Form with Ms. Sanders and documented Ms. Sanders's responses. Specifically, Ms. Sanders reported to jailers that she took several medications and had high blood pressure. Based upon this, a Turn Key medical provider completed a more detailed Medical Intake at which time the Turn Key nurse determined and documented a variety of health information regarding Ms. Sanders. In addition, the Turn Key medical provider contacted the facility that previously had treated Ms. Sanders and obtained Ms. Sanders's vital signs which were within normal limits. Finally, the physical examination of Ms. Sanders did not identify anything abnormal other than the presence of head lice infestation. Based upon the documented presence of head lice, it was

1

recommended that Ms. Sanders be housed in a segregated medical cell.

Throughout her incarceration Ms. Sanders received medications from licensed medical staff every single day, usually twice per day. Throughout her incarceration, each and every time Ms. Sanders made a medical issue or complaint known to a Turn Key staff member, the medical issue was appropriately addressed. This includes the day she fell ill and needed an ambulance to the hospital. Unfortunately, Ms. Sanders passed soon after her transport to the hospital. Ms. Sanders' medical records list her cause of death as sepsis, but Defense expert witness Alex John opined that the cause of death was cirrhosis of liver due to hepatitis C infection combined with chronic alcohol abuse leading to a gastrointestinal hemorrhage. Despite her unfortunate passing and the disagreement among medical experts as to the exact cause of death, the undisputable evidence shows that Turn Key and its healthcare providers took all appropriate actions to address the issues of which they were made aware. Additionally, the undisputed evidence shows that there was no Turn Key policy that was the moving force to cause any underlying constitutional violation of Ms. Sanders. Finally, pursuant to the Oklahoma Government Tort Claims Act Turn Key is immune from liability for claims grounded in tort.

Therefore, as addressed below, Plaintiff is unable to overcome the instant Motion and judgment in Defendant's favor is appropriate.

## **STATEMENT OF UNDISPUTED FACTS**

1. Turn Key is a business entity who was contracted to provide medical care and treatment at the Creek County Jail pursuant to a contract with Creek County. (Exhibit 1, Turn Key Contract) (FILED CONFIDENTIALLY).

2. On October 17, 2016, upon Brenda Sanders' arrival to the Creek County Justice Center, an Intake Medical Form was completed by Creek County Sheriff's staff. (Exhibit 2, CCSO Recs, 000015-000016).

3.  Ms. Sanders answered "no" to medical questions and/or denied all medical and mental health conditions with the exception of high blood pressure and taking "several" medications. (Id.).

4.  On October 18, 2016, a Medical Intake Form was completed by Licensed Practical Nurse (LPN) Nicholas Groom, wherein Ms. Sanders answered questions about her allergies, lice, current injuries, and need for medical devices; additionally, Ms. Sanders' blood pressure, pulse, oxygenation, weight, current medications, medical history, appearance, behavior, state of consciousness, breathing, ease of movement, female health, mental health, drug and alcohol history, withdrawal status, and housing recommendation were made and documented at that time. (Exhibit 3, Turn Key Recs, TK 000010-11).

5.  Ms. Sanders indicated she had a history of high blood pressure since 2011 and that she had undergone gallbladder surgery in 2012. (Id.).

6.  Ms. Sanders reported receiving care from the Okemah Indian Clinic and taking medications for her blood pressure, Ibuprofen, and a "stomach pill." (Id.).

7.  As part of his intake screening, Nurse Groom testified during his deposition that because he wrote "Okemah Indian Clinic" on the Intake Form, he would have placed a call to that facility at that time to request Ms. Sanders' medical records. (Exhibit 4, Groom Dep., at 33-34).

8.  Nurse Groom also documented that Ms. Sanders was alert and nothing remarkable noted in her appearance, breathing, or behavior with the exception of a lice infestation in her hair; Ms. Sanders denied experiencing any withdrawal symptoms. (Exhibit 3, Turn Key Recs, TK 000010-11).

9.  Based on his intake screening, Nurse Groom recommended medical housing to the jail staff due to Ms. Sanders' need for isolation for lice treatment. Id.

10.  The Turn Key medical staff initiated lice treatment for Ms. Sanders. (Exhibit 3, Turn Key Recs, TK 000022).

11. At 2:00pm October 18, 2016, a medical provider, Advanced Practice Registered Nurse (APRN) Lela Goatley was contacted regarding Ms. Sanders booking and need for medication continuation. (Id. at TK000019).

12. APRN Goatley prescribed Ibuprofen, Prilosec (stomach issues), and Norvasc (high blood pressure), to be administered to Ms. Sanders. (Id.).

13. Diarrhea and flatulence are known adverse effects of Prilosec (Omeprazole)[1].

14. Dizziness, fatigue, and nausea are known adverse effects of Norvasc (Amlodipine).**[2]**

15. Ms. Sanders continued to receive medications, prescribed by a medical provider and administered by a licensed nurse, usually twice daily (on a small minority of days Ms. Sanders received her medications only once per day), throughout her incarceration. (Id. at TK000012-13).

16. On October 25, 2016, LPN Kerri Ferris conducted a recheck of Ms. Sanders' hair and additional reapplication of the topical medication to eradicate lice per medication instructions. (Id. at TK000012).

17. With the lice infestation resolved, Ms. Sanders was released to General Population housing.

18. On October 27, 2016, Ms. Sanders submitted a sick call form complaining that she got soap in her eyes and that she had glaucoma; Ms. Sanders complained that her eyes were hurting, and she could barely see. (Exhibit 3, Turn Key Recs, TK 000018).

19. That same day, LPN Cheryl Green responded to Ms. Sanders' complaints; Ms. Sanders was brought to the medical area where Nurse Green evaluated Ms. Sanders and then flushed and washed her eyes. (Id.).

20. On October 27, 2016, Ms. Sanders did not request any other medical interventions or relay any medical concerns, including diarrhea or altered mental status, to Nurse Green. (Id.).

---

[1] https://www.ncbi.nlm.nih.gov/books/NBK539786/

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5051471/

21. Likewise, Nurse Green did not observe any medical concerns, including diarrhea or altered mental status. (Id.).

22. Nurse Green testified in her deposition that if Ms. Sanders had any issues other than her eye complaints, she (Nurse Green) would have documented the same. (Exhibit 5, Green Dep., 157:17-159:7).

23. From October 27, 2016, to November 11, 2016, the Turn Key medical staff provided Ms. Sanders with her medications twice each day in accordance with her provider's prescriptions. (Exhibit 3, Turn Key Recs, TK 000012-13).

24. On November 17, 2016, at 9:50pm, Nurse Ferris responded to Ms. Sanders' complaints of redness in her right eye. (Id. at TK000019).

25. Nurse Ferris contacted APRN Goatley, who ordered artificial tears for Ms. Sanders to be instilled into her right eye twice daily for three days. (Id.).

26. On November 17, 2016[3], Nurse Groom entered a progress note which states that Ms. Sanders was at her holding cell door for the medication pass and had no complaints, and Ms. Sanders was not disoriented and was able to follow commands per her normal state. (Exhibit 3, Turn Key Recs, at TK00016).

27. The next day, on November 18, 2016 at 6:50am, Nurse Ferris arrived at the jail, and one of the officers told her that Ms. Sanders "didn't seem right" during the overnight shift. (Id. at TK000014).

28. Nurse Ferris requested the officer to immediately bring Ms. Sanders to the nursing office. (Id.).

29. Once in the medical office, Ms. Sanders was assessed and she was noted as having a normal temperature of 97.7 degrees, a heart rate 65 beats per minute, a respiratory rate of 14 breaths per minute, a blood pressure of 114/93, and an oxygen saturation of 95%. (Id.).

30. There has been no testimony that Nurse Ferris believed Ms. Sanders to be at risk of harm based on her assessment on November 18, 2016, and Plaintiff's own expert witness testified that Ms. Sanders' vital

---

[3] This note, although it memorializes Nurse Grooms' memory of Ms. Sanders on November 17, 2016, was entered on November 22, 2016.

5

signs on November 18, 2016, just three days before her death, were within normal limits. (Exhibit 6, Lawrence Dep., 123:19-124:2).

31. Moreover, as Nurse Ferris was medically screening Ms. Sanders for any medical issues, Ms. Sanders verbalized that she was "fine" except for slightly blurry vision. (Exhibit 3, Turn Key Recs, at TK00014).

32. Nurse Ferris administered the eye drops and then escorted Ms. Sanders back to her cell; Nurse Ferris noted that Ms. Sanders had no other complaints or concerns during the remainder of her shift. (Id.).

33. Between November 18, 2016, and November 20, 2016, Turn Key nursing staff continued to administer medications to Ms. Sanders twice each day pursuant to her prescriptions. (Id. at TK000012-13).

34. Nurse Ferris explained in her deposition Turn Key nurses were trained to do a medical screening when providing medications to inmates and document when anybody voiced any concerns or questions. (Exhibit 7, Ferris Dep. at 23:18-22).

35. Nurse Ferris further explained that when distributing medications, Turn Key nurses would observe whether their patients were able to verbally speak up and whether they were alert or oriented (Id. at 23:23-24:1).

36. On November 20, 2016, at 11:00am, LPN Tamara Jackson documented that she was called to Ms. Sanders' cell by jail staff because Ms. Sanders was "not responding verbally and disoriented." (Exhibit 3, Turn Key Recs, at TK000015).

37. Nurse Jackson documented that Ms. Sanders was able to verbalize her first name and recorded her vital signs. (Id.).

38. Based on her medical screening and Ms. Sanders' vital signs, Nurse Jackson informed jail staff that an ambulance needed to be called for transport to the hospital. (Id.).

39. Nurse Jackson contacted APRN Goatley to notify her of the decision to request that Ms. Sanders be transported to the hospital. (Id.).

40. The Creek County EMS narrative report states that "[Ms. Sanders] had been moved to the front of the jail a few days ago due to [Ms. Sanders] having constant diarrhea and they put her in a cell alone", but it does not specifically identify who allegedly made this statement. (Exhibit 8, St. John's Med Recs, at SANDERS_00052).

41. The Creek County EMS narrative report states that "an employee stated that [Ms. Sanders] has been deteriorating for the past few weeks, describing [Ms. Sanders] as becoming more altered as of today . . .", but it does not specifically identify who allegedly made this statement. (Exhibit 8, St. John's Med Recs, at SANDERS_00052).

42. The Nurse on duty when the Creek County EMS came to the Creek County Jail on the morning of November 20, 2016, at 11:00am, LPN Tamara Jackson, was a float nurse who had never worked at the Creek County Jail before; thus, Nurse Jackson did not have any personal, first hand knowledge of Ms. Sanders' medical history. (Exhibit 9, Jackson Dep., 97:3-5).

43. The evidence in this case, by way of sworn testimony, shows that it was Jail Supervisor Lindsey Foster, and not a Turn Key employee, who told the Creek County EMS crew that Ms. Sanders had been having constant diarrhea, deteriorating for the past few weeks, and was becoming more altered. (Exhibit 10, Foster Dep., at 29:14-30:1; 80:1-24).

44. Upon arrival to St. John's Medical Center Emergency Department, Dr. Charles Farmer personally took a history from Ms. Sanders, rather than relying on Jail Supervisor Foster's account, and Dr. Farmer documented that Ms. Sanders denied having diarrhea or pain upon his examination. (Exhibit 8, SANDERS 000043).

7

45. Dr. Alex John, a board certified Forensic Pathologist, testified that patients with cirrhosis of the liver, which Ms. Sanders had a diagnosis for, have an accompanying condition called fetor hepaticus that causes them to smell of feces. (Exhibit 11, John Dep., 144:8-21.).

46. As such, there are medical explanations for a smell that may have been observed by the non-party jail staff, not related to diarrhea or fecal matter, which a lay person could mistake for diarrhea.

47. Nurse Kerri Ferris, one of Ms. Sanders' treating nurses throughout her incarceration, and the Turn Key nurse who personally saw and spoke with Ms. Sanders on November 17 and 18, 2016, testified that she was never aware that Brenda Sanders had diarrhea, smelled of diarrhea, had jaundice, or any other serious medical condition. (Exhibit 7, Ferris Dep. 21:13-14; 23.6-10; 23.11-13).

48. There is no evidence that Nurse Grooms, one of Ms. Sanders' treating nurses throughout her incarceration, ever knew that Ms. Sanders was having diarrhea or that her health was deteriorating in any way. (Exhibit 4, Groom Dep., 112:6-9; 124:8-14; 135: 14-19).

49. There is no evidence that Nurse Green, one of Ms. Sanders' treating nurses throughout her incarceration, ever knew that Ms. Sanders was having diarrhea or that her health was deteriorating in any way. (Exhibit 5, Green Dep., 154:19-24).

50. No Turn Key nurses or employees testified to having any knowledge of Ms. Sanders having diarrhea, or complaints of diarrhea, or an altered mental status, while at the jail. (Undisputed Facts 45-47).

51. Plaintiff has no evidence that any Turn Key employee was ever actually aware that Brenda Sanders ever had diarrhea, or any other serious medical condition, during her incarceration at Creek County Jail. (Id.).

52. Detention Officer Bailey Smalley testified that she did not receive any reports from Ms. Sanders' cellmates regarding diarrhea, nor did she ever see any fecal material on Ms. Sanders or the floor. (Exhibit 12, Smalley Dep., 41:23 – 44:2).

53. In spite of not seeing any fecal material, Officer Bailey Smalley only testified that she could smell what she believed to be diarrhea. (Id.).

54. Likewise, Inmate Classica Godwin repeatedly testified that she never saw any diarrhea on Ms. Sanders' clothing, and she never even saw Ms. Sanders use the toilet for a bowel movement. (Exhibit 13, Goowin Dep., 11:10-12; 22:7-16; 32:15-19; and 42:11-13).

55. Supervising Officer Lindsey Foster testified that she saw fecal stains on Ms. Sanders' clothing, and she directed the non-party jail staff to take Ms. Sanders to the shower on one occasion. (Exhibit 10, Foster Dep., 60:6-61:16).

56. However, Supervising Officer Lindsey Foster testified that she could not recall if she notified Turn Key's medical staff regarding Ms. Sanders' alleged diarrhea. (Exhibit 10, Foster Dep., 67:19-23).

57. Detention Officer Cody Smith personally completed some of the observation checks for Ms. Sanders, and he testified that he was never aware of Ms. Sanders ever having diarrhea, and he would have reported it to the healthcare staff had it occurred on his watch. (Exhibit 14, Smith Dep., 41:5-11; 52:13-21).

58. Detention Officer Cody Smith also testified that he did not receive any complaints from any of the other jail officers regarding Ms. Sanders having diarrhea. (Exhibit 14, Smith Dep., 57:2-8).

59. Plaintiff's retained expert witness, Dr. Susan Lawrence, testified that Turn Key's care in this case was negligent, as opposed to a violation of Brenda Sanders' constitutional rights:

> Q. Would it be more accurate to say that, in your opinion, Turn Key provided -- did not provide adequate care to . . . Brenda Sanders rather than no care?
>
> **A. They provided negligent care. They provided negligent care rather than no care.**
>
> (Exhibit 6, Lawrence Dep., at 193:6-15).

## **ARGUMENTS & AUTHORITIES**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only disputes over facts which are material will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 272, 248 (1986). Summary judgment is properly entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

When considering summary judgment in a § 1983 deliberate indifference case, a court looks at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party. *Heidtke v. Corr. Corp. of Am.*, 489 Fed. Appx. 275, 279 (10th Cir. 2012) (*see also Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, S. Ct. 285 (1976)). In cases where the plaintiff bears the burden of proof on essential claims, a defendant need only produce affirmative evidence negating an essential element of the claim or show that plaintiff lacks evidence to carry his burden. *Celotex*, 477 U.S. at 322-24 (*see also Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)). Then, the non-movant must go beyond the pleadings and set forth specific facts demonstrating a triable issue. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; Fed. R. Civ. P. 56(e).

If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, **all other factual issues concerning the claim become immaterial**. *Celotex*, 477 U.S. at 322. (emphasis added). Finally, at the summary judgment stage, the Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 611 (10th Cir. 1994). Thus, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson*, 477 U.S. at 251-52.

**PROPOSITION I:   PLAINTIFF IS UNABLE TO SET FORTH AN ACTIONABLE § 1983 CLAIM AGAINST TURN KEY.**

Plaintiff alleges Turn Key is liable under 42 U.S.C. § 1983. Doc. No. 23, ¶¶ 23-34. Defendant assumes that Plaintiff's claim is premised upon a municipal liability theory under 42 U.S.C. § 1983 despite the fact that Plaintiff's Second Amended Complaint does not reference the basis for his § 1983 claim against Turn Key nor does it include any mention of a Turn Key policy, practice or custom. *See generally* Doc. No. 23. As discussed below in greater detail, Turn Key, as a corporate entity, can only be found to have been deliberately indifferent under a theory of municipal liability. *Monell v. Dept. of Soc. Serv. Of New York,* 436 U.S. 658, 98 S.Ct. 2018 (1978); *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359 (2011).

Additionally, while Plaintiff in his Second Amended Complaint states that the alleged civil rights violation at issue is for deliberate indifference to serious medical needs, wrongful death, negligence, and intentional infliction of emotional distress (Doc. No. 23, ¶ 1), there is plainly no basis in law or fact for a § 1983 claim against this Defendant for wrongful death, negligence, or intentional infliction of emotional distress. Rather, to the extent Plaintiff's § 1983 claim is actionable at all against this Defendant, it only can be for the alleged deliberate indifference to the serious medical needs of Ms. Sanders.

**A. Phillip Sanders lacks the requisite standing to pursue a civil rights claim on behalf of Brenda Sanders.**

As evidenced by a review of Plaintiff's Second Amended Complaint, it is apparent that Plaintiff is attempting to bring individual claims on behalf of Brenda Sanders. *See* Doc. No. 23, p. 1. In fact, Plaintiff brings this action as "an Individual and Husband and Next of Kin of Brenda Jean Sanders, Deceased," not on behalf of Ms. Sanders's estate. *Id.* Generally, "constitutional rights are personal and may not be asserted vicariously." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) (internal citations omitted). "In order to

have standing, a party invoking the court's authority must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *O'Connor v. Washburn Univ.*, 416 F.3d 1216, 1222 (10th Cir. 2005)(quoting *Raines v. Byrd*, 521 U.S. 811, 818-19 (1997)) (internal citations omitted) (emphasis in original). A § 1983 claim must be based on the violation of the plaintiff's personal rights and not those of someone else. *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990).

The facts in *Archuleta,* are particularly relevant to the present case. In *Archuleta*, the Tenth Circuit held that a child lacked standing to bring a civil rights claim based on the alleged violation of his father's constitutional rights; and that the child, who was not the object of the alleged constitutional violations, could not assert a deliberate deprivation of his own rights. *Id.* at 496–98. The same considerations apply to Mr. Sanders' civil rights claims in the present case. As such, just as the child in *Archuleta*, Philip Sanders lacks standing to bring any individual claims in this lawsuit, and any such individual claims asserted by Philip Sanders should be dismissed.

In addition to Philip Sanders lacking standing to bring any individual claims in this case, he also he also lacks standing to bring this lawsuit as husband and next of kin of Brenda Sanders is also improper. The Tenth Circuit has held that the proper remedy for a § 1983 death case is a survival action brought by the estate of the deceased victim. *Berry v. City of Muskogee*, 900 F.2d 1489, 1506-07 (10th Cir. 1990) (holding that a federal civil rights action must be "brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'"). Since *Berry*, Oklahoma Federal courts, including this one, have relied on its holding on repeated occasions: "The federal remedy ultimately approved by the court for § 1983 death actions [is] a survival-type action to be **brought by the estate of the deceased victim**." *Winton v. Bd. of Comm'rs of Tulsa Cty., Okl.*, 88 F. Supp. 2d 1247, 1255–56 (N.D.

Okla. 2000) (emphasis added); see also *Bridges v. Wilson*, No. 15-CV-00126-GKF-JFJ, 2019 WL 11589719, at *3 (N.D. Okla. July 2, 2019).

Of particular relevance to the present case is a 2014 case from the Western District of Oklahoma, *Snow v. Bd. of Cty. Comm'rs of the Cty. of McClain*, No. CIV-14-911-HE, 2014 WL 7335319, at *4 (W.D. Okla. Dec. 19, 2014). In *Snow*, Gary Snow brought the lawsuit as the Special Administrator of the estate of the deceased Kory Wilson; likewise, Kristle Jimenez, attempted to list herself as a Plaintiff as next friend of BDJ–W, the minor son of Mr. Wilson. The *Snow* court dismissed Ms. Jiminez as a Plaintiff, finding that:

> The Board's motion also seeks the dismissal of any claims asserted by Kristle Jimenez, arguing that she lacks standing to assert a § 1983 claim based on injuries to Mr. Wilson and that she is not the surviving spouse or next of kin as to any state claim. Plaintiffs concede the point, indicating that Ms. Jimenez appears here only as mother and next friend of Mr. Wilson's minor son. The Board does not appear to challenge Ms. Jimenez's status insofar as she seeks to act only on behalf of the minor. However, the only remaining claim against the Board is that asserted against it under § 1983. Because a § 1983 civil rights action is personal, the proper remedy is **"a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'"** Therefore, all claims asserted by Ms. Jimenez against the Board will be dismissed.

*Snow v. Bd. of Cty. Comm'rs of the Cty. of McClain*, No. CIV-14-911-HE, 2014 WL 7335319, at *4 (W.D. Okla. Dec. 19, 2014) (emphasis added) (internal citations omitted).

Here, Plaintiff's Second Amended Complaint states that Plaintiff is the husband and next of kin of the Ms. Sanders, Ms. Sanders. Doc. No. 23, p. 1. However, these allegations are insufficient for Plaintiff to meet the requisite standing to pursue a civil rights action on behalf of Ms. Sanders, or individually. *See Snow v. Bd. Of County Comm'rs of the County of McClain*, No. CIV-14-911-HE, 2014 WL 7335319, at *4 (W.D. Okla. Dec. 19, 2014) (unpublished). "[T]he § 1983 civil rights action is a personal suit. It does not accrue to a relative, even the father of the deceased." *Dohaish v. Tooley*, 670 F.2d 934, 936 (10th Cir. 1982). Thus, Philip Sanders, as husband and next of kin, lacks the standing necessary to bring a § 1983 claim on behalf of Brenda Sanders regarding the alleged violation of her constitutional rights.

13

Additionally, the operative complaint, the Second Amended Complaint (Doc. 23), was filed November 21, 2017. Additionally, court records show that Philip Sanders was not legally appointed as the administrator of Brenda Sanders' estate until on November 27, 2017. (Exhibit 15, Nov. 27, 2017 Letters of Administration). As such, at the time that this lawsuit and the operative complaint were filed, Philip Sanders did not have standing to bring this lawsuit. This completely deprives him of any standing to bring a § 1983 claim on behalf of Ms. Sanders.

Thus, Philip Sanders has no standing to bring any individual claims against Turn Key, and Philip Sanders' status as husband and next of kin of Brenda Sanders is insufficient to establish the necessary standing to a § 1983 claim on behalf of Ms. Sanders. As such, judgment in favor of Turn Key is appropriate and should be entered.

### B. There is no *Respondeat Superior* Liability Under § 1983.

Assuming for the purposes of the remaining arguments that Plaintiff did have standing to bring the § 1983 claim he attempts to assert against Defendant, to the extent that it is based upon any theory of vicarious liability, it should fail. Plaintiff has not individually sued any employee of Turn Key. *See* Doc. No. 23. Turn Key is a business entity who was responsible for providing medical care and treatment at the Creek County Jail pursuant to a contract with Creek County. Undisp. Fact No. 1. "[U]nder § 1983, local governments are responsible only for 'their own illegal acts'" and "[t]hey are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292 (1986)). The law is well-established that Turn Key cannot be liable for a constitutional violation through the application of *respondeat superior. Monell,* 436 U.S. at 691; *Hinton*, 997 F.2d at 782. Thus, the only theory upon which Plaintiff could recover against Turn Key under § 1983 is the municipal theory of liability under *Monell*, and summary judgment is proper on any § 1983 claims based on vicarious liability of Turn Key's employees.

Turn Key cannot be held liable under a municipal liability theory under 42 U.S.C. § 1983 because Plaintiff cannot prove the bad intent of Turn Key—that policymakers for Turn Key knowingly established a policy or custom that caused an employee to violate the constitution. Plaintiff must prove who the policymakers were for Turn Key and what they knew. The law is settled that Turn Key cannot be liable for a constitutional violation through the application of *respondeat superior*. *Monnell v. Dept. of Soc. Serv. Of New York,* 736 U.S. 658 (1978).

**C. Plaintiff cannot establish a claim under the municipal theory of liability.**

To reiterate, Turn Key, as a corporate entity, can only be found to have been deliberately indifferent under a theory of municipal liability. *Monell v. Dept. of Soc. Serv. Of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978); *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359 (2011). A municipality can be found liable under § 1983 only where the municipality itself was at fault and caused the constitutional violation at issue. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989). The Supreme Court of the United States has required a plaintiff seeking to impose liability on a municipality under § 1983 to "identify a municipal 'policy' or 'custom' that caused the Plaintiff's injury." *Monell*, 436 U.S. at 2027. "Locating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* It is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury that the government as an entity is responsible for pursuant to § 1983. *Monell*, 436 U.S. at 694. A municipality may violate a person's civil rights "directly" through a designated decisionmaker who caused a deprivation of rights, such as when a city prosecutor directs an unlawful entry and search. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

"The Plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." *Bd. Of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 1371 L. Ed. 2d. 626 (1997). Simply, Plaintiff must prove that the municipal action was performed with the "requisite degree of culpability" and that there is causation between the action and the underlying deprivation. *Id*. Plaintiff has not and cannot identify any unconstitutional policy or custom of Turn Key that was the moving force behind any of her alleged claims, nor can she establish that any such policy directly caused Ms. Sanders's alleged injuries.

Plaintiff's Second Amended Complaint does not reference any Turn Key policy or custom whatsoever. Plaintiff has no evidence of a facially unconstitutional policy or custom of Turn Key and is also unable to establish that there was any specific Turn Key policy or custom that was the moving force behind her alleged constitutional deprivation. On this matter, the Court need look no further than the opinions of Plaintiff's own expert. Plaintiff's Expert, Dr. Susan Lawrence testified that she stands by her Expert Report that was submitted in this case. (Exhibit, 6, Lawrence Dep., at 172:6-14). In her report, Dr. Lawrence's criticisms of Turn Key's policies and procedures fall under the section entitled "II. The medical care provided by Turn Key to Ms. Sanders was negligent and fell beneath the standard of care." (Exhibit 16, Lawrence Report, at 16-20).

At her deposition, Dr. Lawrence criticized Turn Key's policy titled "Patients With Special Health Needs / Chronic Care" (Chronic Care Policy) because, according to Dr. Lawrence, because Ms. Sanders reported a history of hypertension, the policy was not followed by Nurse Grooms because he did not put Ms. Sanders on the chronic care list to be seen by a provider. However, Dr. Lawrence conceded that Ms. Sanders was not hypertensive at the time of her incarceration. (Exhibit 6, Dep. Lawrence, 83:16-20). Dr. Lawrence went on to concede that Ms. Sanders' hypertension did not cause or contribute to her death in any way. (Exhibit 6, Dep. Lawrence, 82:17-21; 83:10-15). Additionally, any alleged failure on the part of Nurse Grooms to follow the policy does not make the policy itself constitutionally deficient; likewise, Nurse

Grooms' alleged failure to follow Turn Key's policy does not suffice to establish a constitutional deprivation on the part of Turn Key. Dr. Lawrence also criticized this policy because it did not state exactly when a patient on the chronic care list is to be seen by a provider. (Exhibit 6, Dep. Lawrence, 82:8-16). However, Dr. Lawrence apparently did not read all the policies produced in this case, because Tun Key's Initial Health Screening Policy J-9 states that "Inmates with current, chronic medical or mental health conditions or prescription medications will be scheduled for a face to face screening/assessment with medical personnel within 48 hours and will be referred to appropriate HCP for review/treatment the next clinical day." (Exhibit 17, Turn Key Policies, at J-9).

Moreover, this hypertension and Chronic Care Policy argument, which Plaintiff will undoubtedly make, is a red herring based on pure speculation. Plaintiff's theory is that if Ms. Sanders had been seen by a mid-level provider for her hypertension, then it is possible that her diarrhea, which was never recognized by any of the other treating nurses, would have been recognized by the mid-level provider and Ms. Sanders' outcome could have been different. Exhibit 6, Dep. Lawrence, 84:12-85:1). However, this notion is pure speculation on the part of Dr. Lawrence, and her criticism should be disregarded accordingly. As such, Plaintiff has no evidence that Turn Key's Chronic Care Policy was constitutionally deficient policy that caused Brenda Sanders' harm.

Dr. Lawrence also criticized Turn Key's sick call system which requires a sick inmate to fill out a form in order to receive medical care. (Exhibit 6, Dep. Lawrence, 94:9-16). Notwithstanding the fact that the sick call form system is the standard throughout the United States penal system, Turn Key's Policy J-11 "Non-Emergency Health Care Requests (Sick Call)", explicitly states that "**Oral** or written requests will be received daily by healthcare staff and triaged within 24 hours." (Exhibit 17, Turn Key Policies, at J-11). Nurse Ferris explained in her deposition Turn Key nurses were trained to do a medical screening when providing medications to inmates and document when anybody voiced any concerns or questions. (Ex. 7,

Ferris Dep. at 23:18-22). Nurse Ferris further explained that when distributing medications, Turn Key nurses would observe whether their patients were able to verbally speak up and whether they were alert or oriented (Id. at 23:23-24:1). As such, Dr. Lawrence's criticism that inmates must fill out a form in order to receive medical care is wrong, and it should be disregarded as such.

Dr. Lawrence also criticized Turn Key because, according to Dr. Lawrence, Turn Key's policy was for medical complaints to be treated in the order received rather than triaged according to severity. (Exhibit 6, Dep. Lawrence, 94:9-16). However, once again, Dr. Lawrence was wrong. Turn Key's policy states that "Requests are documented and reviewed for immediacy of need and the intervention required.", and "any inmate with a request suggesting that the problem may be of an emergent nature (e.g. chest pain, breathing difficulties) will receive immediate attention." (Exhibit 17, Turn Key Policies, at J-11). As such, Turn Key's policy clearly instructs its employees to respond to medical complaints according to necessity. Therefore, once again, Dr. Lawrence's criticism can be summarily disregarded.

Plaintiff's expert opined that Nurse Grooms' alleged failure to fully execute Ms. Sander's medical records request form and subsequently obtain all of Ms. Sanders' medical records, pursuant to Turn Key policy, was a constitutional violation. (Exhibit 6, Dep. Lawrence, 86:3-87:2). However, there is no legal basis for such an opinion – there is no constitutional requirement that the entirety of a patient's medical records be obtained by a jail healthcare provider – the standard is deliberate indifference to a known, serious, medical need. Here, the evidence shows is at the time of her admission Ms. Sanders was medically screened by a licensed nurse, Nurse Grooms. During this screening, Nurse Grooms took a medical history, documented Ms. Sanders' medical status on the Medical Intake form. Nurse Grooms then contacted Ms. Sanders' prior healthcare provider to request her prescriptions and medical records. Nurse Grooms then contacted a Turn Key provider to order appropriate medications. Additionally, as part of his intake screening, Nurse Groom testified during his deposition that because he wrote "Okemah Indian Clinic" on

the Intake Form, he would have placed a call to that facility at that time to request Ms. Sanders' medical records. (Exhibit 4, Groom Dep., at 33-34). Plaintiff's theory that Nurse Grooms should have had Ms. Sanders execute a medical release form and send it to her previous medical providers is another misguided attempt to shoehorn a constitutional violation into this case.

Again, in her report, Dr. Lawrence's criticisms of Turn Key's policies and procedures fall under the section entitled "II. The medical care provided by Turn Key to Ms. Sanders was negligent and fell beneath the standard of care." (Exhibit 16, Lawrence Report, at 16-20). As such, even according to Plaintiff's own expert, any alleged deficiency in Turn Key's policies and procedures was negligent, at most, and therefore fails to meet the high bar of a constitutional deprivation.

Plaintiff is wholly unable to set forth any actual evidence a specific Turn Key policy or custom which was the cause, or moving force, behind any alleged **constitutional** deprivations allegedly suffered by Ms. Sanders. Without evidence of a specific policy or common practice of Turn Key which was the moving force or cause of Ms. Sanders' alleged **constitutional deprivation**, Plaintiff's § 1983 claims against Defendant Turn Key must fail.

In sum, while Defendant maintains that Plaintiff has wholly failed to establish that Ms. Sanders suffered an actionable constitutional deprivation by any Turn Key employee, even if this Court ultimately disagrees, Plaintiff's claim against Turn Key based upon the municipal theory of liability still must fail as there is no evidence of a specific Turn Key policy or custom which was the moving force or cause of that alleged constitutional deprivation. Vague or unrelated claims are not sufficient. Without tangible evidence of an actual and specific Turn Key custom or policy stemming from the Creek County Jail that predated the care at issue, Plaintiff cannot establish a municipal liability claim against Turn Key as a matter of law. Plaintiff lacks evidence to show that Ms. Sanders suffered a constitutional deprivation as a result of a specific Turn Key policy or custom. As such, this Court should grant judgment in Turn Key's favor on any

§1983 claim based on a Monell or municipal liability theory.

**D.   Plaintiff cannot prove an underlying constitutional deprivation by any specific Turn Key employee or medical provider.**

A municipality will not be liable for a constitutional violation based upon a "policy" argument when there was no underlying constitutional violation by any of its employees. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002). Collective allegations against the state are not sufficient to create a civil rights claim; a plaintiff must identify who exactly injured him and then join that party as a defendant. *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242 (10th Cir. 2008); *Stone v. Albert,* 338 Fed. Appx. 757, 759 (10th Cir. 2009); *Gray v. Weber,* 244 Fed Appx. 753 (8th Cir. 2007). If Plaintiff cannot prove a constitutional violation by a specific Turn Key employee, then he loses his civil rights claim against Turn Key and summary judgment must be granted.

"To state a cognizable claim [under § 1983], Plaintiff 'must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) (quoting *Estelle*, 429 U.S. at 106, 97 S. Ct. 285). This standard includes both an objective component and subjective component. *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018). To satisfy the objective component, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994)).

Deliberate indifference is "a stringent standard of fault, requiring proof that [defendant] disregarded a known or obvious consequence of his action." *Connick v. Thompson,* 563 U.S. 51, 61 (2011), quoting *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397 (1959). In particular, the subjective component of the deliberate indifference test "requires a showing that the defendant acted with a *culpable state of mind."* *Gaston v. Ploegger,* 229 Fed.App'x. 702, 710 (10th Cir. 2007) (emphasis added). In that respect, "[t]he subjective component is akin to recklessness in the criminal law, where, to act recklessly, a person must

**consciously disregard** a substantial risk of serious harm." *Self,* 439 F.3d at 1231 (emphasis added). A jail official "cannot be liable for a claim of deliberate indifference 'unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Heidtke v. Corr. Corp. of Am.*, 489 Fed. Appx. 275, 279 – 280 (10th Cir. 2012) (quoting *Self v. Crum*, 439 F.3d 1227, 1231).

In order to show an underlying constitutional violation on the part of a Turn Key employee or medical staff, Plaintiff has the burden to prove the subjective component of the deliberate indifference test, which requires a showing that the defendant "knew of and disregarded an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. If medical care was provided, and there is only a disagreement as to whether the proper care was provided, the case sounds in tort and does not rise to the level of a civil rights claim under § 1983. Where there is no allegation of a total denial of care, but rather plaintiff disagrees with the care provided, the civil rights claim fails. *Kermicle v. Day,* 428 F.Supp.16 (10th. Cir. 1976). An inadvertent failure to provide adequate medical care does not rise to the level of "wanton infliction of pain" necessary to sustain plaintiff's burden of proof for denial of the right to medical care. *Estelle*, at 105. A negligent failure to diagnose a medical condition also does not rise to the level of a constitutional violation. *Estelle*, at 105. Failure to provide a test or failure to transfer to an outside facility does not rise to the level of a civil rights violation. *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976). Performance of a cursory examination does not rise to the level of a civil rights violation. *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008). Delay in transfer to another facility does not constitute a violation. *Redding v. Marsh*, 750 F.Supp.473, 479 (E.D.Okl.1990). Whether an alternative method of treatment was appropriate is a question of negligence, not of constitutional violation. *Redding v. Marsh*, 750 F.Supp.473, 478 (E.D.Okl.1990).

Whether a specialist should have been called in sooner is a question of negligence, not a constitutional violation. *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993). Whether a medical provider made the right decision concerning a medical diagnosis or treatment is a question of negligence law which does not rise to the level of a constitutional deprivation. *Redding v. Marsh*, 750 F.Supp.473, 479 (E.D.Okl.1990). Whether a healthcare provider failed to treat a medical condition that he or she was not actually aware of is not a constitutional violation unless the condition was so obvious that a lay person would recognize that the inmate was at a serious risk of harm.

In order to show an underlying constitutional violation on the part of a Turn Key employee, Plaintiff must specifically show that a Turn Key employee, was both, aware of facts from which the inference could be drawn that a substantial risk of serious harm existed as to the individual, and it must be shown that defendant drew that inference, therefore, consciously disregarding the individual's health and safety to the level of a sufficiently serious deprivation. The Tenth Circuit has explained that case law firmly establishes "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232; *Heidtke*, 489 F. App'x. at 282 ("Only when the symptoms obviously point to a substantial risk of harm can we draw an inference of the medical professional's conscious disregard of an inmate's medical emergency.")

Here, Plaintiff's claims against Turn Key stem from allegations that Turn Key medical providers failed to recognize was at a serious risk of harm and failed to act and delayed her transfer to the hospital. First and foremost on this topic, Plaintiff's own retained expert witness, Dr. Susan Lawrence, testified that Turn Key's care in this case was negligent, as opposed to a violation of Brenda Sanders' constitutional rights:

> Q. Would it be more accurate to say that, in your opinion, Turn Key provided -- did not provide adequate care to . . . Brenda Sanders rather than no care?
> **A. They provided negligent care. They provided negligent care rather than no care.**
> (Exhibit 6, Lawrence Dep., at 193:6-15).

22

This testimony alone should be sufficient to show that all of Plaintiff's claims in this case are couched in tort and fail to rise to the level of a constitutional deprivation.

Undoubtedly, Plaintiff will argue that lay persons, including the correctional staff and Ms. Sanders' cell mates, complained to Turn Key's nurses that Ms. Sanders was having diarrhea. However, the undisputed evidence shows that only a single detention officer ever actually testified to have seen Ms. Sanders with fecal material on her pants that required Ms. Sanders to be taken to the showers, and she went on to testify that she could not recall whether she ever told the medical staff of the alleged diarrhea. Undisp. Facts 43, 55, and 56.

Notably, medical experts in this case testified that there are medical explanations for such a smell, not related to diarrhea or fecal matter, which a lay person could mistake for diarrhea. (cite). Not to mention, having a loose stool or diarrhea is not a medical emergency and there has been no evidence in this case that any person having diarrhea in a jail setting must be immediately transferred to a hospital for some particular treatment. Diarrhea is a common, non-emergent ailment that can be caused by a litany of reasons, including diet and medications. To the extent that Plaintiff relies on diarrhea as the sign and symptom that was so obvious a lay person would know that Ms. Sanders was at a serious risk of harm, this claim must fail.

In contrast to the opinion of these lay witnesses, it is vital to understand that there is not a single medical record that says that Ms. Sanders had diarrhea. Plaintiff will likely try to rely on the Creek County EMS narrative report which states that Ms. Sanders had been having constant diarrhea and deteriorating for approximately two weeks. However, the source of this information did not come from any medically trained healthcare provider. In fact, the Nurse on duty when EMS arrived, LPN Tamara Jackson, was a float nurse who had never worked at Creek County before that day and who was not familiar with Ms. Sanders' medical history. (Exhibit 9, Jackson Dep., 97:3-5). The information in the EMS report came from Jail Supervisor Lindsey Foster, not a Turn Key employee. (Exhibit 10, Foster Dep., at 29:14-30:1; 80:1-

24). The EMS report carries only as much weight as the observations of the non-medically trained Lindsey Foster. Moreover, the non-party detention officers knowledge does not impute to any of the nurses or medical staff of Turn Key, and each of Ms. Sanders' treating nurses testified that they were never aware that she had diarrhea. The EMS providers' note is only as accurate as the source of information upon which it is based; thus, for purposes of documenting an alleged history of diarrhea, the EMS report is meaningless.

The deliberate indifference standard requires that a **Turn Key employee** must have both been aware of facts from which the inference could be drawn that a substantial risk of serious harm to Ms. Sanders existed, and said **Turn Key employee** must also have drawn such an inference. The undisputable evidence here is clear: **no Turn Key employee was ever aware that Ms. Sanders was at a serious risk of harm, including diarrhea, altered mental status, jaundice. Each Turn Key employee involved in Ms. Sanders' care testified as such**. (Undisputed Facts 45-47).

Additionally, the deliberate indifference standard requires that Plaintiff prove that Turn Key ignored a known serious medical risk. As discussed above, no Turn Key employee was ever aware that Ms. Sanders had a serious medical need. However, it is worth reviewing all the medical care and treatment that Ms. Sanders did receive, just in case there remains any question as to whether Ms. Sanders medical complaints were ignored.

If Ms. Sanders was suffering from prolonged diarrhea, or any other medical condition, there is no good reason why she would not have expressed the same to the Turn Key medical staff. Especially on November 17 and November 18, when the undisputed evidence shows that she had face to face, personal interactions with Nurse Ferris, who in turn had access to a medical provider (APRN Goatley). Ms. Sanders never once reported that she had diarrhea. The only reports of diarrhea come from jail guards and inmates – never Ms. Sanders herself, and never from a Turn Key employee. The evidence further shows that Ms. Sanders never disclosed to any Turn Key employee that she had cirrhosis of the liver, or any other life

threatening illness. The evidence further shows that each and every time a Turn Key employee was made aware of an issue or complaint with Ms. Sanders, it was quickly and appropriately addressed.

On October 18, 2016, Ms. Sanders received a detailed medical screening by a licensed nurse, and a medical provider was contacted for consultation. On October 25, 2016, Nurse Ferris completed the additional lice treatment, and there was no documentation of any concerns or observation of diarrhea. On October 27, 2016, Ms. Sanders specifically requested in writing via the Sick Call Request Form to be seen due to issues with her eyes. Nurse Green evaluated and treated Ms. Sanders by washing out her eyes, which provided relief. There was no indication – either stated or observed – of diarrhea. On November 17 and 18, 2016, Nurse Ferris evaluated Ms. Sanders, as well as called the mid-level provider for orders regarding an issue with Ms. Sanders' eyes. Nurse Ferris was face to face with Ms. Sanders, as she obtained a full set of vital signs, administered eye drops, and walked Ms. Sanders back to her cell. Nurse Ferris wrote a detailed note about this encounter, and there was no mention of stated or observed diarrhea. Throughout her entire incarceration, Ms. Sanders received medications twice daily, during which the medical staff had the opportunity to assess her condition and take any complaints. Throughout all of this medical care and treatment, there is not a single mention of Ms. Sanders having diarrhea. Likewise, there is no evidence that Ms. Sanders reported having any diarrhea to any of the Turn Key nurses or medical staff that assessed her during her incarceration. Plaintiff cannot point to any medical diagnosis that went untreated, nor can Plaintiff point to any medical complaint made by Ms. Sanders that was not assessed and treated.

As stated throughout this brief, no Turn Key employee was ever aware that Brenda Sanders' had diarrhea or complaints of diarrhea. However, even if a Turn Key employee had been made aware of diarrhea as a symptom, diarrhea is not an emergent condition. It is unreasonable to expect that every inmate with diarrhea be sent to the hospital. Moreover, diarrhea and flatulence are known adverse effects of Ms. Sanders prescribed medication Prilosec. As such, if hypothetically a nurse had been aware of Ms. Sanders

having diarrhea, it would have been easily attributed as a knows and common side effect of her prescription medication rather than a sign or symptom of a serious medical condition. Likewise, to any extent that Plaintiff alleges that Ms. Sanders was exhibiting an altered mental status that the Turn Key staff failed to recognize, dizziness, fatigue, and nausea are known adverse effects of Ms. Sanders prescribed medication Norvasc. Thus, if hypothetically a nurse had been aware of Ms. Sanders having an altered mental status, it would have been easily attributed as a knows and common side effect of her prescription medication rather than a sign or symptom of a serious medical condition.

At their core, these claims against Turn Key are critical of the decision making of Turn Key medical providers and the appropriateness of their assessments of Ms. Sanders. Plainly, such claims are not actionable under § 1983. Rather, if actionable at all, such allegations sound in tort. Pursuant to the binding caselaw, negligence is not enough to state a claim under § 1983 for deliberate indifference of medical needs. *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997). "Disagreement about course of treatment or mere negligence in administering treatment do not amount to a constitutional violation." *Strain*, 977 F.3d at 987. If medical care was provided and there is only a disagreement as to whether the proper care was provided, the case sounds in tort and does not rise to the level of a civil rights claim. *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976).

**PROPOSITION II:   PLAINTIFF IS UNABLE TO STATE AN ACTIONABLE CLAIM UNDER OKLAHOMA LAW**

   **A.  Turn Key is statutorily immune from liability in tort.**

Plaintiff's claims of wrongful death, negligence, and intentional infliction of emotional distress are that of tort and judgment must be granted in Turn Key's favor pursuant to the Oklahoma Government Tort Claims Act as a matter of law. Under Oklahoma's Governmental Tort Claims Act ("GTCA"), Turn Key is considered an "employee" of the state and immune from liability for tort claims. Section 152.1 of Title 51 of the Oklahoma Statutes provides:

> The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.

OKLA. STAT. tit. 51, § 152.1(A). The GTCA goes on to say, "licensed medical professionals under contract with the city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies' are considered "employees of the state" for purposes of the GTCA. OKLA. STAT. tit. 51, § 152(b)(7). The Oklahoma Supreme Court has explicitly extended such immunity to a jail's health care contractor such as Turn Key:

> Generally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the GTCA by virtue of sections 152(7)(b), 153(A), and 155(25). *See* 51 O.S.Supp.2015 § 152(7)(b) ("As used in The Governmental Tort Claims Act: . . . 7. 'Employee' means any person who is authorized to act on behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time basis. . . b. For the purpose of The Governmental Tort Claims Act, the following are employees of this state, regardless of the place in this state where duties as employees are performed: . . . (5) physicians who provide medical care to inmates pursuant to a contract with the Department of Corrections, [and] . . . (7) licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies. "); *id*. §§ 153(A), 155(25). We have not been asked whether Turn Key Health, LLC or its staff are "employees" under section 152(7)(b), **but have assumed they are for purposes of answering the questions certified to us.**

*Barrios v. Haskell Cty. Pub. Facilities Auth*., 2018 OK 90, 432 P.3d 233, n.5 (emphasis added). As the Oklahoma Supreme Court explained, "in cases including tort claims against the State and state actors, the Court begins with the understanding that the State is statutorily immune from tort suit unless the Legislature has expressly waived that immunity." *Id*. at ¶ 8.

Here, Plaintiff has set forth claims against Turn Key for wrongful death (*see* Doc. No. 23, ¶¶ 35-40), negligence (*see id.* at ¶¶ 41-45) and the alleged intentional infliction of emotional distress (*see id.* at ¶¶ 46-52) all of which surround the medical care and treatment of Ms. Sanders at the Creek County Jail. *See generally* Doc. No. 23. Plaintiff himself alleged that Turn Key, by way of its employees, were providing

27

medical care to inmates at the Creek County Jail pursuant to a contract with Creek County (*id.* at ¶ 6) and this allegation is consistent with the uncontroverted evidence gathered to date (*see* Undisp. Fact. No. 1.) Accordingly, at all relevant times hereto, Turn Key provided services to Ms. Sanders while acting as the healthcare contractor at the Creek County Jail. Turn Key provided these services, by and through its employees and agents, pursuant to contract with the county. In accordance with the Oklahoma Supreme Court's ruling in *Barrios*, immunity afforded by the GTCA applies to correctional health care contractors, such as Turn Key, as well as such contractors' employees. Thus, there is no question that Turn Key and its employees are insulated from liability in tort pursuant to the GTCA. Such inclusion is fitting, as an entity can only act through its employees, and where such employees are entitled to tort immunity, so too should the employer entity be entitled to immunity. Accordingly, under the facts of this case and based on the clarification pronounced by the *Barrios* Court, Turn Key falls within the definition of "employee" under the GTCA and is therefore entitled to immunity from Plaintiff's state tort claims.

Many courts facing this same question have also arrived at the correct conclusion that correctional health care contractors such as Turn Key and its employees are classified as an "employee" under the GTCA and therefore protected by its provisions. For instance, the United States District Court for the Western District of Oklahoma held that Turn Key and its employees were immune from liability pursuant to the GTCA. *See Espinosa Hernandez v. Armor Corr. Health Serv's., Inc*., 2019 WL 3069430, *8 (W.D. Okla. Mar. 11, 2020) (dismissing Plaintiff's state law claims of negligence based on Armor's immunity under the GTCA.) *See also Thompson v. Norman Reg'l Hosp*., CIV-19-113-SLP (W.D. Okla. Mar. 11, 2020)*(*"there is no indication that the Oklahoma Supreme Court would treat Turn Key, as an entity, different from its employees based on the guidance provided by *Barrios*.") *Id*. at p. 19. In addition, the Court stated "[e]very federal court to apply *Barrios* to Turn Key or to similar jail-healthcare-providing entities and their employees has ruled similarly." *Id*. at p. 20. *See also Holland v. Glanz*, No. 16-CV-349-JED-JFJ, 2019 WL

4781869, at *7 (N.D. Okla. Sept. 30, 2019) ("Armor is an 'employee' under the [GTCA] and, therefore, is immune from tort liability.")

Likewise, in its decision in *Birdwell v. Glanz*, this Court has also held that Armor Correctional Health Services, a private healthcare contractor providing medical services to inmates at Tulsa County jail, is an "employee" under the GTCA and, thus, "entitled to immunity from tort suits arising out of the 'operation or maintenance of any prison, jail, or correctional facility'." *Birdwell v. Glanz,* Case No. 15-CV-304-TCK-FHM (N.D. Okla. Mar. 12, 2019) (citing OKLA. STAT. tit. 51, §§ 152(14) and 155(25)). The Court in *Birdwell* further expanded on the grounds for its ruling by stating that "the *Barrios* holding provides a strong indication that the Oklahoma Supreme Court would find both Armor and its employees. . . to be 'employees' under the [GTCA] who are entitled to immunity from tort liability." *Id* at p. 18. These rulings follow a myriad of similar rulings from the Northern District that are consistent with this proper interpretation and application of the GTCA. *See Strain v. Armor Corr. Health Care Serv's., Inc*., No. 19-CV-527-JED-FHM, 2020 WL 5026548 (N.D. Okla. Aug. 25, 2020)(Dismissing defendant's state law negligence claims on grounds that Armor is immune from liability under the GTCA); *Crocker v. Armor Corr. Health Serv's, Inc.*, No. 17- CV-149-TCK-FHM, 2019 WL 2146595, *4 (N.D. Okla. May 16, 2019)("Pursuant to . . . *Barrios*, the Court concludes that the Oklahoma GTCA immunity provisions apply to Armor and its employees, who are therefore exempt from tort liability for Plaintiffs' negligence claim . . ."); *Bradshaw v. Armor Corr. Health Serv's., Inc.*, No. 17-CV-615-TCK-FHM, 2019 WL 1675148, *7 (N.D. Okla. April 17, 2019) (finding the GTCA's immunity provisions apply to Armor and its employees for state law tort claims); *Prince v. Turn Key Health Clinics, LLC*, No. 18-CV-282-CVE-JFJ, 2019 WL 238153, *9 (N.D. Okla. Jan 16, 2019) (dismissing Plaintiff's state law claims of negligence based on Armor and Turn Key's immunity under the GTCA); *Burke v. Regalado*, 2019 WL 1371144, *2 (N.D. Okla. Mar. 26, 2019) (dismissing Plaintiff's state law claims of negligence based on Armor's employees' immunity

29

pursuant to *Barrios* and the GTCA); *Wright v. Glanz*, 13-CV-315-JED-JFJ, 2020 WL 1663356, at *9 (N.D. Okla. Apr. 3, 2020) *Nayebyazdi v. Turn Key*, District Court of Oklahoma County, Case No; CJ-2020-4425 (dismissing Plaintiff's state law claims of negligence based on Armor's employees' immunity pursuant to *Barrios* and the GTCA). Said simply, the vast majority of courts that have encountered this question since the *Barrios* decision, including this Court, have found that both private correctional healthcare contractors and their employees are statutorily immune from liability in tort in Oklahoma pursuant to the GTCA.

## **CONCLUSION**

For all the reasons set forth herein, Defendant, Turn Key Health Clinics, LLC., prays that its Motion for Summary Judgment be granted, and that judgment on all of the claims against it by Plaintiff be entered in its favor.

Respectfully submitted,

*/s/ Austin Young*
SEAN P. SNIDER, OBA # 22307
AUSTIN J. YOUNG, OBA # 32684
JOHNSON HANAN AND VOSLER
9801 N. Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
E-Mail: ssnider@johnsonhanan.com
E-Mail: ayoung@johnsonhanan.com
*Attorneys for Defendants Turn Key Health Clinics, Inc.*

30

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on **December 17, 2021** a true and correct copy of the above and foregoing was electronically transmitted to the Clerk of this Court using the ECF System for filing and transmittal of a Notice of Electronic Filing and to all ECF registrants who have appeared in this case.

*/s/ Austin Young*
Austin J. Young