```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3   PHILIP SANDERS, an           )
     Individual and Husband       )
 4   and Next of Kin of Brenda    )
     Jean Sanders, Deceased,      )
 5                                )
               Plaintiff,         )  NO. CIV-17-492-JHP
 6                                )
     vs.                          )
 7                                )
                                  )
 8   (1) CREEK COUNTY BOARD OF    )
     COUNTY COMMISSIONERS,        )
 9   (2) SHERIFF BRET BOWLING,    )
     in his official capacity     )
10   as Creek County Sheriff,     )
     and                          )
11   (3) TURN KEY HEALTH          )
     CLINICS, a limited           )
12   liability company,           )
                                  )
13                                )
                                  )
14         Defendants.            )

15

16           VIDEOCONFERENCE DEPOSITION OF

17              SUSAN LAWRENCE, M.D.

18            TAKEN ON DECEMBER 1, 2020

19           ON BEHALF OF THE DEFENDANTS

20             IN LANCASTER, CALIFORNIA

21

22

23    REPORTED BY:  EMILY CRIPE, CSR, RPR, RMR, CRR

24

25
```

1   you getting the two weeks from?

2     A.     If I remember correctly, that's what we
3   had at Adelanto detention facility, that if
4   somebody came in and they had their intake
5   screening and they were identified as chronic
6   care, I believe the policy was that within two
7   weeks they had to be seen by a provider.

8     Q.     Was there a specific time period stated
9   in Turn Key policies that you noticed?

10    A.     They actually didn't, which is -- at
11  least this policy, you know, it -- it doesn't say
12  how -- how soon, which is a deficit because, you
13  know, if -- if you identify that somebody has a
14  chronic medical condition but you don't see them
15  for three months, that gives a tremendous amount
16  of time for somebody to become very ill.

17    Q.     And have you noticed any evidence in
18  the records of Ms. Sanders becoming ill due to
19  her high blood pressure issues?

20    A.     Well, it was not due to her high blood
21  pressure issues.  But I will say this:  If she
22  had had a physical exam, even if it was because
23  of high blood pressure issues, if she had had a
24  physical exam, that would have been an
25  opportunity to identify -- and lab work as

1   well -- that would have been an opportunity to
2   identify other health problems of which she may
3   not have been aware or didn't think was important
4   or at least didn't -- didn't mention in the
5   absence of getting outside medical records.
6            So having a medical visit, a physical
7   exam and lab work within two weeks, would have
8   identified some of these other problems.
9        Q.   Okay.  And we will discuss different
10  aspects of your opinions in turn.  But with
11  regard to blood pressure issues, you did not
12  notice any evidence of Ms. Sanders having any
13  medical issues because of her hypertension;
14  correct?
15       A.   No.
16       Q.   And on her medical intake form, when
17  she was first assessed by Turn Key nurses, her
18  blood pressure was 138 over 62.  Is that within
19  normal limits?
20       A.   Yes, that is within normal limits.
21       Q.   And would you agree that the LPN that
22  did Ms. Sanders' medical intake contacted Nurse
23  Goatley and advised them of the -- this patient
24  having hypertension and being on Norvasc and
25  received provider orders to administer Norvasc

1    for management of hypertension issues of this
2    patient?
3       A.    Yes, but that's not sufficient.  Just
4    giving a blood pressure medication without doing
5    an evaluation to see if there were other issues
6    related to hypertension that require attention,
7    without doing lab work to determine if there are
8    underlying problems related to hypertension, you
9    know, that's what needs to be done.  It's not
10   sufficient just to prescribe Norvasc and leave it
11   at that.
12      Q.    But you have not noticed any
13   significant medical issues resulting just from
14   the hypertension alone in Ms. Sanders?
15      A.    Well, again, you know, maybe not from
16   the hypertension alone, but another -- you know,
17   people with chronic medical problems often have
18   multiple chronic medical problems, but they may
19   only be aware of one.  And if you have a physical
20   examination and laboratory testing done by a
21   qualified provider, either a mid level or a
22   physician, it gives you the opportunity to
23   identify other problems that the person may not
24   be aware of.  So that's where the lack of the
25   development of a treatment plan for hypertension,

1    you know, was so deficient.

2        Q.    What other criticisms of nursing care

3    of Ms. Sanders do you have?

4        A.    Well --

5              MR. RICHARDSON:  Objection to form.

6              THE WITNESS:  I'm sorry?

7        Q.    (By Ms. Thompson)  We discussed --

8              MR. RICHARDSON:  No, go ahead.  I just

9    made an objection to form.

10             THE WITNESS:  Can you be more specific

11   or can you rephrase -- it's a very broad

12   question.  Can you rephrase the question or be

13   more specific?

14       Q.    (By Ms. Thompson)  Yes.  We have just

15   discussed your criticism of nursing care by Turn

16   Key with regard to not developing -- or not

17   seeing Brenda Sanders in person within the 14-day

18   period; in your opinion, she should have been

19   seen within that time period and assessed because

20   she's a chronic patient.  Am I stating your

21   testimony correctly?

22       A.    Yes.

23       Q.    Other -- is there another criticism,

24   besides that one, of nursing care received by

25   Brenda Sanders that you can articulate?

1    A.    Well, I actually have many, so let me
2    start with one other one.
3    Q.    Okay.
4    A.    Also critically important.  So in Creek
5    County they had an authorization for release of
6    medical information form that they were supposed
7    to have the patients complete so they can send it
8    in order to get their medical records.  So there
9    is a form in the -- in the Creek County medical
10   records for Mrs. Sanders dated 10/17/2016.  It
11   has her name, full name, Social Security number,
12   booking number, et cetera.  And it -- it says,
13   you know, she needs to fill this out in order --
14   so that her records can be received.
15          And so she -- there's no signature.  So
16   there's -- not only is there no signature, but
17   there's no documentation that she refused to
18   sign.  So you -- and you can't -- you can't tell
19   what was -- what was the reason why there's no
20   signature.  Did they not ask her?  Did she
21   actually refuse?  As far as I'm concerned, you
22   know, at least at the facility that I worked, if
23   you didn't have a documentation that the patient
24   refused, then you can't prove that they refused.
25   Then it looks like it just wasn't done.  So in

1  this case it looks like they just didn't ask her
2  to sign it.
3      And the other thing about -- on the
4  medical intake form, where it's noted that she
5  was a patient at, I think it's Okemah Indian
6  Clinic, the Indian health service clinic, and
7  there was -- in a deposition Nicolas Groom stated
8  that he picked up the phone -- he remembered
9  picking up the phone and calling the clinic, but
10 without a release of medical records, they're not
11 going to tell you anything on the phone.  So him
12 calling them is moot because she didn't agree to
13 have her medical records released.
14     Q.   Did you mention earlier that sometimes
15 you would call medical care providers when you
16 worked for the federal prison facility?
17     A.   Uh-huh.
18     Q.   And what did you do in that
19 circumstance?
20     A.   I had a release of medical information
21 that I would fax over before they would speak to
22 me.
23     Q.   Okay.  Do you have any evidence to
24 indicate that Nurse Groom did not fax over a
25 medical release?

1   is a Turn Key policy dated 2/1/16 called "Access
2   to Care, Clinical Services."  And this policy
3   says, "The responsible health authority
4   identifies and eliminates any barriers to inmates
5   receiving health care."  So -- and they give you
6   a couple of examples of unreasonable barriers,
7   which these three examples that they give don't
8   -- don't really fit Mrs. Sanders's situation.
9   But, you know, for them to say that they have to
10  go in order, regardless of severity of their --
11  their condition, that's a barrier to health care.
12           Another barrier is to say that
13  Mrs. Sanders, no matter how sick she was or
14  confused she was, has to fill out a form herself,
15  that they can't take information from fellow
16  inmates who have observed her.  And I remember in
17  Mr. Groom's deposition he stated that in -- in
18  delivering medications, in dispensing
19  medications, that often he would get information
20  from fellow inmates that alerted him to problems
21  going on with people that he could then act on.
22           So -- so it's my opinion that Turn Key
23  created barriers for people to -- for inmates to
24  get -- to access medical care by stating that,
25  you know, they have to fill out the form

1    A.    Yes.

2          MR. RICHARDSON: Objection.

3          THE WITNESS: In a major way.

4    Q.    (By Ms. Thompson) Besides the fact
5    that you believe that the nurse should have seen
6    some sort of jaundice in her eye, what else do
7    you disagree with in this assessment?

8    A.    Well, it -- it contradicts the
9    testimony of the -- of the two detention officers
10   and the prior testimony of Classica Godwin that
11   she had been becoming progressively weaker and
12   had been confused. Those things are not
13   mentioned in the nurse's note, and I find it hard
14   to believe that she was just -- you know, just
15   during that period of time that she was being
16   assessed that she appeared completely normal and
17   without any evidence of these other signs or
18   symptoms.

19   Q.    The nurse did take the vital signs of
20   Ms. Sanders at that time, did she not?

21   A.    Yes, she did.

22         MR. RICHARDSON: Objection; form.

23   Q.    (By Ms. Thompson) And the vital
24   sign -- the blood pressure that's recorded of 114
25   over 73, is that within normal limits?

1    A.    Yes, it is.  Her vital signs were
2    within normal limits.  That's not the whole
3    picture, though.  Vital signs are just one part
4    of the picture.  There's other parts as well.
5    Like, for example, are their eyes yellow, do they
6    appear weak and debilitated.  It's a whole -- you
7    have to look at multiple factors, not just vital
8    signs.
9    Q.    Why would you expect this nurse, based
10   on the report that the patient did not seem quite
11   right without any mention specifically to the
12   eyes, why would you expect this nurse to check
13   for jaundice?
14   A.    Well, you don't check for jaundice.
15   She put eye drops in her eye.  There's no way she
16   could have avoided seeing it.
17   Q.    So it is your opinion, even though you
18   were not there and did not assess this patient
19   yourself, that she would have had jaundice at
20   that time?
21   A.    Yes.  Based on my years and years of
22   experience in internal medicine, treating people
23   with liver disease, yes.
24   Q.    Do you take -- just as an outside, do
25   you take testimony of all witnesses that

1  always if -- like, if I have -- even in private
2  practice, if I have a new patient come to me, I
3  don't make a decision based on what they tell me.
4  You know, I ask them to sign a release of
5  information, I get their medical records.
6      Q.    (By Ms. Thompson)  Besides what we have
7  discussed already, do you have any other
8  criticisms of the nursing care provided to Brenda
9  Sanders?
10           MR. RICHARDSON:  Other than what's in
11  her report and she's testified to?
12           MS. THOMPSON:  Right.  Other than
13  what's in your report and you have testified to.
14           THE WITNESS:  I don't believe so.
15     Q.    (By Ms. Thompson)  Give me just a
16  moment, please.  I believe we're almost done.
17           Dr. Lawrence, I have a quick question
18  about your comment in the report on Page 14,
19  Paragraph 3, last paragraph.
20     A.    Uh-huh.
21     Q.    Here you state that, "Clearly
22  Mr. Groom's testimony by his late entry was
23  false."
24           Do you have any reason to doubt the
25  truthfulness of Mr. Groom's testimony with regard

```
 1    was never seen by any Turn Key providers for
 2    anything?
 3         A.    I'm not saying that.  I mean, she was.
 4    It just wasn't very competent care and the real,
 5    serious issues were never addressed.
 6         Q.    Would it be more accurate to say that,
 7    in your opinion, Turn Key provided -- did not
 8    provide adequate care to --
 9               MR. RICHARDSON:  Objection to form.
10         Q.    (By Ms. Thompson)  -- Brenda Sanders
11    rather than no care?
12         A.    They provided negligent care.
13               MR. RICHARDSON:  Objection to form.
14               THE WITNESS:  They provided negligent
15    care rather than no care.
16         Q.    (By Ms. Thompson)  Do you have any
17    evidence to indicate that any of the LPNs or the
18    APRN were improperly licensed to perform their
19    duties?
20         A.    I have no evidence of that.
21         Q.    Do you have any evidence to point to
22    that any of the LPNs or the APRN received
23    improper training from Turn Key?
24               MR. RICHARDSON:  Objection to form.
25               THE WITNESS:  I don't have any evidence
```