# Expert Witness Report

in the matter of

## Philip Sanders, an Individual, Husband, and Personal Representative of the Estate of Brenda Jean Sanders, Deceased

### v.

## Turn Key Health Clinics, a limited liability company

Prepared for:
Attorney Charles L. Richardson
Richardson Richardson Boudreaux PLLC
7447 S. Lewis Avenue
Tulsa, OK  74136

Prepared by:
Susan E. Lawrence, MD
2851 West Avenue L # 302
Lancaster, CA  93536

Report Date:  July 16, 2020

*Susan E. Lawrence MD*

_____

Susan E. Lawrence, MD

**EXHIBIT**

**2**

**Introduction**

This document is my expert report in the matter of Philip Sanders, an Individual, Husband, and Personal Representative of the Estate of Brenda Jean Sanders, Deceased [plaintiff] v. Turn Key Health Clinics, a limited liability company [defendants].

I was retained in this matter by Attorney Charles L. Richardson on April 3, 2019. Attorney Richardson represents Philip Sanders in this case.

**Qualifications**

I earned a Bachelor of Arts (A.B.) degree in biology and psychology from Barnard College of Columbia University in 1974, and an M.D. degree from Baylor College of Medicine in 1978. I completed one year of internal medicine internship and two years of internal medicine residency at the State University of New York at Buffalo Medical School Affiliated Hospitals in 1981. In 1984, I completed a two year fellowship in Hematology/Oncology at the University of Texas Medical Branch, Galveston. I achieved lifetime board certification in Internal Medicine in 1983 and in Medical Oncology in 1985.

From 1985 through 1992, I practiced medical oncology through my private office in Lancaster, California. In 1992, I launched a nonprofit organization, The Catalyst Foundation, which provided free medical care for people living with HIV/AIDS. I served as Catalyst's Medical Director and Staff Physician until 2011, and in this capacity I treated cancers and other conditions occurring within the HIV/AIDS population. In 2011, I created the Bartz-Altadonna Community Health Center (BACHC), a federally qualified health center in Lancaster which took over the provision of HIV/AIDS care from Catalyst. I served as BACHC's volunteer medical director until 2012.

From October 2013 through September 2016 I served as Staff Physician/Medical Director at the Adelanto Detention Facility in Adelanto, California. In this capacity I provided primary medical care as well as specialty care in HIV/AIDS, chronic viral hepatitis, coccidioidomycosis, and cancer for the detainee population. As Medical Director I was also involved in quality

2

improvement programs, investigations into patient deaths, planning and delivery of appropriate medical care services for detainees, and other administrative issues.

From October 2004 through February 2017 I volunteered at California State Prison-Los Angeles County, providing rehabilitative programming and serving as a resource to prisoners in addressing their unmet healthcare needs.

In December 2016 I earned a J.D. degree summa cum laude from Concord Law School. I passed the July 2017 California Bar Examination, and am now a licensed attorney in the state of California.  Since then I have been involved in conducting inmate medical exams and assessments for consultations regarding their medical needs and/or for release request purposes.

My full C.V., which includes publications in the past 10 years, is available as Exhibit A (attached).

**Prior Testimony**

In the past four years, I have testified by deposition and trial in the following cases:

1) Nathaniel Robinson v Kevin Krembs et. al (170cv-0349, US District Court of Wisconsin)

2) Tipton v Corizon (2:19-cv-00060-JT-JZB, US District Court, District of Arizona)

3) Moore v Kraus, et. al (18-001395-NH-State of Michigan, Circuit Court for County of St. Clair)

4) Gilmore v David Decker, et. al. (2:16-cv-209-JMS-MJD, US District Court, Southern District of Indiana)

5) Bossardet v. Ryan, et. al (4:17-cv-00517-FRZ-TUC, US District Court, District of Arizona)

6) Gilmore v David Decker, et. al. (2:16-cv-209-JMS-MJD, US District Court, Southern District of Indiana)  (trial)

**Compensation**

I am paid $500/hour for the review of records and the writing of this report.

**Materials Reviewed**

I have reviewed the medical records of Brenda Sanders and other documents which were necessary to render this opinion. These are:

1. Turn Key Health, Brenda Sanders Medical Records, 10/17/16 – 11/22/16

2. St. John Hospital, Brenda Sanders, Medical Records, 11/20/16 – 11/21/16

3. Death Certificate, Brenda Sanders, 11/21/16 (Certified 12/5/16)

4. Turn Key Health List of Policies and Procedures

5. Turn Key Health Policies and Procedures

6. Contract Between Creek County, Oklahoma, Creek County Sheriff's Office, and Turn Key Health Clinics, 6/22/15

7. First Amendment to Contract Between Creek County, Oklahoma, Creek County Sheriff's Office, and Turn Key Health Clinics, 6/20/16

8. Creek County Sheriff's Office Records

9. Complaint, 8/11/17; Amended Complaint, 9/20/17; and Second Amended Complaint, 11/21/17

10. Turn Key's Answer to Second Amended Complaint, 8/7/18

11. Plaintiff's Responses to Defendants' First Set of Discovery, 11/19/18

12. Plaintiff's Supplemental Responses to Defendants' First Set of Discovery, 2/18/19

13. Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production

14. Defendant Turn Key First Supplemental Response to Plaintiff Interrogatory # 5

15. Defendant Turn Key First Supplemental Response to Plaintiff Interrogatory # 10

16. Defendant Turn Key Responses to Plaintiff's First Discovery Requests

17. Defendant Turn Key Responses to Plaintiff's Second Set of Discovery Requests

18. Deposition of Philip Sanders, 10/23/19

19. Deposition of Heather Sanders, 10/25/19

20. Creek Nation Community Hospital, Medical Records, 2011- 2015

21. Deposition of Philip Sanders, Jr. 1/3/2020

22. Deposition of Cheryl Green, 3/11/2020

23. Deposition of Nicholas Groom, 5/6/2020

4

24. Deposition of Bailey Smalley, 6/2/2020

25. Deposition of Lindsay Foster, 6/16/2020

26. Deposition of Classica Godwin, 6/17/2020

27. Deposition of Cody Smith, 6/19/2020

28. Creek County Justice Center, Booking Activity Reports

29. Creek County Justice Center, Medical Observation Checklists

30. Creek County Justice Center, Segregation Activity Records

I have the expertise to evaluate the reliability of these records. They are of the type usually relied upon in such cases, but no opinion is given as to the reliability of these particular records because of disparities between the jail medical records and reports of events noted in the EMT report, the St. John Hospital records, and deposition testimony. For this reason, it is highly probable the jail records are absent or incomplete. My opinions are, however, based on the records provided. Below is a summary of the facts contained in the records I reviewed.

**Facts**

Brenda Sanders was a 56 year old woman with a past history of hypertension, GERD, anxiety, depression, alcohol use disorder, and alcoholic cirrhosis. On October 17, 2016, she was admitted to the Creek County Jail. Approximately two weeks prior to her death on November 21, 2016, she developed severe diarrhea and deteriorating mental status, for which she received no treatment at the jail until she was transferred to St. John Hospital ER on November 20, 2016. She died in the intensive care unit the following day. The chart below details the timeline of her illness.

| 10/17/16 | Mrs. Sanders was admitted to the Creek County Jail. [CREEK_COUNTY_SO_000034] |
| --- | --- |
| 10/17/16 | A Creek County Sheriff's Office Intake Medical Form was completed at 23:26. Line 22 indicated Mrs. Sanders was taking several medications, and line 33 that she had high blood pressure. [CREEK_COUNTY_SO_000015; CREEK_COUNTY_SO_000031].<br><br>A Creek County Sheriff's Office Authorization and Consent form for release of medical records for Mrs. Sanders was blank as far as provider from whom |

| | |
|---|---|
| | records were sought, and the form was not signed by her.  Date was 11/17/16 and time 11:27.  [CREEK_COUNTY_SO_000016] [TK Records018] |
| 2009 - 2015 | Outside medical records from Creek County Community Hospital revealed the following information about Mrs. Sanders.  This information would have been available to Turn Key medical staff had they followed through on requesting her medical records from outside community healthcare providers.<br><br>On 9/30/10, Mrs. Sanders was noted to have elevated liver function tests dating back to 2009.  It was also noted she took NSAIDs.<br><br>On 4/5/11, Mrs. Sanders was again noted to have elevated liver function tests.  A Hepatitis C antibody test was performed and was positive.  On 4/15/11, a Hepatitis C viral load test was performed and was negative, indicating Mrs. Sanders had been exposed to Hepatitis C at some point but did not have chronic infection.<br><br>Clinical note of 8/17/12 mentions Mrs. Sanders complained of abdominal pain for the past three months, a 25 pound weight loss, anorexia, and abdominal swelling for the past 2 weeks.  She stated she drank a pint of rum daily.  On exam she was noted to have a distended abdomen with a firm enlarged liver and possible epigastric mass.  Weight was 110.<br><br>Clinical note of 8/22/12 indicated she still had abdominal pain, but it was improved.  Physical exam showed hepatomegaly.  Diagnoses were alcoholic cirrhosis (based on CT and ultrasound findings), chronic Hepatitis C (erroneous because of negative Hepatitis C viral load) and cholelithiasis.  Weight was 112.<br><br>Clinical note of 9/10/12 indicated Mrs. Sanders complained of abdominal pain, nausea, vomiting, and poor appetite.  She stated she had stopped drinking.  Physical exam showed ascites, 1-2+ pedal edema.  Weight was 122.  On 9/11/12 she was referred to GI for upper endoscopy with banding of esophageal varices and paracentesis.<br><br>Clinical note of 11/30/12 indicated Mrs. Sanders continued to complain of abdominal pain.  She was now taking Lactulose daily.  She stated she had had no alcohol since August 2012.  Her weight was 105.  On physical exam she looked ill appearing and cachectic, with nonicteric sclerae.  Abdominal exam showed a positive fluid wave and umbilical hernia.  Liver was not palpable and she was not jaundiced.  Daily weights and abdominal girth measurements were ordered. |

| | |
|---|---|
| | Clinical note of 12/7/12 indicated Mrs. Sanders was anemia with H/h 7.4/23.2. Weight was 106.  Physical exam showed she was ill-appearing and had scleral icterus and minimal ascites.  Note mentions she drank alcohol last week.<br><br>Clinical note of 4/9/13 indicated Mrs. Sanders was hospitalized for acute pancreatitis from 4/2 – 4/4/13.  During her hospital stay she was noted to be jaundiced with a bilirubin of 3.4. She was recovering well and stated her alcohol intake was "much lighter."<br><br>Clinical note of 7/2/13 mentioned Mrs. Sanders was "falling occasionally" and was feeling depressed.  Physical exam showed she was well developed and had hepatic enlargement.  Lactulose was continued.  Note did not mention any findings of severe liver disease.  No mention of alcohol intake.<br><br>ER note of 12/17/14 states Mrs. Sanders was complaining of back pain, and that she "falls a lot."  X ray lumbar spine was read as showing chronic degenerative changes but no acute process.  Abdominal exam was normal.  No mention of findings of severe liver disease.  She was to follow up with her primary care doctor.  No mention of alcohol intake.<br><br>Clinical note of 5/26/15 mentions Mrs. Sanders was depressed because she lost her roommate to a violent crime.  She had not been to the clinic in 6 months due to lack of transportation.  Physical exam showed she looked well and abdominal exam was normal.  No mention of alcohol intake.  Weight was 122.<br><br>(No Bates numbers.) |
| 10/18/16 | A Turn Key Health Medical Intake form was completed by an LPN (name illegible), which indicated Mrs. Sanders had been diagnosed with hypertension in 2011, and was on Norvasc 5 mg daily for this.  She also was noted to be taking Ibuprofen and Ranitidine, and that she had her gallbladder removed in 2012. She had a history of anxiety and depression, had seen mental health professionals at Creek Nation in the past, and had been prescribed Remeron. Her last drink of alcohol was noted to be 10/11/16, and that she had no present symptoms or withdrawal and had not had these issues in the past. Form also mentioned she received her medical care in the community at Okemah Indian Clinic (sic), and that she was checked for head lice and required treatment, which was ordered.  [TK Records007 – 008, 019]<br>[CREEK_COUNTY_SO_000013] |
| 10/27/16 | Mrs. Sanders placed a Sick Call Request complaining she could hardly see, that she had glaucoma and got soap in her eyes. The request was received by Medical the same day, with an undated and unsigned note that she had been assessed by the nurse, her eyes had been washed out and she could see better. [CREEK_COUNTY_SO_000011] |

| | |
|---|---|
| | |
| 11/17/16 | Artificial tears were ordered by an APRN (name illegible). [TK Records016] |
| | |
| 11/18/16 | Handwritten progress note signed by an LPN (name illegible) states the detention officers supervisor alerted her when she arrived for work at 0650 that Mrs. Sanders "didn't seem right" overnight.  According to the note (written at 0830) Mrs. Sanders was immediately brought to the clinic for evaluation.  Her blood pressure was 114/73, pulse 65, temp 97.7, respirations 14.  Her only complaint was slightly blurry vision.  Artificial tears were administered as per orders and the LPN walked Mrs. Sanders back to the housing unit. [CREEK_COUNTY_SO_000010] |
| | |
| 11/22/16 | Handwritten progress note by LPN Nick Groom stated this is a late entry for 11/17/16 at 0830.  The note states Mrs. Sanders came to the holding cell for medication pass, and had no "s/s [signs/symptoms] of hyperventilation or hypotension observed. Inmate not disoriented and able to follow commands per her normal state."  [CREEK_COUNTY_SO_00026]<br><br>No other jail medical records (aside from those noted above) were available for my review prior to Mrs. Sanders' transfer to St. John Hospital ER on 11/20/16. |
| | |
| 11/27/18 | Creek County Sheriff's Office Inmate Medical Form dated 11/27/18 at 11:31 contained the same information as the form dated 11/17/16. [CREEK_COUNTY_SO_000018] |
| | |
| 11/20/16 | EMS Report stated jail RN informed EMT's that Mrs. Sanders had been becoming more confused, weak, and having diarrhea for the past two weeks.  There was vomit on the side of her face and RN stated she did not know if Mrs. Sanders had vomited.  The RN also stated she did not know Mrs. Sanders, and that Mrs. Sanders had been moved to the front (sic) of the jail due to her having constant diarrhea and they put her in a cell alone.  An employee stated Mrs. Sanders had been deteriorating for the past few weeks, describing her as "becoming more altered and as of today unable to walk, pt having poor food and fluid intake as well."  RN stated he/she had no medical history on Mrs. Sanders and did not know if she takes medications on a regular basis. RN reported O2 saturation was low and she had wheezing and rales (she listened to her lungs this morning). [SANDERS_000052] |
| | |

| | |
|---|---|
| 11/20/16 | St. John Hospital ER Triage note states, " Pt presents with AMS [altered mental status] from jail—pt has Cheyne-stokes respirations—pt has evidence of recent vomiting and jail reports pt has had diarrhea x 2 weeks and mental status has been declining x 2 weeks." [SANDERS_000040]

ER provider note by Charles Farmer, MD, states, "According to EMS, pt has had diarrhea and an altered level of consciousness for two weeks." Also, "Pt is heavily breathing at time of examination and is hypotensive.  Pts history is severely limited secondary to clinical condition."

Mrs. Sanders was given a bolus of 3L NS and started on IV broad spectrum antibiotics.  Labs showed evidence of hepatic and renal failure. Ammonia level was elevated at 165.  CBC showed H/H 8/1/24.9, platelets 81,000, PT/PTT elevated at 2.8/29.8, BUN 63, Creat 2.36, SGOT 102, SGPT 46, albumin 2.6, total bilirubin 7.8, direct bilirubin 3.7. Chest X ray was read as showing cardiomegaly and bilateral airspace opacities reflecting edema, pneumonia, or diffuse alveolar damage/ARDS.  She was intubated and transferred to the ICU. [SANDERS_000043]

Hepatitis C (HCV) antibody (+) but no HCV viral load done. [SANDERS_000071]  HCV viral load performed in 2011 at Creek Nation Community Hospital was negative. [No Bates number.]

U/A showed 2+ protein, + for bilirubin, 25-50 wbc's, bacteria 4+. [SANDERS_000070]

CT chest was performed as read as showing significant bilateral pleural effusions and diffuse parenchymal opacities. [SANDERS_000321]

CT abdomen and pelvis was read as showing marked thickening of the cecum and ascending colon, suggestive of colitis; liver small and nodular, suggesting underlying liver disease; ascites; and concern for abdominal varices. [SANDERS_000321 - 322]

Abdominal ultrasound was read as showing liver with nodular contour and coarsened echotexture suggesting hepatic cirrhosis. Kidneys were normal. [SANDERS_000324]

CT of the head was read as showing no intracranial process and mild subcutaneous edema particularly in the left face. [SANDERS_000323]

ICU Progress Note mentioned Mrs. Sanders' vital signs were blood pressure 84/46, pO2 100% on 4L oxygen, pulse 82, respirations 21, temperature 36.8. She was jaundiced on physical exam, encephalopathic, and oriented to name only.  She was tachypneic and lung exam showed diffuse rhonchi.  Impression was 1) Severe sepsis with shock, ?UTI, ? pneumonia; 2) Acute hypoxic |

| | |
|---|---|
| | respiratory failure; 3) Acute kidney injury; 4) Hepatopathy; 5) Coagulopathy, anemia, thrombocytopenia in setting of sepsis and liver failure.  Medical records were requested from the jail.  [SANDERS_000062-63] |
| | |
| 11/21/16 | ICU Progress Note indicated Mrs. Sanders' vital signs were blood pressure 66/33, respirations 32, O2 48%, temperature 36.9.  CBC showed elevated wbc (20.4), continued severe anemia (H/H 7.8/24.3), platelets low at 125,000.  Renal function slightly worse with metabolic acidosis (Creat 2.75/BUN 62, Bicarb 14).  She remained hypotensive despite multiple pressors and hypoxic despite mechanical ventilation.  Nephrology was consulted for dialysis.  Antibiotics, Lactulose, Bicarb drip, and Albumin were continued.  [SANDERS_000303 - 304]<br><br>Urine culture (+) for E.coli, >100,000 cfu/ml. [SANDERS_000075]<br><br>Assessment in ICU Progress Note was 1) Respiratory failure; 2) Septic shock; 3) Encephalopathy; 4) Cirrhosis; 5) Coagulopathy; and 6) Acute Kidney Injury.  Note states code status was discussed with Mrs. Sanders' son, who agreed with Do Not Resuscitate (DNR) status because of her imminent death due to her dire medical condition.  [SANDERS_000303 - 304]<br><br>Nephrology consult stated Mrs. Sanders had a history of heavy daily alcohol intake prior to her incarceration (information obtained from her son). Physical exam again noted jaundice.  Ascites was noted on abdominal exam, and lung sounds were coarse bilaterally.  Impression was 1) Acute kidney injury in setting of shock and multiorgan failure; 2) Shock, likely septic; 3) Metabolic acidosis; 4) Respiratory failure; 5) Chronic liver disease with acute decompensation and with markedly elevated bilirubin and PT; 6) Pyuria, hematuria, proteinuria; and 7) Abnormal coagulation parameters.<br><br>The note stated Mrs. Sanders was "on maximum support currently and continues to be extremely critical.  Continuous Renal Replacement Therapy (CRRT) was indicated but it is unlikely to make any impact on her dismal outlook and she may not tolerate it given her low mean arterial pressures."  A detailed discussion was had with Mrs. Sanders' son and ICU attending physician.  [SANDERS_000060-61]<br><br>Mrs. Sanders died on 11/21/16 at 12:10.  [SANDERS_000330] |

**Scope of Report**

In this report, I have been asked to provide an opinion as to whether the care provided to Mrs. Sanders by defendants constituted deliberate indifference to her serious medical needs.  In

addition, I have been asked to provide an opinion as to whether the care provided to Mrs. Sanders by defendants was negligent and proximately caused her death.

**Expert Opinions and Basis for Opinions**

My basis and reasons for my opinion(s) come from a combination of

- My education, training, and experience in the field of internal medicine and correctional medicine. I am familiar with the standard of care for medical practices that currently relate to issues of care and treatment of patients like Mrs. Sanders;
- The materials reviewed, which are listed in this report; and
- Current standards for health services in jails.

**I. Turn Key was deliberately indifferent to Mrs. Sanders' serious medical needs.**

In Estelle v. Gamble, 429 U.S. 97 (1976), the United States Supreme Court ruled that to constitute an Eighth Amendment violation for inadequate prison medical care, there must be both an objectively serious medical condition and deliberate indifference to that condition. In Wilson v. Seiter, 501 US 294 (1991), the Court held that the same standard applies to pre-trial detainees like Mrs. Sanders through the due process clause of the Fourteenth Amendment.

**A. Altered mental status accompanied by severe diarrhea is a serious medical condition, and Turn Key was deliberately indifferent when it failed to provide any medical care to Mrs. Sanders for these problems.**

Within the medical community, altered mental status associated with severe diarrhea is considered an objectively serious medical condition, as these can be symptoms of a life threatening underlying illness (such as liver failure or sepsis) which can result in death if not promptly identified and treated.

**1. Turn Key was deliberately indifferent because it knew or should have known the seriousness of Mrs. Sanders' condition, and failed to provide any medical care whatsoever to identify and treat her problem.**

Despite the absence of any clinical notes by medical providers, Turn Key knew or should have known of Mrs. Sanders' deteriorating health status during the two weeks prior to her death.

Turn Key was made aware of Mrs. Sanders' serious condition by multiple inmates who were housed with her in "L" Pod not long after her arrival in the jail.  In her deposition of June 17, 2020, former inmate Classica Godwin explained Mrs. Sanders slept by the foot of Ms. Godwin's bed in a "boat" (a portable bed used by prisoners in event of overcrowding). Ms. Godwin noted when the detention officers first brought Mrs. Sanders to "L" Pod, she was too weak to lift her "boat" so the officers carried it for her, even though jail policy required each inmate to do this themselves.  Because of the proximity of their sleeping arrangements, Ms. Godwin was in an excellent position to observe Mrs. Sanders' condition.  She stated that even when she first arrived in "L" Pod, Mrs. Sanders had a foul fecal odor about her.  On two occasions, Ms. Godwin observed Mrs. Sanders to be confused and disoriented upon awakening from sleep, stating she did not know where she was.  She also noticed Mrs. Sanders' eyes were yellow, she complained of problems with her vision, and required help in getting up from her bed and filling her water container because of progressive weakness.

On several occasions, when nursing staff came around to pass medications, Ms. Godwin spoke with them about Mrs. Sanders' condition and need for medical care.  She testified she literally *begged* them for help, saying, "Can you guys *please, please, please* check her out?" only to hear, "Fill out that medical request form and we'll get to her.  It has to go in order." Ms. Godwin stated even as a lay person it was obvious to her that "anyone in their right mind" would have seen Mrs. Sanders was desperately ill and "needed more than this little nurse that's passing out this medicine."

Finally, Ms. Godwin testified, the inmates in "L" Pod took matters into their own hands. Numerous women continuously pushed the alarm button in the cell to force the detention officer to come and take Mr. Sanders away, as they could no longer stand the stench of feces permeating their living quarters.  Creek County Justice Center documents indicate she was taken to Medical Observation, a fact of which Turn Key nursing staff must have been aware.

There is also powerful and substantial evidence from the personal observations of detention officers that Turn Key nursing staff had actual knowledge of Mrs. Sanders' increasingly critical condition but took absolutely no action to provide her with any medical care whatsoever.

In her deposition of June 13, 2020, Detention Supervisor Lindsey Foster clearly and straightforwardly testified about her personal observations of Mrs. Sanders' deteriorating condition during the approximately two weeks she was housed in a cell in the booking area. Ms. Foster describes Mrs. Sanders' severe diarrhea and incontinence and an abnormal, horrible odor of feces (she referred to it as the "smell of death") that was present in each cell in which Mrs. Sanders was placed. She stated this odor was readily apparent when the "bean hole" or small portal in the cell door was opened to allow medications and meals to be passed, and the smell was simply overwhelming if the cell door itself was opened. Ms. Foster noted that Mrs. Sanders' orange jumpsuits were often stained with feces, and there was soiled toilet paper soiled strewn about the cell floor. ("The only request she had was for more toilet paper," she noted.) Detention staff had to assist Mrs. Sanders with changes of clothes and showers, until she became too ill to walk to the shower from her cell. Although inmates were required to walk to the cell door to receive their medications and meal trays, as time went on, Mrs. Sanders became too weak and debilitated to do so. Ms. Foster and the detention officers needed to enter the cell to deliver the meal trays. She noted that Mrs. Sanders was consuming very little, if any, of the food and liquids she was provided.

Ms. Foster explained that Turn Key nursing staff could not enter a cell except in the presence of a detention officer, and she described numerous occasions in which she accompanied a nurse to Mrs. Sanders' cell to provide her medications. Ms. Foster personally witnessed the nurses observe Mrs. Sanders' increasingly dire condition, yet take absolutely no action. She repeatedly testified that it would be impossible for anyone, even a lay person, to see Mrs. Sanders and not know something was terribly wrong.

Ms. Foster and other detention staff, including Detention Officer Bailey Smalley (who also testified similarly in her deposition) notified Turn Key nurses on multiple occasions of Mrs. Sanders' condition and desperate need for medical care. Nothing was done. She mentioned on one occasion she personally informed head nurse Nick Groom, who replied he would assess Mrs. Sanders "later." There is no evidence he ever did so. Ms. Foster stated at her deposition that it was her impression the Turn Key nursing staff were "lazy and did not do their jobs."

13

According to Ms. Foster's testimony, a new nurse was in the facility on 11/20/16, the day Mrs. Sanders was finally sent to the hospital. The nurse, identified as Tamara Jackson by Nick Groom in his May 6, 2020 deposition, was someone who "floated," was rarely in the jail, and came in that day to cover for Groom, who happened to be off work. For these reasons, Ms. Jackson would not have been familiar with the patients. Ms. Foster observed Mrs. Sanders was no longer able to walk and was very confused and disoriented, and informed Ms. Jackson of the situation. Unlike the regular Turn Key nursing staff, she immediately went to Mrs. Sanders' cell, took her vital signs, and shouted, "Call 911!" When EMS arrived, Ms. Foster, as senior detention supervisor, gave the paramedics a detailed report of her first-hand knowledge of Mrs. Sanders' deteriorating condition over the past two weeks. Ms. Jackson informed the paramedics she did not know Mrs. Sanders but had observed her extremely serious condition that day when assessing her at Ms. Foster's request.

During his deposition, Nick Groom testified when he left the facility on November 17, 2016, Mrs. Sanders was "fine and there was (sic) no issues with her." Ms. Jackson had called Mr. Groom's cell phone while he was still on vacation to inform him Mrs. Sanders had been taken to the hospital. Mr. Groom acknowledged writing a November 22, 2016 "late entry" note to document an interaction he allegedly had with Mrs. Sanders on November 17, which read, "[Mrs. Sanders] came to the holding cell for medication pass, and no "s/s [signs/symptoms] of hyperventilation or hypotension observed. Inmate not disoriented and able to follow commands per her normal state." Mr. Groom stated his purpose in writing this "late entry" was to "have a complete record...because it was kind of surprising that someone that I saw that seemed okay when I saw her suddenly declined."

Clearly, Mr. Grooms testimony about his "late entry" is false. He had been directly informed by Ms. Foster previously about the seriousness of Mrs. Sanders' condition, and while conducting pill pass as part of his nursing duties, he had personally witnessed Mrs. Sanders' condition and smelled the toxic odor of feces in her cell. For these reasons, there is no way he could have believed she was "okay" on November 17 and then abruptly deteriorated for no apparent reason on November 20. The references to certain symptoms, "hyperventilation," "hypotension," and "disorientation," seemed specifically chosen to deny the existence of such problems before Mrs. Sanders was sent to the ER. Mr. Groom's purpose appears to have been to cover up his prior

14

knowledge of Mrs. Sanders' dire situation and the fact that he knew what was going on and chose to do nothing.

According to the EMS report, there was dried vomitus on the left side of Mrs. Sanders' face, and the head CT performed in the hospital was read as showing subcutaneous edema, suggesting the vomitus had been present on her face for some time.

It is shocking and unconscionable that Mrs. Sanders' condition was allowed to deteriorate to the point at which she died in the ICU 24 hours after being rushed from the jail to the hospital in critical condition. Mrs. Sanders' symptoms were exceptionally obvious, even to a lay person, and it is astonishing that the Turn Key nurses never reported them to a mid-level provider or physician so that immediate medical attention could have been provided. There are no clinical notes documenting that any attempt was made to provide medical care to Mrs. Sanders, or that her condition was recognized by anyone aside from the detention staff and Tamara Jackson.  At no time during Mrs. Sanders' stay in the jail did she see a clinical provider (mid-level or physician), only LPN's, and she never had a physical examination by a licensed health care professional.

It should also be noted that, according to the contract between Turn Key and Creek County, Turn Key was responsible for payment of all laboratory testing, X ray services, and hospitalization costs for inmates housed at the jail.  This created a financial incentive for Turn Key to avoid providing these critically important services to Mrs. Sanders, which would have saved her life.

There are almost no words to describe the cruelty and callousness of the Turn Key nursing staff as they intentionally ignored a dying woman for weeks, abandoning her to unbelievably horrifying conditions and forcing her to live in her own vomit and excrement.

The complete failure of Turn Key to provide any medical attention whatsoever to a very sick patient showed deliberate indifference to Mrs. Sanders' serious medical needs, leading to her death from septic shock and multiorgan failure.

**2. Turn Key was deliberately indifferent because it knew or should have known the failure to keep accurate, organized medical records posed a substantial risk to Mrs. Sanders' health.**

15

In view of the information provided to the paramedics by Tamara Jackson and Lindsay Foster, it is clear that accurate, organized medical records were not being kept. There were no written jail medical records available for my review that documented Mrs. Sanders' transfer to the "front of the jail" in a cell by herself because of her severe diarrhea and confusion. Such documentation maintained as required would have caused an increase in communication among medical staff, leading to a discussion with a physician who could have taken action to treat Mrs. Sanders before it was too late.

Turn Key's complete failure to maintain any written documentation on Mrs. Sanders' deteriorating condition showed deliberate indifference to Mrs. Sanders' serious medical needs, leading to her death from septic shock and multiorgan failure.

## II. The medical care provided by Turn Key to Mrs. Sanders was negligent and fell beneath the standard of care.

### 1. Turn Key failed to provide an initial health assessment for Mrs. Sanders within fourteen days of entry into the facility, in accordance with the standards of the medical profession.

The National Commission on Correctional Health Care (NCCHC) sets nationally accepted standards of care for patients in jails and prisons. According it 2014 publication, "Standards for Health Services in Jails," essential compliance indicator J-E-04 ("Initial Assessment") states, "Inmates receive initial health assessments." When these assessments are conducted depends on the size and staffing of the facility. For larger facilities with 24/7 onsite health staff coverage, inmates with "clinically significant findings as a result of a comprehensive receiving screening receive an initial health assessment as soon as possible, but no later than 2 working days after admission." For smaller facilities, a full population assessment (meaning all inmates) receive an initial health assessment within fourteen days of arrival. (According to Creek County Jail's contract with Turn Key, a provider (physician or mid-level) will provide a clinic once weekly for up to 4 hours, and there will be 112 hours allotted to a Licensed Nurse (does not specify RN or LPN, and does not specify 24 hour presence)). Therefore, Creek County Jail likely falls under the "full population assessment" standard, meaning that all inmates must receive an initial health assessment (which includes the performance of a physical examination by a physician, mid-level, or RN) within fourteen days of admission.

According to Turn Key Policy J-9 ("Intake Health Screening"), "Screenings completed by correctional staff will be reviewed by qualified medical staff in a timely manner. Inmates with current, chronic medical or mental health conditions or prescription medications will be scheduled for a face-to-face screening/assessment with medical personnel within 48 hours and will be referred to appropriate HCP [health care provider] for review/treatment the next clinical day." This policy does not require that inmates with chronic health issues have an in-person visit with a medical provider (mid-level or physician) or that a physical examination be performed by a provider or RN.   This is out of compliance with NCCHC Standard J-E-04 ("Initial Assessment").

The contract between Creek County Jail and Turn Key is also out of compliance with NCCHC Standard J-E-04.  The contract provides that only those inmates "identified with health concerns" (and not all inmates admitted to the facility) will have a secondary clinical health review no later than fourteen days after the inmate's arrival. The contract also does not specify that a physical exam must be performed as part of this secondary clinical health review, or what type of medical professional must conduct such a review.

Creek County Jail and Turn Key fell beneath the NCCHC standard (and the terms of their own contract) in that Mrs. Sanders never received an initial assessment which included a physical examination within fourteen days of her arrival, or indeed, at any time during her stay.  The fact that she was on medication for hypertension meant that she had an "identified health concern," so even under the terms of their contract, the defendants would have been required to provide Mrs. Sanders with an initial assessment, which should have been conducted no later than 10/31/16 (twenty-one days before her death).

If Mrs. Sanders had received such an initial assessment (which would have been conducted around the time her symptoms were reported to be present), a physician would have intervened by ordering immediate transportation to the ER, or at least by ensuring an on-site evaluation with laboratory and X ray testing and frequent monitoring with in-person follow up medical visits.  A physical examination done at the time of the initial assessment would have identified physical findings such as jaundice (which was so severe as to be noticed soon after Mrs. Sanders' arrival by fellow inmate Classica Godwin, who had no medical training) and ascites (which was

17

apparent when she arrived at the hospital). This would have prompted laboratory studies (including a urinalysis and culture) and treatment to prevent the development of sepsis. It also would have allowed for the identification and treatment of her underlying cirrhosis, which, even when stable and compensated, is an important factor predisposing patients to the development of sepsis.

My review of the medical records from Creek County Community Hospital documents that although Mrs. Sanders had advanced alcoholic cirrhosis, her disease was stable and manageable as long as she abstained from alcohol. Clinical notes from 2012 and 2013 indicate her liver disease was decompensated, and she was seriously ill, jaundiced, and with pedal edema and severe ascites requiring frequent paracenteses. However, clinical notes from 2014 and 2015 demonstrate marked improvement in her liver disease and general health with no physical findings suggestive of cirrhosis on physical exam.

To a reasonable degree of medical certainty, it is my opinion that this breach of care caused the delay in diagnosing and treating Mrs. Sanders' diarrhea and altered mental status, culminating in severe sepsis and multiorgan failure. Mrs. Sanders' death is a direct and proximate cause of the defendants' breach of care.

**2. Turn Key failed to request information from Mrs. Sanders' previous health care providers, in accordance with the standards of the medical profession and with its own Policy and Procedure J-20.**

According to NCCHC essential compliance indicator J-E-04 (Initial Health Assessment), "It is important to review past health records, including those from community providers. If these records have not been received at the time of the initial health assessment, they should be requested after receiving a signed release from the inmate."

In addition, Procedure #4 in Turn Key's Policy Number J-20 ("Continuity of Care/Referrals") states, "Information will be requested from previous health care providers. Patient will be asked to sign the Release of Information form, which will be forwarded to the outside provider."

The records contain a release of medical records authorization form dated 10/17/16 containing Mrs. Sanders' typewritten name, date of birth, and social security number. However, the remainder of the form is blank and Mrs. Sanders did not sign it.

18

Nurse Nick Groom testified at deposition that although there was no written documentation in the chart, he did contact Indian Health to obtain information on Mrs. Sanders' medical history because "that's what I did every time" on conducting patient intakes. Despite stating he had independent recollection of calling Indian Health on the day Mrs. Sanders arrived in the jail, he could not remember if he spoke with anyone. "I probably left a message…because it's just a lot of bureaucratic stuff to get through," he said. He also noted, "Usually with Indian Health, whether you have sent them anything or call them, they're very slow to respond to you, I can tell you that." There is no documentation Turn Key received any medical records from Indian Health, or, if it did, that this information was used for the benefit of Mrs. Sanders' care.

If outside medical records had been received, they would have provided vital information about Mrs. Sanders' condition, including advanced cirrhosis, alcohol use disorder, and related issues. Such information would have been vitally important to Turn Key medical staff in providing appropriate care for Mrs. Sanders and in alerting them to be on the lookout for the development of problems.

To a reasonable degree of medical certainty, it is my opinion that this breach of care caused the delay in diagnosing and treating Mrs. Sanders' diarrhea and altered mental status, culminating in severe sepsis and multiorgan failure. Mrs. Sanders' death is a direct and proximate cause of the defendants' breach of care.

**3. Turn Key failed to develop an individualized treatment plan for Mrs. Sanders (as a patient with the chronic disease of hypertension), in accordance with the standards of the medical profession.**

According to NCCHC essential compliance indicator J-F-01 (Patients with chronic disease and other special needs), such patients must be identified and "receive ongoing multidisciplinary care aligned with evidence-based standards."

From the available medical records, there is no evidence that Mrs. Sanders was identified as a chronic disease patient for whom an individualized treatment plan was to be developed by a physician or other qualified provider. Such identification may have drawn more attention to Mrs. Sanders' medical needs, and as with the initial assessment, may have led to a physical

examination and laboratory testing which would have mitigated the seriousness of her illness and prevented her death.

To a reasonable degree of medical certainty, it is my opinion that this breach of care caused the delay in identifying and treating Mrs. Sanders' diarrhea and altered mental status, culminating in severe sepsis and multiorgan failure. Mrs. Sanders' death is a direct and proximate cause of the defendants' breach of care.

**4. Turn Key failed to create and maintain a confidential health record for Mrs. Sanders that was in accordance with the standards of the medical profession.**

According to NCCHC essential compliance indicator J-A-08 (Health Records), compliance indicator 4 states, "Evidence exists that the health record is available to health staff and health encounters are documented."

There is no evidence that information about Mrs. Sanders' two week history of diarrhea and altered mental status that was shared by Lindsay Foster with the paramedics (including her transfer to a single cell at the front of the jail) was documented in the health record. As noted above, such documentation would have alerted other medical staff to notify a physician so that immediate action could be taken to provide Mrs. Sanders with lifesaving care.

To a reasonable degree of medical certainty, it is my opinion that this breach of care caused the delay in diagnosing and treating Mrs. Sanders' diarrhea and altered mental status, culminating in severe sepsis and multiorgan failure. Mrs. Sanders' death is a direct and proximate cause of the defendants' breach of care.

I specifically reserve the right to add to, amend, or subtract from this report as new evidence comes into discovery or as new opinions are formulated.


**Exhibits**

1) Exhibit A, C.V. of Susan Lawrence, MD, dated 12/31/19 (attached).

## References

1) Standards for Health Services in Jails, National Commission on Correctional Health Care, 2014

2) National Commission on Correctional Health Care, 2018 Standards for Health Services: What's New?, available at https://www.ncchc.org/2018-standards-whats-new

3) Remi Neviere, MD, Sepsis syndromes in adults: Epidemiology, definitions, clinical presentation, diagnosis, and prognosis, UpToDate, December 2019, Retrieved January 11, 2020

4) Eric Goldberg, MD, Sanjov Chopra, MD, MACP, Cirrhosis in adults: Overview of complications, general management, and prognosis, UpToDate, December 2019, Retrieved January 11, 2020

<u>EXHIBIT A</u>

**SUSAN E. LAWRENCE, M.D.**
2851 West Avenue L #302
Lancaster, CA  93536
Mobile: (805) 338-1357
E-mail:  susan_lawrence@live.com
Updated 12/31/19

*Experienced Correctional Medicine Physician and Consultant.  Double Board Certified (Internal Medicine and Medical Oncology).  Columbia and Baylor Educated.  Award winning writer.*

<u>BOARD CERTIFICATION:</u>

Internal Medicine:   September 1983
Medical Oncology:  September 1985

<u>PROFESSIONAL POSITIONS:</u>

CEO, Lawrence Medical Legal Services
January 2017 - present
Medico-legal consultation and locum tenens patient care services (correctional medicine, internal medicine, Hepatitis  C, HIV, and medical oncology)

Staff Physician/Lancaster VA CBOC
October 2016 - December 2017
Duties included treatment of patients with HIV, Hepatitis B and C, cancer, and internal medicine issues.

Prisoner Healthcare Consultant
October 2004-present

Founder and CEO, The Center for Life Without Parole Studies
July 2017-present
Duties include commutation applications for California state prisoners serving LWOP, including medical evaluations

Liaison, The Other Death Penalty Project
June 2008-March 2018

**Staff Physician/Medical Director, Adelanto Detention Facility (Privately Operated Federal ICE Prison)/CorrectCare Solutions, October 2013-September 2016**

Duties included treatment of patients with HIV, Hepatitis B and C, cancer, and internal/general medicine issues, as well as administrative duties including quality improvement programs, investigations into patient deaths, and planning and delivery of appropriate medical care services.

**The Catalyst Foundation:** Founder, August 1993 CEO/Medical Director, August 1993 –September 2013
Duties included treatment of patients with HIV, Hepatitis B and C, cancer, and internal medicine issues.
Development Consultant, September 2013-February 2017

**Bartz-Altadonna Community Health Center**
Co-Founder, August 2011
Medical Director, August 2011-June 2012
Duties included supervising the treatment of patients with HIV, Hepatitis B and C, cancer, and internal medicine issues.

**Private Practice, Medical Oncology, Internal Medicine and HIV/AIDS, Lancaster, California**
January 1985 – July 1993

EDUCATION:

Undergraduate:  Barnard College of Columbia University
New York, New York
Degree: A.B., Biology and Psychology, 1974

Medical School:  Baylor College of Medicine, Houston, Texas
Degree: M.D., 1978

Internship:  State University of New York Medical School at Buffalo Affiliated Hospitals

23

|  |  | Straight Internal Medicine<br>July 1978 – June 1979 |
|---|---|---|
|  | Residency: | State University of New York Medical School at<br>Buffalo Affiliated Hospitals<br>July 1979 -- June 1981 |
|  | Fellowship: | University of Texas Medical Branch at Galveston<br>Hematology/Oncology<br>January 1983 – December 1984 |
|  | Law School: | Concord Law School, Kaplan University<br>January 2012 – December 2016<br>Degree:  J.D., summa cum laude |

**LICENSURE:**          California (#C41677) and Indiana (#01073098A)
California State Bar # 318340

**PUBLICATIONS:**          Author, *Creating a Healing Society:  The Impact of Human Emotional Pain and Trauma on Society and the World*  (Elite Books, December 2006)

"The Lowdown on California's Prop 34," Counterpunch, October 31, 2012 (Op-Ed)

"California's Prop 34:  Yes or No, the Death Penalty Remains," San Francisco Bay View, November 2, 2012 (Op-Ed)

**AWARDS:**          James Irvine Foundation Leadership Award Finalist, 2008

Concord Law School, Outstanding Achievement in Criminal Law, 2012

Concord Law School, Distinguished Scholar, 2012, 2015, 2016

Concord Law School, Sue Lane Award, 2017

24

WRITING AWARDS:                      Eric Hoffer Award 2007

                                     Nautilus Book Award, 2007

                                     ForeWord Magazine Book of the Year Finalist,
                                     2007

                                     Independent Publisher Magazine Highlighted
                                     Title, 2007

"CREATING A HEALING SOCIETY"
PRESENTATIONS (partial list)
                                     California State Prison-Los Angeles County,
                                     Lancaster, CA, 2004-2017

                                     Violence in the World of Our Youth, San Diego, CA
                                     2005

                                     The San Carlos Apache People, San Carlos, AZ,
                                     2006

                                     The Mayo Clinic, Rochester, MN, 2007

                                     Creativity and Madness Conference, Santa Fe,
                                     NM, 2007

                                     Tarzana-Encino Regional Medical Center, Tarzana,
                                     CA, 2007

                                     Antelope Valley Hospital, Lancaster, CA, 2007

                                     Antelope Valley College, Lancaster, CA,  2007-
                                     2010

                                     Unitarian Universalist Church, Lancaster, CA, 2007

                                     United Church of Christ, California City, CA, 2008

                                     California Rehabilitation Oversight Board (C-ROB),
                                     Sacramento, CA, 2008

VCA West Los Angeles Animal Hospital, Los Angeles, CA, 2008

Ryan White CARE Act Annual Conference, Bethesda, MD, 2011

California Association of Social Rehabilitation Agencies (CASRA), San Diego, CA, 2011

West Valley Counseling Center, Tarzana, CA, 2012