IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) PHILIP SANDERS, and Individual and Husband and Next of Kin of BRENDA JEAN SANDERS, deceased, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) Case No.: 17-CV-492-JED-CDL<br>) |
| (1) CREEK COUNTY BOARD OF COUNTY COMMISSIONERS, and (2) SHERIFF BRET BOWLING, in his official capacity as Creek County Sheriff, and (3) TURN KEY HEALTH CLINICS, a limited liability company, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**DEFENDANT TURN KEY HEALTH CLINICS, LLC'S
REPLY TO PLAINTIFF'S RESPONSE TO ITS MOTION FOR SUMMARY
JUDGMENT ON ALL CLAIMS OF PLAINTIFF PHILIP SANDERS**

COMES NOW Defendant, Turn Key Health Clinics, LLC, (hereinafter "Defendant" or "Turn Key"), and submits its Reply to Plaintiff's Response to its Motion for Summary Judgment.

## ARGUMENTS AND AUTHORITIES

**A. Turn Key controverts the following facts asserted in pages 11 – 16 of Plaintiff's Response:**

6. *Disputed*. Dr. Lawrence's Report is inadmissible hearsay, and NCCHC standards do not create any applicable standard of care. See *Dunn ex rel. Albery v. State Farm Mut. Auto. Ins. Co.*, 264 F.R.D. 266, 271 (2009).

7. *Disputed*. The cited policy states that patients who meet certain criteria, including those with chronic medical conditions, will be "scheduled for a face-to-face screening/assessment with medical personnel within 48 hours and will be referred to appropriate HCP (health care provider) for review/treatment the next clinical day."

8. *Disputed*. At the time of her booking, Brenda Sanders was infested with head lice, and her medical records show a history of hypertension, GERD, anxiety, depression, alcohol use disorder, and alcoholic cirrhosis, Cholelithiasis (gallstones), Abdominal ascites (accumulation of fluid in the abdominal cavity), and Acute pancreatitis. Plaintiff's Ex. 3, and Plaintiff's Ex. 18 at 5.

9. *Disputed*. See Turn Key Undisputed Facts Nos 11, 12, 25, 39, and the exhibits cited therein.

14(d). *Disputed*. See Turn Key Undisputed Fact No 54, and the exhibits cited therein.

15 and 16. *Disputed*. See Turn Key Undisputed Facts Nos 52 and 53, and the exhibits cited therein.

17. *Disputed*. Turn Key healthcare providers responded appropriately to all known complaints and needs of Brenda Sanders. See Turn Key Undisputed Facts 1 – 59, and the exhibits cited therein.

18. *Disputed*. See Turn Key Undisputed Facts Nos 52, 53, 54, 57, and 58, and the exhibits cited therein.

19, 20, 21, 33 and 34. *Disputed in part*. Defendant does not dispute that this represents the witnesses' testimony, but there is contradicting evidence by way of medical records and testimony from trained healthcare professionals that dispute these witnesses' lay impressions and explain why they thought they smelled feces. See Turn Key Undisputed Facts Nos 45 - 50, and the exhibits cited therein.

22. *Disputed in part*. See Turn Key Undisputed Facts No 55, and the exhibits cited therein.

23. *Disputed in part*. Defendant does not dispute that Dr. Lawrence offered such speculation, but Defendant disputes the mischaracterization of Turn Key's policies. See No. 7 above.

1

24. *Disputed*. During this two week period Mrs. Sanders received twice daily medications, Nurse Ferris responded to and treated all of Mrs. Sanders' complaints, and Nurse Ferris consulted APRN Goatley for treatment of Mrs. Sanders' complaints. See Turn Key's Undisputed Facts Nos 23 – 35, and the evidence cited therein.

25 and 26. *Disputed in part*. Disputed to the extent that Plaintiff uses undefined, subjective terms and phrases "close proximity" and "within eyesight".

30. *Disputed*. Defense expert, Alex John, board certified pathologist, testified that Mrs. Sanders' death was caused by cirrhosis of liver due to Hepatitis C infection and chronic ethanol use complicating acute on chronic gastrointestinal hemorrhage." And that this can occur suddenly and without warning. Exhibit 1 to this Reply, 151:18-24.

31. *Disputed*. Dr. Lawrence's Report is inadmissible hearsay.

32. *Disputed*. Defendant and defense counsel ask that this baseless accusation be stricken from the record. Counsel would further remark that it is unprofessional and disingenuous to accuse witnesses of lying, and to accuse counsel of coaching witnesses to lie, with absolutely no evidence.

### B. Plaintiff has failed to controvert Defendant's Statement of Uncontroverted Facts with competent evidence.

Here, Turn Key would submit that Plaintiff failed to sufficiently controvert any of its Undisputed Facts with facts and evidence such that a material question of fact remains. However, on several instances, Plaintiff failed to even attempt to cite to facts and evidence that specifically controvert Turn Key's Undisputed facts, and such uncontroverted facts should be deemed admitted. The Local Rules for the Northern District provide that: "All material facts set forth in the statement of material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in this rule." LCvR56.1(c). Moreover, the local rules further require Plaintiff to cite to evidence that contradicts each of Turn Key's undisputed facts, which Plaintiff has failed to do. LCvR56.1(e). After a painstaking analysis – which LCvR56.1(c) was specifically designed to prevent – it is clear, Plaintiff has failed to controvert with admissible evidence, the following Facts Nos. 3, 8, 21, 22, 31, 39, and 44. Therefore, such facts are undisputed and should be admitted.

### C. Plaintiff does not have standing to assert a civil rights claim on behalf of Brenda Sanders.

On November 21, 2017, Plaintiff filed his Second Amended Complaint, which superseded all other complaints filed in this case, and became the operative Complaint in this proceeding. However, Plaintiff was not legally appointed as the administrator of Brenda Sanders' estate until November 27, 2017. Consequently, at the time of filing this lawsuit and at the time the operative complaint were filed, Philip Sanders did not have proper standing to allow him to bring this lawsuit, either in an individual capacity or in a representative capacity. Accordingly, Philip Sanders has no standing to bring any individual claims against Turn Key, and Philip Sanders' status as husband and next of kin of Brenda Sanders is insufficient to establish the necessary standing to a § 1983 claim on behalf of Ms. Sanders. As such, judgment in favor of Turn Key is appropriate and should be entered.

Plaintiff's claim of a "scrivener's error" is disingenuous and self-serving. For the *first time*, in his Response to Defendant's Motion for Summary Judgment, Plaintiff attempted to correct a fatal deficiency in his operative Complaint [Doc. No. 23] – Plaintiff's failure to delineate that he is asserting the instant Complaint as the Personal Representative of Decedent's estate. Plaintiff now requests the Court to overlook this omission as a mere "scrivener's error." However, it is clear from the procedural posture of this case, Plaintiff has shown an understanding of the significance of ensuring suit is brought in the proper capacity. Plaintiff clearly understood that to have sufficient standing to assert the instant action, he needed to bring suit as the Personal Representative of Decedent's estate – which he correctly pled in his original complaint. (Doc. No. 2). Although, it is worth noting that at the time Mr. Sanders filed his original complaint, he was not yet appointed Personal Representative and therefore misrepresented his status to the Court.

Further, Plaintiff had more than four (4) years or 1,522 days, since Plaintiff's filing of the operative complaint and the filing of Plaintiff's Response, to identify and seek leave of the Court to amend his "scrivener's error," and failed to do so; rather, Plaintiff now attempts to amend this fatal defect by simply stating in his Response, "Plaintiff requests to clarify that he is suing as the Personal Representative of the Estate of Brenda Sanders." (Doc. No. 204, p. 18). This is clearly not the proper means for amending his Complaint. Standing relates to the Court's fundamental "gate keeping" function – which, by design, intentionally restricts the court's ability to hear cases brought by improper Plaintiffs.

Plaintiff lacked standing to file this action at the tie of its filing and at the time of the filing of the Second Amended Complaint. Standing cannot be created mid-litigation. It is a non-negotiable pre-requisite that must exist at the time the case is filed, which did not occur in this case.

**D. Plaintiff cannot establish a claim under the municipal theory of liability.**

Plaintiff has not established that any of Turn Key's polices, procedures, or customs were constitutionally deficient. Without evidence of a specific, facially unconstitutional policy or common practice of Turn Key which was the moving force or cause of Ms. Sanders' alleged constitutional deprivation, Plaintiff's § 1983 claims against Defendant Turn Key must fail.

In his Response, Plaintiff principally takes issue with Turn Key's policy related to "Intake Health Screening," internally known as Policy & Procedure "J-9". (Doc. No. 204, p. 19). Plaintiff argues that J-9 is purportedly at odds with the National Commission on Correctional Health Care's ("NCCHC") Standard "J-E-04" because it "does not require that inmates with chronic health issues have an in-person visit with a medical provider." whereas, J-9 only requires that the inmate be "scheduled" or "referred" to be seen by a provider. (Doc. No. 204, p. 20).

Plaintiff's argument is non-sensical and just plain wrong. Tun Key's Initial Health Screening Policy J-9 states that "Inmates with current, chronic medical or mental health conditions or prescription

4

medications will be scheduled for a face to face screening/assessment with medical personnel within 48 hours and will be referred to appropriate HCP for review/treatment the next clinical day." (Exhibit 17, Turn Key Policies, at J-9). Defendant is truly at a loss as to how to logically counter Plaintiff's argument, as a referral and scheduling are necessary pre-requisites of seeing a provider.

Additionally, Plaintiff is misguided in his analysis regarding the relevance of the NCCHC's Standards and their applicability to the case at bar. Contrary to Plaintiff's erroneous reliance on Dr. Lawrence's statement that, "NCCHC sets nationally accepted standards of care for patients in jails and prisons," this is certainly not the case. The court in *Dunn ex rel. Albery v. State Farm Mut. Auto. Ins. Co.*, 264 F.R.D. 266, 271 (2009), held that if a particular type of accreditation (such as NCCHC accreditation) is not required by the state for licensure and is over and beyond such licensing requirements, it is irrelevant to any claims of negligence and is therefore inadmissible. *Id*. To be clear, internal policies and procedures, as well as promulgations from outside accrediting agencies (like NCCHC) do not set the standard of care. **This is true because the NCCHC does not set or establish what is required to be provided under the constitution**. Only courts do that. The fact that there is an outside, independent and voluntary organization that promulgates recommendations for correctional health care does not mean that complying with those guidelines is required by the constitution. Furthermore, county jails decide whether they want to be accredited by the NCCHC, there is not a requirement to do so. Therefore, the Creek County jail is not NCCHC accredited and most importantly, their standards are not binding and not applicable in any way to the outcome of this case.

Plaintiff's arguments are nothing more than a red herring and are unsurprisingly based on pure speculation. Here, the evidence shows is at the time of her admission Ms. Sanders was medically screened by a licensed nurse, Nurse Grooms. During this screening, Nurse Grooms took a medical history, documented Ms. Sanders' medical status on the Medical Intake form. (Defense Exhibit 3, Turn Key Recs,

5

TK 000010-11). Nurse Grooms then contacted Ms. Sanders' prior healthcare provider to request her prescriptions and medical records. (Defense Exhibit 4, Groom Dep., at 33-34). Nurse Grooms then contacted a Turn Key provider to order appropriate medications. (Defense Exhibit 3, at TK000019). This is insufficient to Plaintiff, he argues that *if* Ms. Sanders had been seen by a mid-level provider for her hypertension, then it *is possible* that her diarrhea, which was never recognized by any of the other treating nurses, *would have* been recognized by the mid-level provider and Ms. Sanders' outcome *could have* been different. Plaintiff's Response, Doc. No. 211, at ¶ 23. Plaintiff's insistence on creating a marked distinction between a patient being "scheduled" or "seen" or "referred" is nothing more than semantics. The essence of these policies is to get vulnerable patients to providers as quickly as possible. Whether a provider is consulted; whether a patient is scheduled to be seen by a provider; whether a patient is referred to a provider to be seen is irrelevant because the purpose of the policy is the same in each instance – to facilitate a patient to be evaluated by a provider. Plaintiff has no evidence to suggest that because Turn Key's policies allowed for Decedent to be "scheduled" to be seen or "referred" to be seen they are somehow constitutionally defective.

Upon a simple review of the evidentiary record, the house of cards upon which Plaintiff's hypotheticals are constructed comes crashing down. Dr. Lawrence outright conceded that Ms. Sanders was not hypertensive at the time of her incarceration. (Dep. Lawrence, 83:16-20). Dr. Lawrence also conceded that Ms. Sanders' hypertension did not cause or contribute to her death in any way. (Dep. Lawrence, 82:17-21; 83:10-15). Additionally, an alleged failure on the part of Nurse Grooms to follow the enacted policy does not make the policy itself constitutionally deficient; likewise, Nurse Grooms' alleged failure to follow Turn Key's policy does not suffice to establish a constitutional deprivation on the part of Turn Key. (Dep. Lawrence, 84:12-85:1).

As such, Plaintiff has no evidence that Turn Key's Chronic Care Policy was a constitutionally

deficient policy that caused Brenda Sanders' harm, therefore there is no causal link to the at-issue Chronic Care Policy and Decedent's unfortunate death. Even more telling is the fact that Dr. Lawrence's criticisms of Turn Key's policies and procedures fall under the section entitled "II. The medical care provided by Turn Key to Ms. Sanders was negligent and fell beneath the standard of care." (Dr. Lawrence's Report, at 16-20). This is a strong indication that even Plaintiff's own expert believes that any alleged deficiency in Turn Key's policies and procedures was negligent, at most, and therefore fails to meet the high bar of a constitutional deprivation. Moreover, Plaintiff has completely failed to show any evidence that the Turn Key policies of which Plaintiff's expert is critical, were promulgated by Turn Key in a manner that was indifferent to any serious risk of harm to patients. Rather, these policies, on their faces, show that Turn Key sought to identify patients who may have been at risk of harm and ensure that they would be seen by physicians as necessary. As such, Plaintiff has failed to establish any policy or custom of Turn Key that was the moving force of any constitutional deprivation or that caused Mrs. Sanders' death.

### E. Plaintiff cannot establish an underlying constitutional deprivation by Turn Key.

Here, the evidence shows that no Turn Key personnel was ever made aware that Decedent was at a risk of serious harm or death. Plaintiff relies, almost exclusively, upon the testimony of lay witnesses who were not Turn Key staff to attempt support his claims, including from fellow inmates and correctional staff – primarily, Jail Supervisor, Lindsey Foster. Conversely, Defendant exclusively relies on testimony from its trained medical personnel. The undisputable evidence is clear: there is no testimony or evidence from any Turn Key employee that they were ever aware that Ms. Sanders was at a serious risk of harm, including diarrhea, altered mental status, or jaundice. Each Turn Key employee involved in Ms. Sanders' care testified as such. (Undisputed Facts 45-47). One cannot be indifferent to that which he does not know.

However, Plaintiff spends considerable time alleging that Defendant was made aware that Decedent suffered from hypertension or high blood pressure, an allegedly serious condition. But, her

7

complaints were being treated accordingly – with the use of prescription medications. See Undisputed Facts Nos 12 and 15. Throughout her entire incarceration, medical staff had the opportunity to assess Decedent's condition and take any complaints from her. See Undisputed Facts No 34. Throughout all of this medical care and treatment, Plaintiff has failed to provide any evidence that Decedent reported having any issues related to her hypertension to any of the Turn Key nurses or medical staff, other than what is noted in her intake assessment. Simply stated, Plaintiff cannot point to any medical diagnosis that went untreated, nor can Plaintiff point to any medical complaint made by Decedent to a Turn Key medical provider that was not assessed and treated.

Notwithstanding the fact that Ms. Sanders' history of hypertension was recognized and treated, hypertension was not the cause of her death. Neither Turn Key nor its health care providers were indifferent to Ms. Sanders' hypertension. The undisputed evidence shows that they recognized her history and provider her the appropriate medications.

To the extent that the alleged serious risk of harm which Turn Ky was indifferent to was diarrhea, there is no evidence any Turn Ky staff member actually had any knowledge of Ms. Sanders experiencing diarrhea. On November 17 and November 18, when the undisputed evidence shows that she had face to face, personal interactions with Nurse Ferris, who in turn had access to a medical provider (APRN Goatley). Undisputed Facts Nos 24 and 25. There is no evidence that Ms. Sanders ever once reported that she had diarrhea. The only supposed reports of diarrhea come from jail guards and inmates – never Ms. Sanders herself, and never from a Turn Key employee. Likewise, Plaintiff can produce no evidence that anyone ever notified Turn Key staff that Ms. Sanders was experiencing diarrhea. Plaintiff can produce no evidence that will show that Ms. Sanders ever disclosed to any Turn Key employee that she had cirrhosis of the liver, or any other life threatening illness. The evidence further shows that each and every time a Turn Key employee was made aware of an issue or complaint with Ms. Sanders, it was quickly and appropriately addressed. See

Exhibit 3, Turn Key Recs.

On October 18, 2016, Ms. Sanders received a detailed medical screening by a licensed nurse, and a medical provider was contacted for consultation. Undisputed Facts Nos 2 – 15. On October 25, 2016, Nurse Ferris completed the additional lice treatment, and there was no documentation of any concerns or observation of diarrhea. Undisputed Facts No. 16. On October 27, 2016, Ms. Sanders specifically requested in writing via the Sick Call Request Form to be seen due to issues with her eyes. Undisputed Fact. No. 18. Nurse Green evaluated and treated Ms. Sanders by washing out her eyes, which provided relief. There was no indication – either stated or observed – of diarrhea. On November 17 and 18, 2016, Nurse Ferris evaluated Ms. Sanders, as well as called the mid-level provider for orders regarding an issue with Ms. Sanders' eyes. Nurse Ferris was face to face with Ms. Sanders, as she obtained a full set of vital signs, administered eye drops, and walked Ms. Sanders back to her cell. Undisputed Fact. Nos 24 - 31. Nurse Ferris wrote a detailed note about this encounter, and there was no mention of stated or observed diarrhea. Undisputed Fact. No. 32.

Plaintiff has failed to satisfy his evidentiary burden in establishing that Turn Key was both aware of facts that Decedent suffered from a serious medical issue, and in drawing on this inference, chose to consciously disregarded risks to her health and safety to the level of a sufficiently serious deprivation. Plaintiff's argument on this prong is incoherent. As previously argued, Defendant had no knowledge of a serious medical issue. Moreover, Plaintiff's argument falls apart when considering the extensive amount of care that was provided to Decedent during her incarceration, including treatment related to controlling her hypertension.

Plaintiff's ultimate criticism in this case seems to be that although the Turn Key providers were treating Mrs. Sanders' hypertension, head lice, and eye complaints, they failed to recognize and treat some other condition which there is no evidence they knew about. Plaintiff's theory further posits that Mrs.

Sanders should have received some higher level of treatment or the Turn Key staff should have followed a treatment plan, and Mrs. Sanders may have been sent to the hospital sooner. To the extent these are Plaintiff's claims against Turn Key and its providers, these claims sound in tort and not deliberate indifference. Thus, summary judgment should be entered in favor of Defendant because Plaintiff has no evidence to prove these claims against Defendant.

### F. Turn Key is statutorily immune from liability in tort.

The GTCA clearly states that, "licensed medical professionals under contract with the city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies' are considered "employees of the state" for purposes of the GTCA. OKLA. STAT. tit. 51, § 152(7)(b)(7).

Plaintiff would have the Court read only 51 O.S. § 152 (7)(a)(1), which excludes "independent contractors", and wholly ignore 51 O.S. § 152 (7)(a)(7). Plaintiff argues that cases interpreting the GTCA are consistent with denying immunity to independent contractors like Turn Key, and Plaintiff relies heavily on a case from 2001 in making this argument (See *Sullins v. American Medical Response of Okla. Inc.*, 2001 OK 20). The obvious error in this argument is that the specific provision of the GTCA which provides immunity from tort to contractors like Turn Key, 51 O.S. § 152 (7)(a)(7), was enacted November 1, 2008. See Amended by Laws 2008, SB 824, c. 348, § 1, eff. November 1, 2008. Thus, the arguments presented by Plaintiff are outdated, and the plain language of the GTCA which was actually in effect at the time of the care in this case clearly includes Turn Key as an employee under the GTCA.

### CONCLUSION

For all the reasons set forth herein, Defendant, Turn Key Health Clinics, LLC, prays that its Motion for Summary Judgment be granted, and that judgment on all of the claims against it by Plaintiff Philip Sanders be entered in favor of the Defendant.

Respectfully submitted,

*/s/Austin J. Young*

_____
SEAN P. SNIDER, OBA # 22307
AUSTIN J. YOUNG, OBA # 32684
JOHNSON HANAN AND VOSLER
9801 N. Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
E-Mail: ssnider@johnsonhanan.com
E-Mail: ayoung@johnsonhanan.com
*Attorneys for Defendants Turn Key Health Clinics, Inc.*

/

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2022, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing:

| | |
|---|---|
| Charles L. Richardson | clr@rrbok.com |
| Colton L. Richardson | colton@rrbok.com |
| Michael L. Carr | mlc@czwlaw.com |

*/s/Austin J. Young*

_____
Austin J. Young

11