IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PHILIP SANDERS, an Individual and Husband and Next of Kin of BRENDA JEAN SANDERS, Deceased,<br><br>        Plaintiff,<br><br>v.<br><br>TURN KEY HEALTH CLINCS, a limited liability company,<br><br>        Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT AND DISMISSING PARTIES' MOTIONS IN LIMINE AS MOOT<br><br><br><br>Case No. 4:17-CV-492-TS-CDL<br><br>District Judge Ted Stewart[1] |

This matter is before the Court on Defendant's Motion for Summary Judgment[2] and the parties' respective Motions in Limine.[3] For the reasons discussed herein, the Court will grant Defendant's Motion in part and dismiss the parties' Motions in Limine as moot.

## I. BACKGROUND

Plaintiff is Phillip Sanders, named in the Second Amended Complaint as "an Individual and Next of Kin" of Brenda Jean Sanders ("Ms. Sanders").[4] Defendant is Turn Key Health Centers ("Turn Key"), a company that provided medical treatment and care for inmates, pursuant to contract, at the Creek County Detention Center ("the Detention Center") during the time at

---

[1] Sitting by special designation for the Northern District of Oklahoma.

[2] Docket No. 194.

[3] Docket Nos. 190, 191, 192, 193, and 195.

[4] Docket No. 23.

1

issue. Plaintiff's claims arise from alleged actions or inactions by Turn Key with respect to its medical treatment of Ms. Sanders, who was incarcerated at the Detention Center in the days leading up to her death.

Ms. Sanders was booked into the Detention Center on October 17, 2016. At the time of her admission, an employee of the Detention Center completed an Inmate Medical Form with Ms. Sanders.[5] The Medical Intake Form indicates that Ms. Sanders reported she was in good health aside from suffering high blood pressure and taking several medications. The following day, Nicholas Groom, an LPN and employee of Turn Key, gathered additional health information from Ms. Sanders, which was documented in a Medical Intake Form.[6] The Medical Intake Form indicates that Ms. Sanders reported a gallbladder surgery in 2012, and again reported her high blood pressure and prescribed medications. The Medical Intake Form further indicates that Nurse Groom observed that Ms. Sanders had "unremarkable" appearance, breathing, and ease of movement, was "alert," and was behaving "appropriately."[7] On October 18, 2016, APRN Lela Goatley, another Turn Key employee, was informed of Ms. Sanders' need for medical continuation and prescribed Ms. Sanders Ibuprofen, Prilosec, and Norvasc. Ms. Sanders received these medications throughout her incarceration.

Plaintiff alleges that Turn Key policies require an incoming inmate to sign a medical authorization to be signed that allows their healthcare records to be obtained from prior

---

[5] Docket No. 194-2.

[6] Docket No. 194-3.

[7] *Id.* at 1.

healthcare providers. The parties dispute whether Ms. Sanders' medical history was obtained by a Turn Key employee as required by Turn Key policy.

The parties dispute numerous facts regarding Ms. Sanders' health condition and observable symptoms during her incarceration. Plaintiff has submitted affidavits supporting that: during her incarceration, Ms. Sanders was lethargic, had yellow eyes, reported she couldn't see or had blurry vision, was often confused, smelled strongly of diarrhea, had to be showered, and displayed signs of an altered mental status; other inmates complained of Ms. Sanders' foul smell and, as a result, Ms. Sanders was moved to various isolated cells, which were close in proximity to Turn Key employee offices; and employees of the Detention Center observed that Ms. Sanders' health was deteriorating and reported their concerns to Turn Key employees. This narrative is further supported by a Creek County Emergency Ambulance report, completed the day before Ms. Sanders' death, which stated that a worker at the Detention Center told the emergency responder that Ms. Sanders had been moved to an isolated cell due to her having constant diarrhea and that Ms. Sanders had been "been deteriorating over the last few weeks."[8]

Plaintiff alleges that, during this time, Turn Key failed to provide the necessary medical care in treating Ms. Sanders and any care provided fell grossly below what she required. Turn Key, by contrast, argues that its employees treated Ms. Sanders regularly and appropriately. Further, Turn Key argues Plaintiff has presented no evidence that any Turn Key employee

---

[8] Docket No. 212-9 (SEALED).

observed or was otherwise aware of any symptoms that would lead them to believe Ms. Sanders required additional medical attention beyond what she was receiving.[9]

On November 20, 2016, Ms. Sanders was found in critical condition in her cell. An ambulance was called and she was taken to the hospital. Upon arrival, she was diagnosed with respiratory failure, septic shock, encephalopathy, healthcare-associated pneumonia, coagulopathy, cirrhosis, acute kidney injury, and hepatopathy. Ms. Sanders passed away the next day.

Plaintiff brings four causes of action against Turn Key: (1) Deliberate Indifference to Serious Medical Needs under 42 U.S.C. § 1983; (2) Wrongful Death under Oklahoma statute; (3) Negligence under Oklahoma state law; and (4) Intentional Infliction of Emotional Distress under Oklahoma state law. Turn Key moves for summary judgment to dismiss each cause of action as a matter of law.

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[10] In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[11] "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the

---

[9] Docket No. 194 ¶ 51 ("Plaintiff has no evidence that any Turn Key employee was ever actually aware that Brenda Sanders ever had diarrhea, or any other serious medical condition, during her incarceration at Creek County Jail.").

[10] Fed. R. Civ. P. 56(a).

[11] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

claim."[12] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[13]

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact."[14] "Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[15] Once a movant has carried its initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[16]

## I.  DISCUSSION

Plaintiff's first cause of action is brought under 42 U.S.C. § 1983 for Turn Key's alleged deliberate indifference to Ms. Sanders' serious medical needs. In its Motion for Summary Judgment, Turn Key argues Plaintiff's § 1983 claim must be dismissed for lack of standing and also for failure to substantively support municipal liability.

### a.  Standing

Turn Key argues that Plaintiff does not have standing to bring a § 1983 claim as an individual or next of kin of the aggrieved party, but instead, must have brought the suit as a

---

[12] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[13] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[14] *Adler*, 144 F.3d at 670–71.

[15] *Id.* at 671.

[16] *Id.* (quoting Fed. R. Civ. P. 56(e)).

representative of Ms. Sanders' estate. In response, Plaintiff argues that the Second Amended Complaint and other filings make clear that he is bringing claims on Ms. Sanders' behalf and also provides a court order showing that Plaintiff was appointed the "Personal Representative on behalf of Brenda Sanders' estate."[17] In the alternative, Plaintiff requests that the Court allow him to "clarify" his standing.

"[Standing] is the threshold question in every federal case, determining the power of the court to entertain the suit."[18] "'[S]tanding is determined at the time the action is brought . . . and [courts] generally look to when the complaint was first filed, not to subsequent events' to determine if a plaintiff has standing."[19] "Absent a plaintiff with constitutional standing, federal courts lack jurisdiction."[20] The Tenth Circuit has made clear, and the Plaintiff does not appear to dispute, that a § 1983 survival action must be brought by the estate of the deceased, and an individual suing in their own capacity lacks standing to bring such suit.[21] The Court must,

---

[17] Docket No. 211-20.

[18] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[19] *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253–54 (10th Cir. 2007)).

[20] *Id.*

[21] *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1506–07 (10th Cir. 1990) ("[T]he federal courts must fashion a federal remedy to be applied to § 1983 death cases. The remedy should be a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'") (quoting 42 U.S.C. § 1983); *see also Martinez v. Sequoyah Cnty. Crim. Just. Auth.*, No. CIV-21-84-TDD, 2022 WL 19377, at *3 (E.D. Okla. Jan. 3, 2022) ("[T]he only plaintiff who may bring a § 1983 matter is [the plaintiff] in her capacity as personal representative of [the deceased's] estate."); *Walker v. Corizon Health, Inc.*, 370 F. Supp. 3d 1271, 1282–83 (D. Kan. 2019) (dismissing § 1983 claims brought by plaintiffs in their individual capacities or as the deceased's heir finding that "[t]hose plaintiffs, acting in those modes of capacity, lack standing to sue under § 1983") *rev'd on other grounds*, 947 F.3d 1244 (10th Cir. 2020); *Murphy v. Bitsoih*, 320 F. Supp. 2d 1174, 1186 (D.N.M. 2004)

therefore, determine if Plaintiff has properly supported his standing as the representative of Ms. Sanders' estate.

As stated, Plaintiff's Second Amended Complaint provides that the suit is brought by Plaintiff in his capacity as "an Individual and Husband and Next of Kin of Brenda Jean Sanders." However, Plaintiff's original Complaint[22] and Summons[23] provides that the suit was brought by Plaintiff, "an Individual, Husband and Personal Representative of the Estate of Brenda Jean Sanders." As pointed out by Turn Key, Plaintiff had not yet been appointed as Ms. Sanders' estate representative at the time Plaintiff filed his original or Second Amended Complaint. Turn Key argues that, where Plaintiff was not appointed to be the representative of Ms. Sanders' estate until after the Second Amended Complaint was filed, and standing is determined at the time the complaint was filed, Plaintiff cannot have standing to bring a claim under § 1983 and the claim must be dismissed.

While Turn Key is correct that standing is determined at the time the suit was brought and Plaintiff did not have standing at that time, such does not support dismissal for lack of standing in this case. Rule 17 of the Federal Rules of Civil Procedure states that "[a]n action must be prosecuted in the name of the real party in interest."[24] It further states that

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After

---

("Under *Berry,* the estate of decedent . . . is the appropriate party to bring the derivative Section 1983 action.").

[22] Docket No. 2.

[23] Docket No. 3.

[24] Fed. R. Civ. P. 17(a)(1).

ratification, joinder, or substation, the action proceeds as if it had been originally commenced by the real party in interest.[25]

 "The fact is, Rule 17(a) does more than merely provide a relation back principle. It provides that substitution shall have the *same effect as if* the action had been commenced in the name of the real party in interest."[26] While "standing and real party in interest are two distinct concepts,"[27] "[w]hether a complainant is the real party in interest . . . is generally resolved by inquiring whether he or she has standing."[28] Following this logic, courts have applied Rule 17 to allow plaintiffs to cure a standing defect.[29]

Therefore, that Plaintiff was not yet appointed to be the representative of Ms. Sanders estate at the time the original or Second Amended Complaint was filed, does not require dismissal for lack of standing. At most, Rule 17 would require the Court to allow Plaintiff to amend the Second Amended Complaint to support that he is the real party in interest.[30] However,

---

[25] *Id.* 17(a)(3).

[26] *Esposito v. United States*, 368 F.3d 1271, 1277–78 (10th Cir. 2004) (internal quotation marks and citations omitted).

[27] *Mitchell Food Prod., Inc. v. United States*, 43 F. App'x 369, 369 (Fed. Cir. 2002).

[28] *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

[29] *CPI Card Grp., Inc. v. Multi Packaging Sols., Inc.*, No. 16-CV-02536-MEH, 2017 WL 5714320, at *8 (D. Colo. Nov. 28, 2017) (dismissing without prejudice the matter for lack of subject matter jurisdiction, but staying "the effect of the dismissal order pending resolution of a motion for joinder to be filed by [the correct party of interest]"); *see also Est. of Smart v. City of Wichita*, No. 14-2111-EFM, 2018 WL 534335, at *1 (D. Kan. Jan. 24, 2018) (granting plaintiff's motion under Fed. R. Civ. P. 17(a) for leave to "amend their complaint to allege their appointment as administrators, thereby making clear that the proper real party in interest is pursuing the claims").

[30] While "[r]ead literally, Rule 17(a) would appear to require that a party *always* be given a reasonable time to substitute the real party in interest where objection has been made," the Tenth Circuit has found that "[s]uch a literal reading . . . would countenance conduct in violation of the spirit of the Rules." *Esposito*, 368 F.3d at 1275. Therefore, the Tenth Circuit requires courts to consider (1) "whether [the] mistake was honest"; and (2) "whether the defendant was

Plaintiff's original Complaint and Summons provided notice to the Court and Turn Key that

Plaintiff intended to bring claims as the representative of Ms. Sanders' estate. Further, Plaintiff

has since provided documentation supporting that Plaintiff has been appointed to be the

representative of Ms. Sander's estate. By continuing this action, now as the duly-appointed

represented of the estate, Plaintiff has effectively ratified the earlier actions.[31] The Court

therefore finds it has a sufficient basis to determine that Plaintiff has standing to bring a § 1983

claim against Turn Key and will exercise jurisdiction over this claim accordingly.

### b. *Municipal Liability*

Next, Turn Key argues that Plaintiff's § 1983 claim must be dismissed as a matter of law

for Plaintiff's failure to support a claim of municipal liability. In *Monell v. Department of Social*

*Services*,[32] the Supreme Court held that "a municipality cannot be held liable under § 1983 on a

*respondeat superior* theory."[33] Under *Monell*, a government entity "may only be held liable

'when execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"[34]

---

prejudiced thereby" before allowing ratification, joinder, or substitution under Rule 17(a). *Id.* at 1276. Because Plaintiff's original Compliant named him as "representative of the estate," giving the Court and Turn Key notice of his status and claims, and the claims brought by Plaintiff are unchanged, the failure to list him as "representative of the estate" in the Second Amended Complaint could not be a calculated move and Turn Key was not prejudiced by the mistake.

[31] *Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1272 (10th Cir. 1997) ("A proper ratification pursuant to Rule 17(a) requires the ratifying party to authorize continuation of the action, and agree to be bound by the lawsuit's result.").

[32] 436 U.S. 658 (1978).

[33] *Id.* at 691.

[34] *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283–84 (10th Cir. 2019) (quoting *Monell*, 436 U.S. at 694).

"Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."[35] The *Monell* doctrine "has been extended to 'private entities acting under color of state law,' such as medical contractors" like Turn Key.[36] To establish municipal liability, a plaintiff must show (1) the existence of a municipal policy or custom, (2) a direct causal link between the policy or custom and the injury alleged; and (3) deliberate indifference on the part of the municipal entity.[37]

Regarding the first element, the Tenth Circuit has identified the following as amounting to "an official policy or custom":

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.[38]

In support of his claim, Plaintiff points solely to Turn Key's Initial Health Screening Policy J-9 ("Policy J-9") as the policy that has caused the underlying constitutional deprivation. Policy J-9 states,

---

[35] *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403–04 (1997) (citing *Monell*, 436 U.S. at 694).

[36] *Lucas v. Turn Key Health Clinics,* 58 F.4th 1127, 1144 (10th Cir. 2023) (quoting *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003)).

[37] *Id.* at 1145; *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

[38] *Waller*, 932 F.3d at 1283 (quoting *Bryson*, 627 F.3d at 788).

Screenings completed by correctional staff will be reviewed by qualified medical staff in a timely manner. Inmates with current, chronic medical or mental health conditions or prescription medications will be scheduled for a face to face screening/assessment with medical personnel within 48 hours and will be referred to appropriate HCP for review/treatment the next clinical day.[39]

Plaintiff argues that this policy is deficient in that it does not require inmates with chronic medical conditions, like Ms. Sanders, to be seen by a health professional. Plaintiff's designated expert, Dr. Lawrence, opines that the above-quoted policy is inadequate because it states only that the inmate should be "scheduled" and "referred" within the specified time period, but "does not require that inmates with chronic health issues have an in-person visit with a medical provider (mid-level or physician) or that a physical examination be performed by a provider or RN."[40] Dr. Lawrence asserts that such policy is not in line with the National Commission on Correctional Health Care ("NCCHC") standards. Turn Key disputes Plaintiff's interpretation of Policy J-9 as a matter of "semantics" and asserts that the language of the contract plainly does require that a patient meeting the described conditions be seen within the stated time frame.

"[W]hen an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question."[41] Here, the Plaintiff appears to assert that the language of the policy itself violates federal law by not meeting an acceptable standard of care. This argument fails for two reasons.

First, Plaintiff has not pointed to any legal authority supporting that a policy violates the Constitution if it fails to require an inmate with a current, chronic medical or mental health issue

---

[39] Docket No. 212-21 at 2 (SEALED).

[40] Docket No. 212-18 at 17 (SEALED).

[41] *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

to be seen by a medical professional within a certain amount of time. Dr. Lawrence opines that failure to have such a policy does not conform to NCCHC standards. NCCHC is a national organization that establishes "rigorous standards for health services in correctional facilities" and offers a voluntary accreditation program for facilities that meet their standards.[42] That a policy does not conform with industry standards or best practices, does not automatically equate it to a constitutional deprivation.

Second, a plain reading of Policy J-9 does not support Plaintiff's interpretation. Like a contract, the interpretation of a policy is a question of law that can be resolved by the Court at the summary judgment stage.[43] The Court's construction of Policy J-9 "should be a natural and reasonable one, fairly construed to effectuate its purpose, and viewed in the light of common sense so as not to bring about an absurd result."[44] Policy J-9 requires "inmates with current, chronic medical or mental health conditions or prescription medications" to "be scheduled for a face to face screening/assessment with medical personnel within 48 hours and . . . referred to appropriate HCP for review/treatment the next clinical day." Accepting Plaintiff's interpretation of this language would mean that Turn Key intended to have medically or mentally ill inmates referred and scheduled to see a medical professional, but did not intend to have those inmates

---

[42] NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE, ABOUT US, https://www.ncchc.org/about-us/ (Last visited Mar. 14, 2023).

[43] *See Zurich Am. Ins. Co. v. Dillon Cos., LLC*, 595 F. Supp. 3d 1003, 1007 (D. Colo. 2022) ("Both of those elements turn on the interpretation of the contract, a question of law that this Court is well positioned to address without the presentation of additional evidence."); *Kaltenbacher v. Hillcrest HealthcareSystem*, No. 05-CV-0508-CVE-FHM, 2006 WL 2990526, at *3 (N.D. Okla. Oct. 19, 2006) ("[T]he Court will apply general principles of contract construction in interpreting the Policy.").

[44] *Allianz Life Ins. Co. of N. Am. v. Muse*, No. 20-6026, 2022 WL 3701606, at *7 (10th Cir. Aug. 26, 2022) (quoting *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295–96 (Okla. 1974)).

actually seen or treated by a medical professional. This would effectively render the quoted portion of Policy J-9 meaningless and nonsensical. Further, a policy requiring "referring" and "scheduling" an inmate for medical care, but not requiring that the inmate actually receive medical care, would lead to an "absurd result." Though the deadlines prescribed are not a model of clarity, the language of Policy J-9 plainly requires that a chronically ill inmate be seen by a medical professional within days after their incarceration. Therefore, the Court finds Policy J-9 does not violate federal law on its face.

Policy J-9 does not otherwise support Turn Key's liability because the Plaintiff has not provided sufficient evidence to establish the causation or deliberate indifferent prongs of municipal liability. "To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right."[45] "This requirement is satisfied if the plaintiff shows that the municipality was the 'moving force' behind the injury alleged."[46] While Plaintiff has asserted numerous failures by Turn Key employees to provide medical care, Plaintiff has not supported that such failures were caused by a Turn Key policy or practice.

Plaintiff first argues that, had Turn Key employees followed their policies and obtained Ms. Sanders' prior healthcare records, they would have learned that Ms. Sanders suffered from chronic conditions and their "failure to obtain the required records prevented Ms. Sanders from

---

[45] *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks and citations omitted).

[46] *Id.* (quoting *Brown,* 520 U.S. at 404).

being seen [by a doctor or physician's assistant], [which] ultimately resulted in her death."[47]

Somewhat in opposite, Plaintiff also argues that Turn Key "was well aware that Brenda Sanders suffered from hypertension and was a chronic care patient who should have been seen by a provider. However, their policies did not require that she be seen by a provider," which "could have saved [her] life."[48] Regarding the first argument, that an employee failed to follow a policy cannot, by itself, establish causation for municipal liability.[49] Regarding the second argument, as discussed, the plain language of Turn Key's policy J-9 *does* contemplate that a chronically ill patient will be seen and treated by a medical professional, negating that the policy caused her lack of treatment.  Therefore, neither argument supports that Policy J-9, or any other Turn Key policy, was the "moving of force" behind Ms. Sanders' tragic death.

Finally, Plaintiff has not provided evidence supporting deliberate indifference on the part of Turn Key. "In any § 1983 suit . . . the plaintiff must establish the state of mind required to prove the underlying violation."[50] "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to

---

[47] Docket No. 211. at 6; *see also Id*. at 7 ("Defendant should have obtained Sanders medical records, Sanders should have been classified with chronic conditions requiring a visit by a physician, a physician would have immediately recognized the symptoms that lead to Sanders' death and could have been treated preventing the death of Sanders.").

[48] *Id.* at 25.

[49] *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007) ("[M]unicipalities cannot be held liable for unauthorized actions by their employees. . . . [W]hen [employees] act inconsistently with official policy or custom, though perhaps even still within the scope of employment, that will not suffice [to establish municipal liability].").

[50] *Brown*, 520 U.S. at 405.

disregard the risk of harm."[51] Again, Plaintiff has alleged that "there were many constitutional deprivations by specific [Turn Key] employees."[52] However, Plaintiff has failed to sufficiently tie these alleged failures by individual Turn Key employees to Turn Key as a municipal entity. Specifically, there is no evidence before the Court showing that Turn Key was on notice that Policy J-9, or any other of its policies, was "substantially certain to result in a constitutional violation." Nor is there evidence before the Court showing that Turn Key was otherwise on notice of its employees' alleged constitutional violations. At best, Plaintiff has shown that Turn Key's policy fell below industry standards, which might demonstrate negligence but is not sufficient to demonstrate deliberate indifference.

Plaintiff has failed to demonstrate an issue of fact regarding any of the necessary elements to establish municipal liability under § 1983. Further, since Plaintiff did not bring claims against any of the individual employees of Turn Key, the Court need not address the parties' remaining arguments. The Court accordingly dismisses the Plaintiff's first cause of action as a matter of law.

c. *Claims Under Oklahoma State Law*

Each of Plaintiff's three remaining causes of action are brought under Oklahoma tort law. Turn Key argues that each of these claims is subject to dismissal as a matter of law because Turn Key is immune from tort liability under the sovereign immunity provision of the Oklahoma

---

[51] *Barney,* 143 F.3d at 1307.

[52] Docket No. 211 at 26; *see also id.* at 29 ("All of these actions, or inactions, show that Defendant's employees . . . knew or should have known (through blissful ignorance) of the medical needs that Brenda Sanders required and the potential risks of Brenda Sanders['] health and symptoms.").

Government Tort Claims Act ("GTCA").[53] Plaintiff disagrees and argues that, as an independent contractor, Turn Key is not granted immunity by the GTCA. Resolution of this issue will require the Court to engage in statutory interpretation of Oklahoma state law.

Where a court dismisses the federal claims over which it had original jurisdiction, "the question becomes whether it [has] any basis on which to retain supplemental jurisdiction over the [remaining] state law claims."[54] "[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims."[55] While this decision is left to the discretion of the district court, the Tenth Circuit has made clear that, "[w]hen all federal claims have been dismissed, the court . . . usually should . . . decline to exercise jurisdiction over any remaining state claims."[56] Though the claims at issue have been pending in federal court for a number of years, given the Tenth Circuit's clear directive and that resolution of the remaining claims depend primarily on interpretation of Oklahoma statute, the Court dismisses the remaining claims so that they may be resolved by an Oklahoma state court.

---

[53] Okl. Stat. Ann. § 152.1 ("The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.").

[54] *Est. of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004).

[55] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[56] *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).

## IV. CONCLUSION

It is therefore

ORDERED that Turn Key's Motion for Summary Judgment (Docket No. 194) is GRANTED in part. Plaintiff's First Cause of Action is dismissed with prejudice, while the remaining three causes of action are dismissed without prejudice. It is further

ORDERED that the Parties' respective Motions in Limine (Docket Nos. 190, 191, 192, 193, and 195) are DISMISSED as moot.

DATED this 22nd day of March, 2023.

BY THE COURT:

_____

Ted Stewart
United States District Judge